**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

NASRIN KALANTARIPOUR,

      Plaintiff,                               Case No. 1:21-cv-00272-JMC

    -against-

THE GEORGE WASHINGTON
MEDICAL FACULTY ASSOCIATES,

    Defendant.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTUAL SUMMARY ................................................................................................... 2

LEGAL STANDARD....................................................................................................... 5

ARGUMENT .................................................................................................................... 6

I.     MFA DID NOT DISCRIMINATE AGAINST MS. KALANTARIPOUR...................... 6

       A. MFA Fired Kalantaripour For Poor Performance........................................... 7

       B. MFA's Reasons For Firing Kalantaripour Are Not Pretext For Intentional
          Discrimination.............................................................................................. 9

       C. Ms. Kalantaripour Cannot Create An Inference Of Discrimination. ........................ 12

       D. Ms. Kalantaripour Was Not Subjected To A Hostile Work Environment. ................. 16

II.    MFA DID NOT RETALIATE AGAINST MS. KALANTARIPOUR. .......................... 19

       A. Ms. Kalantaripour Did Not Engage In Protected Activity........................................ 20

       B. No Causal Connection Between Protected Activity and Termination......................... 25

       C. Ms. Kalantaripour Cannot Show That "But For" Her Complaint She Would Not
          Have Been Fired, Or That MFA's Reasons For Firing Her Were Pretext........... 28

III.   PLAINTIFF DID NOT EXHAUST HER CLAIMS AGAINST DR. EHRLICH ............ 28

CONCLUSION................................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akonji v. Unity Healthcare, Inc.*,
   517 F. Supp. 2d 83 (D.D.C. 2007) ........................................................................16

*Akosile v. Armed Forces Ret. Home*,
   141 F. Supp. 3d 75 (D.D.C. 2015) ........................................................................12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................5, 6

*Baird v. Gotbaum*,
   792 F.3d 166 (D.C. Cir. 2015) ............................................................................15

*Bennett v. Solis*,
   729 F. Supp. 2d 54 (D.D.C. 2010) ........................................................................10

*Brady v. Off. of Sergeant at Arms*,
   520 F.3d 490 (D.C. Cir. 2008) ..............................................................6, 9, 11, 29

*Broderick v. Donaldson*,
   437 F.3d 1226 (D.C. Cir. 2006) ..........................................................................25

*Brooks v. Grundmann*,
   748 F.3d 1273 (D.C. Cir. 2014) ..........................................................................18

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ..........................................18

*Burton v. District of Columbia*,
   153 F. Supp. 3d 13 (D.D.C. 2015) ........................................................................7

*Carter v. George Wash. Univ.*,
   387 F.3d 872 (D.C. Cir. 2004) ..............................................................................7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................5, 6

*Chowdhury v. Schafer*,
   587 F. Supp. 2d 257 (D.D.C. 2008) ......................................................................10

*Clemmons v. Acad. for Educ. Dev.*,
   107 F. Supp. 3d 100 (D.D.C. 2015) ......................................................................24

*Copeland v. Arklay LLC*,
  273 F. Supp. 3d 69 (D.D.C. 2017) ....................................................................27

*Desmond v. Mukasey*,
  530 F.3d 944 (D.C. Cir. 2008) ..........................................................................9

*Dhuria v. Trustees of U.D.C.*,
  827 F. Supp. 818 (D.D.C. 1993) ......................................................................28

*Douglas v. Donovan*,
  559 F.3d 549 (D.C. Cir. 2009) ........................................................................18

*Fischbach v. D.C. Dept. of Corr.*,
  86 F.3d 1180 (D.C. Cir. 1996) ..........................................................................9

*Furey v. Mnuchin*,
  334 F. Supp. 3d 148 (D.D.C. 2018) ..................................................................25

*Ginger v. D.C.*,
  477 F. Supp. 2d 41 (D.D.C. 2007), aff'd, 527 F.3d 1340 (D.C. Cir. 2008) ............19

*Gray v. Foxx*,
  637 F. App'x 603 (D.C. Cir. 2015) ...................................................................18

*Gregg v. Hay Adams Hotel*,
  942 F. Supp. 1 (D.D.C. 1996) ..........................................................................28

*Gulley v. D.C.*,
  474 F. Supp. 3d 154 (D.D.C. 2020) ..................................................................12

*Hampton v. Vilsack*,
  685 F.3d 1096 (D.C. Cir. 2012) .........................................................................7

*Harris v. D.C. Water & Sewer Auth.*,
  791 F.3d 65 (D.C. Cir. 2015) ...........................................................................19

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ..........................................................................................17

*Harris v. McDonald*,
  No. 17-594, 2017 WL 4217101 (D.D.C. Sept. 19, 2017) .....................................26

*Hicklin v. McDonald*,
  235 F. Supp. 3d 242 (D.D.C. 2017) ..................................................................13

*Hodges v. Washington Tennis Serv. Int'l, Inc.*,
  870 F. Supp. 386 (D.D.C. 1994) ........................................................................7

iii

*Holbrook v. Reno*,
   196 F.3d 255 (D.C. Cir. 1999) ........................................................................................11

*Hovsepyan v. Blaya*,
   770 F. Supp. 2d 259 (D.D.C. 2011) ................................................................................10

*Huang v. Wheeler*,
   215 F. Supp. 3d 100 (D.D.C. 2016) ................................................................................28

*Hunter v. D.C.*,
   905 F. Supp. 2d 364 (D.D.C. 2012), *aff'd sub nom. Hunter v. D.C. Gov't,* No.
   13-7003, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013)..................................................25

*Iweala v. Operational Techs. Servs., Inc.*,
   634 F. Supp. 2d 73 (D.D.C. 2009) ....................................................................................7

*Jones v. Billington*,
   12 F. Supp. 2d 1 (D.D.C. 1997) ........................................................................................6

*Jones v. D.C. Water & Sewer Auth.*,
   No. CV 12-1454 (JEB), 2016 WL 659666 (D.D.C. Feb. 18, 2016) ................................19

*Kelly v. Mills*,
   677 F. Supp. 2d 206 (D.D.C. 2010), *aff'd*, No. 10-5049, 2010 WL 5110238
   (D.C. Cir. Dec. 14, 2010).................................................................................................9

*Knight v. Mabus*,
   134 F. Supp. 3d 348 (D.D.C. 2015) ................................................................................19

*Langley v. Napolitano*,
   677 F. Supp. 2d 261 (D.D.C. 2010) ................................................................................28

*Lemmons v. Georgetown Univ. Hosp.*,
   431 F.Supp.2d 76 (D.D.C. 2006) ....................................................................................24

*Lewis v. D.C.*,
   653 F.Supp.2d 64 (D.D.C. 2009) ....................................................................................16

*Marshall v. Potter*,
   634 F. Supp. 2d 66 (D.D.C. 2009) ..................................................................................27

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)...........................................................................................................5

*Mitchell v. Powell*,
   No. 17-CV-00182 (APM), 2018 WL 6735800 (D.D.C. Dec. 24, 2018) ........................17

*Mitchell v. Toledo Hosp.*,
  964 F.2d 577 (6th Cir. 1992) .......................................................................................11

*Morgan v. Washington Metro. Area Transit Auth.*,
  No. CV 15-0401 (RC), 2016 WL 6833926 (D.D.C. Nov. 18, 2016).......................................18

*Morris v. McCarthy*,
  825 F.3d 658 (D.C. Cir. 2016) .....................................................................................26

*National R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).................................................29

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998).............................................................................................16, 17

*Park v. Howard Univ.*,
  71 F.3d 904 (D.C. Cir. 1995) .....................................................................................16

*Patterson v. Johnson*,
  505 F.3d 1296 (D.C. Cir. 2007) ...................................................................................18

*Peters v. District of Columbia*,
  873 F.Supp.2d 158 (D.D.C. 2012) ...............................................................................16

*Peters v. Renaissance Hotel Operating Co.*,
  307 F.3d 535 (7th Cir. 2002) .....................................................................................29

*Phillip v. Holladay Prop. Servs.*,
  937 F. Supp. 32 (D.D.C. 1996) ...................................................................................11

*Rattigan v. Holder*,
  982 F. Supp. 2d 69 (D.D.C. 2013) ..........................................................................19, 28

*Richard v. Bell Atlantic Corp.*,
  167 F. Supp. 2d 34 (D.D.C. 2001) ...............................................................................11

*Román v. Castro*,
  149 F. Supp. 3d 157 (D.D.C. 2016) ..............................................................................27

*Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
  507 F. Supp. 2d 93 (D.D.C. 2007), *aff'd*, 548 F.3d 137 (D.C. Cir. 2008)...........................8, 13

*Sitar v. Ind. Dep't of Tranp.*,
  344 F.3d 720 (7th Cir. 2003) .....................................................................................24

*Solomon v. Vilsack*,
  734 F.3d 1 (D.C. Cir. 2014) .........................................................................................9

v

*Sparrow v. United Air Lines, Inc.*,
    216 F.3d 1111 (D.C. Cir. 2000) ........................................................................7

*Talavera v. Shah*,
    638 F.3d 303 (D.C. Cir. 2011) .........................................................................26

*Timmons v. U.S. Capitol Police Bd.*,
    407 F. Supp. 2d 8 (D.D.C. 2005) .....................................................................25

*Univ. of Texas Southwestern Med. Ctr. v. Nassar*,
    570 U.S. 338, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013) ...............................19

*Uzlyan v. Solis*,
    706 F. Supp. 2d 44 (D.D.C. 2010) ...................................................................29

*Vatel v. Alliance of Auto. Mfrs.*,
    627 F.3d 1245 (D.C. Cir. 2011) .......................................................................13

*W. World Ins. Co. v. Stack Oil, Inc.*,
    922 F.2d 118 (2d Cir. 1990) ..............................................................................6

*Walker v. Children's Nat'l Med. Ctr.*,
    236 F. Supp. 3d 136 (D.D.C. 2017) .................................................................26

*Walker v. Johnson*,
    798 F.3d 1085 (D.C. Cir. 2015) .........................................................................7

*Waterhouse v. D.C.*,
    298 F.3d 989 (D.C. Cir. 2002) .........................................................................13

*Webster v. United States Dep't of Energy*,
    443 F. Supp. 3d 67 (D.D.C. 2020) ...................................................................10

*Welzel v. Bernstein*,
    436 F.Supp.2d 110 (D.D.C. 2006) ...................................................................23

*White v. Vilsack*,
    888 F. Supp. 2d 93 (D.D.C. 2012) ..............................................................28, 29

*Wiley v. Glassman*,
    511 F.3d 151 (D.C. Cir. 2007) .........................................................................19

## Statutes

42 U.S.C. § 1981 ...............................................................................................7, 19

## Other Authorities

Fed. R. Civ. P. 56(c) ...............................................................................................5

Medical Faculty Associates, Inc. ("MFA"), by counsel, submits this memorandum of points and authorities in support of its Motion for Summary Judgment.

## <u>INTRODUCTION</u>

MFA terminated Nasrin Kalantaripour's employment because of her ongoing performance issues and her failure to improve. After being disciplined for her poor performance, including making a false statement, Ms. Kalantaripour was placed on a performance improvement plan. Unfortunately, her performance did not improve and her employment was terminated. Ms. Kalantaripour's race, gender and national origin had nothing to do with the decision.

In fact, Ms. Kalantaripour concedes no derogatory comments were made about her race, gender or national origin—or her accent—and she cannot create an inference of discrimination by now claiming she was told there were communications issues, or that she did not understand her bosses or they did not understand her. This is particularly true when it is undisputed that Ms. Kalantaripour's accent did not impede communication and, instead, she was told there was a "lack of full transparency" in her communications, and they were inconsistent and not timely.

Even if Ms. Kalantaripour could raise an inference of discrimination, she cannot demonstrate that MFA's reasons for terminating her employment were pretextual and that discrimination was the real reason.

Similarly, Ms. Kalantaripour cannot show the decision makers were aware of alleged protected activity, much less that any such activity could be causally connected to her placement on a performance improvement plan or the termination of her employment. Further, even if Ms. Kalantaripour could demonstrate knowledge of protected activity or a causal connection between such activity and an adverse employment action, she cannot show that MFA's reasons for firing her were pretextual, and that "but for" alleged protected activity, she would not have been fired.

Summary judgment should be granted in MFA's favor.

## FACTUAL SUMMARY[1]

MFA is a 501(c)(3) not-for-profit physician-lead practice group.  (SOMF ¶ 1)  It is the largest independent physician practice in the Washington, DC metro area, with more than 750 physicians.  (SOMF ¶ 1)  In May 2018, MFA hired Nasrin Kalantaripour to be the Practice Manager for Neurology, Neurosurgery, Psychiatry, and Dermatology.  (SOMF ¶ 2) Ms. Kalantaripour was recruited and hired by Adrien Saks, the Practice Group Administrator, to whom she also reported.  (SOMF ¶ 4)  Ms. Kalantaripour's race, gender and national origin, or her accent, did not prevent her from being hired.  (SOMF ¶ 5)

In July 2018, MFA directed Ms. Kalantaripour to focus on Dermatology.  (SOMF ¶ 10) As Practice Manager, she was responsible for the day to operations and administrative functioning of the Department. (SOMF ¶¶ 7-8)  Unfortunately, as Dr. Adam Friedman, who became interim and then Chair of the Department, wrote to MFA's human resources department in December 2018, "I'm sorry to say [Ms. Kalantaripour] cannot do this job.  Plain and simple." (SOMF 9 45)

Dr. Friedman's complaint to HR followed a communication to Ms. Kalantaripour, in which he made clear that her inability to properly manage schedules "drastically impacts patient care and satisfaction, which is already at an all-time low."  (SOMF ¶ 44)

---

[1] MFA's Statement of Material Facts As to Which There is No Genuine Dispute ("SOMF"), is filed with this Motion.  Attached to it are:  Exhibit A, Declaration of Pamela McClain; Exhibit B, Excerpts of Deposition Testimony of Plaintiff Nasrin Kalantaripour; Exhibit C, Excerpts of Deposition Testimony of Adrien Saks; Exhibit D, Excerpts of Deposition Testimony of Dr. Vishal Patel; Exhibit E, Declaration of Dr. Vishal Patel; Exhibit F, Excerpts of Deposition Testimony of Dr. Adam Friedman; Exhibit G, Declaration of Dr. Adam Friedman; Exhibit H, Declaration of Adrien Saks.

Dr. Friedman's complaint followed numerous complaints by Dr. Vishal Patel, Director of Dermatological Surgery, about Ms. Kalantaripour's poor performance. (SOMF ¶¶ 15-29) Dr. Patel, who was hired in October 2018, received numerous patient complaints about scheduling issues in his first month on the job, and found Ms. Kalantaripour to be unreliable and untrustworthy in her communications with him. (SOMF ¶¶ 12, 16)

On November 28, 2018, two days after Dr. Patel asked Ms. Kalantaripour, "Can you let me know why this [scheduling error] is still happening or what the reason is here?", she complained to HR about Dr. Alison Ehrlich, who was then head of the Department. (SOMF ¶¶ 26, 30) Ms. Kalantaripour's e-mail complaint said Dr. Ehrlich was "unprofessional," but makes no mention of discrimination. (SOMF ¶ 30)

Dr. Ilana DeLuca, another dermatologist in the Department, also complained about Ms. Kalantaripour's performance, writing, "I have had continuing staffing issues since I began working here in October and have now reached a point where I am unable to provide appropriate patient care given the decisions as outlined [in my e-mail to Ms. Kalantaripour]." (SOMF 49)

Consistent with Dr. Patel's experiences regarding Ms. Kalantaripour's lack of trustworthiness, after directing Ms. Kalantaripour to order surgical instruments on January 10, 2019, Dr. Patel heard nothing further from her about the order, so he followed up by e-mail of January 22, 2019, asking for the status. (SOMF ¶¶ 58-60) Ms. Kalantaripour responded that day, claiming, "I have placed the order." Dr. Patel asked for the specific date the order was placed, but Ms. Kalantaripour did not respond to the question. (SOMF ¶¶ 61-63) Instead, she told him, "No need to bore you with the process." (SOMF ¶ 63) Dr. Patel then raised the issue with Pamela McClain, MFA's Chief Operating Officer, who looked into it and found the instrument order was not placed until January 23, 2019, the day after Dr. Patel asked about it.

(SOMF ¶ 66)  Accordingly, Ms. McClain issued Ms. Kalantaripour a disciplinary memo

regarding the incident and wrote in part:

> Nasrin, your handling of this issue is not acceptable.  It is an example of similar
> behavior the physicians have expressed to me—lack of responsiveness, poor
> follow-up and communication…An immediate and sustained improvement is
> required with regard to timely communication and follow up.  Otherwise,
> progressive disciplinary action, leading up to and including termination, may be
> taken.

(SOMF ¶ 68)

Unfortunately, no improvement was seen and, on February 14, 2019, Ms. Kalantaripour

was placed on a performance improvement plan.  The PIP in part said:

> You have received ongoing feedback regarding [performance] issues, including
> discussions on December 10th and January 25th and by e-mail on December 5th.
> Overall, you are not meeting the expectations of your position as Practice
> Manager…Timely communication and follow up is lacking.  There has also been
> a lack of full transparency in your communications, leading the parties with
> whom you communicate to believe that actions or activities are complete or near
> completion when in reality they are not.  This then leads to a mistrust of the
> information you are providing.  At times there also appear to be gaps and
> inconsistencies in communication between you and your staff, where you do not
> clearly convey necessary information to everyone who needs it.  Due in part to
> your poor communication, many department members have lost respect for you.
> This makes it harder for you to work effectively with providers and staff…

(SOMF ¶¶ 71-78)

Ms. Kalantaripour did not demonstrate improvement, however, and, in fact, complaints

about continued.  For example, Elizabeth Hazuka, Dr. Friedman's Medical Assistant, on March

5, 2019, wrote in part:

> [Kalantaripour] will lie to patients and staff directly and will not admit to making
> any mistakes.  I feel that I am constantly picking up after her, yet she will not own
> up to any mistake that she has made.  She will blame everyone else or lie about
> what happened.

(SOMF ¶ 81)

MFA terminated Ms. Kalanataripour's employment on March 22, 2019.  (SOMF

¶ 82)

No derogatory comments about Ms. Kalanataripour's race, gender or national origin,

were made to or about her, and no one made fun of or mocked her accent.  (SOMF ¶¶ 90, 93)

And her accent did not impede communications.  (SOMF ¶ 94-95)  Mr. Saks and Ms. McClain,

who made the termination decision, did so because of Ms. Kalantaripour's performance failings.

(SOMF ¶¶ 87, 95,112)  Her accent had nothing to do with it.  (SOMF ¶ 87)  Further, they were

not aware of any discrimination complaint she now says she may have made before she was

placed on a performance improvement plan or fired.  (SOMF ¶ 114)

## LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, affidavits, and

other discovery establish that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The party seeking summary judgment bears the initial

responsibility of identifying the bases for its motion and those portions of the record that

demonstrate the absence of a genuine factual issue.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  If the movant satisfies this burden, the non-moving party must proffer admissible

evidence demonstrating that a trial is required because disputed issues of material fact exist.

*Liberty Lobby*, 477 U.S. at 249.

For a plaintiff to survive summary judgment, she "must do more than simply show that

there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Nor may the non-movant rely on evidence that is

merely colorable, conclusory or speculative; rather, she must present "concrete evidence from

which a reasonable [fact-finder] could return a verdict in his favor."  *Liberty Lobby,* 477 U.S. at

256; *see also W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient, there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby, Inc.*, 477 U.S. at 252.

The Supreme Court has made clear that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp.*, 477 U.S. at 327.

Discovery demonstrates that Ms. Kalantaripour's claims are based on speculation and suspicion, not admissible evidence. District of Columbia courts have readily granted summary judgment in cases like this, premised on allegations of discrimination for which there is no evidence. *E.g., Jones v. Billington*, 12 F. Supp. 2d 1 (D.D.C. 1997). The same result is warranted here.

## ARGUMENT

## I.    MFA DID NOT DISCRIMINATE AGAINST MS. KALANTARIPOUR

At summary judgment, if "an employer has asserted a legitimate non-discriminatory reason for the [challenged action], [a] district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Off. of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, "... the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason." *Id*. Where an employer asserts a legitimate, nondiscriminatory reason for an adverse employment action, "the burden-shifting framework disappears, and a court reviewing summary

judgment looks to whether a reasonable jury could infer intentional discrimination ... from all the evidence." *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).[2]

In making this determination, a court may consider evidence of a *prima facie* case, evidence offered to rebut the employer's reasons for its action, and any other evidence of discrimination. *Hampton v. Vilsack,* 685 F.3d 1096, 1100 (D.C. Cir. 2012). Importantly, Ms. Kalantaripour's disagreement with or disbelief in the reasons MFA fired her, cannot demonstrate that a reasonable jury could find discrimination. *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 58 (D.D.C. 2015). She must produce evidence demonstrating MFA's reasons were false, and that it intentionally discriminated against her because of her race, gender or national origin. *Walker v. Johnson*, 798 F.3d 1085, 1096 (D.C. Cir. 2015). This she cannot do.

### A.  MFA Fired Kalantaripour For Poor Performance.

The evidence demonstrating Ms. Kalantaripour's poor performance is significant and from multiple sources. MFA has strong legitimate business reasons for terminating her employment.

Dr. Friedman said flatly that Ms. Kalantaripour could not do the job, "plain and simple." (SOMF ¶ 45) Dr. Patel made multiple complaints about Ms. Kalantaripour, stating at one point, "When we met, I thought we went through this and identified what changes need to be made and you told me they would be corrected. It is frustrating that it has not been done since we discussed last week…This is now the 4th time we have discussed this since I started and I have tried to get the schedule right…" (SOMF ¶ 19) Dr. DeLuca wrote, "I have had continuing

---

[2] "The same framework applies to § 1981 claims." *Iweala v. Operational Techs. Servs., Inc.*, 634 F. Supp. 2d 73, 81 (D.D.C. 2009); *see also, Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 n. 3 (D.C. Cir. 2000) ("[T]he same framework is used for evaluating claims under 42 U.S.C. § 1981" and Title VII.); *Hodges v. Washington Tennis Serv. Int'l, Inc.*, 870 F. Supp. 386, 387 n.1 (D.D.C. 1994) ("This Circuit has used the same standards as to what constitutes a hostile environment under both Title VII and 42 U.S.C. 1981.").

staffing issues since I began working here in October and have now reached a point where I am unable to provide appropriate patient care given the decisions as outlined [in my e-mail to Kalantaripour]."  (SOMF ¶ 49)  Elizabeth Hazuka, a Medical Assistant, complained, "[Kalantaripour] will lie to patients and staff directly and will not admit to making any mistakes. I feel that I am constantly picking up after her, yet she will not own up to any mistake that she has made.  She will blame everyone else or lie about what happened."  (SOMF ¶ 81)

Ms. Kalantaripour's lack of candor and non-responsiveness resulted in Pamela McClain issuing her a disciplinary memo due to her failure to properly order instruments as directed:  "It is an example of similar behavior the physicians have expressed to me—lack of responsiveness, poor follow-up and communication…An immediate and sustained improvement is required with regard to timely communication and follow up."  (SOMF ¶ 68)

Ms. Kalantaripour's performance shortcomings resulted in the issuance of a performance improvement plan which said in part:  "Timely communication and follow up is lacking.  There has also been a lack of full transparency in your communications, leading the parties with whom you communicate to believe that actions or activities are complete or near completion when it reality they are not.  This then leads to a mistrust of the information you are proving.  At times there also appear to be gaps and inconsistencies in communication between you and your staff, where you do not clearly convey necessary information to everyone who needs it."  (SOMF ¶¶ 75-78)

In short, MFA relied on and offers compelling legitimate non-discriminatory reasons for its actions. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 2d 93, 106 (D.D.C. 2007), *aff'd*, 548 F.3d 137 (D.C. Cir. 2008) ("[F]ailure to perform satisfactorily is one of the 'most common legitimate reasons for discharge.'").  Ms. Kalantaripour cannot show these

reasons are pretextual and that intentional race, gender and national origin discrimination were the real reasons.

**B.    MFA's Reasons For Firing Kalantaripour Are Not Pretext For Intentional Discrimination.**

In order to demonstrate pretext, Ms. Kalantaripour must provide evidence discrediting MFA's reasons for firing her and show they are "unworthy of credence" and that intentional discrimination was the real reason. *Brady,* 520 F.3d at 495-496; *Solomon v. Vilsack,* 734 F.3d 1, 15 (D.C. Cir. 2014). The question is not whether Ms. Kalantaripour disagrees with MFA's description of the events or the enforcement of its policies, it is whether she can show that the reasons MFA relied on are false, *i.e.,* that MFA is lying about its stated reasons and that intentional discrimination was the real reason. *See Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008) ("[I]t will not do for the plaintiff to show that the employer's stated reason was false if the employer believed it in good faith; the plaintiff must establish a basis to conclude that the employer has lied about the reason or, more directly, that the reason was discriminatory."). Of course, "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Fischbach v. D.C. Dept. of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Given the compelling undisputed evidence here, the Court need go no further in order to grant summary judgment in favor of MFA. Summary judgment should be granted. *Kelly v. Mills*, 677 F. Supp. 2d 206, 223 (D.D.C. 2010), *aff'd*, No. 10-5049, 2010 WL 5110238 (D.C. Cir. Dec. 14, 2010) (granting summary judgment where defendant presented "credible and persuasive evidence showing that plaintiff was placed on a PIP and ultimately terminated because of his unacceptable job performance" and where, with regard to pretext, to "the extent that [plaintiff]s

9

supervisor] treated [plaintiff's comparator] differently by speaking to him in Spanish, writing him notes and inviting him to his office, there is no evidence to suggest that this behavior had anything to do with [plaintiff's] race"); *Webster v. United States Dep't of Energy*, 443 F. Supp. 3d 67, 84 (D.D.C. 2020) (granting summary judgment where PIP "was based on legitimate, nondiscriminatory, nonretaliatory reasons," where plaintiff "was told that she had 90 days to improve her performance after receiving the counseling memorandum, yet she failed to do so," where PIP "was designed to help her improve her performance" and where plaintiff "has been unable to show that DOE's stated reasons for placing her on a PIP were merely pretextual, and no reasonable juror could find otherwise"); *Hovsepyan v. Blaya*, 770 F. Supp. 2d 259, 269 (D.D.C. 2011) (granting summary judgment where "no reasonable jury could disagree . . . that [plaintiff] was 'given a reasonable opportunity to demonstrate sustained acceptable performance . . . but failed to do so' . . . nor could it find from the evidence that [defendant's] reasoning was pretextual and that he really fired [plaintiff] because of his age"); *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010) (granting summary judgment where "plaintiff was placed on a PIP and was given an opportunity to raise his performance to an acceptable level but failed to do so"); *Chowdhury v. Schafer*, 587 F. Supp. 2d 257, 264 (D.D.C. 2008) (granting summary judgment where defendant "presented evidence of a legitimate, non-discriminatory reason for Chowdhury's termination: his performance was unacceptable and after being given a chance to improve, he continued to produce unacceptable work product" where plaintiff failed to complete performance improvement plan and failed to raise performance to an acceptable level).

 If, however, the Court looks beyond the voluminous evidence of poor performance and considers whatever evidence of alleged pretext Ms. Kalantaripour offers, the result is unchanged. Ms. Kalantaripour cannot show pretext.

10

The most common evidence used to attempt to demonstrate pretext, is evidence showing that similarly situated employees received more favorable treatment.  *Brady,* 520 F.3d at 495. With respect to evidence of similarly situated employees allegedly being treated differently, Ms. Kalantaripour has nothing to offer:

> Q:     Can you identify for me any employee who had the same number of complaints about them that you did and didn't get fired?
>
> Mr. Branch:  Objection, calls for speculation.
>
> A:      I don't know.

(SOMF ¶ 109)

At most, Ms. Kalantaripour claims she did not see Dr. Patel or Dr. Ehrlich treat anyone else the way they treated her.  Of course, without identification of a similarly situated employee who was allegedly treated differently, this is just speculation.  *See Richard v. Bell Atlantic Corp.*, 167 F. Supp. 2d 34, 42 (D.D.C. 2001) (assumption and speculation do not constitute the "sufficient" and "substantial" evidence she is required to produce to defeat summary judgment). Indeed, in order to identify a similarly situated and valid comparator, Ms. Kalantaripour must do more than speculate, she must come forward with an MFA employee who is similarly situated to her in "all material respects."  *See e.g., Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (in order to show a similarly situated comparator, plaintiff must demonstrate that all relevant aspects of employment situation were nearly identical to proposed comparator).

In order to be deemed similarly situated "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Phillip v. Holladay Prop. Servs.,* 937 F. Supp. 32, 37 (D.D.C. 1996) (*citing Mitchell v. Toledo*

11

*Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis added)).  Ms. Kalantaripour cannot identify

any MFA employee who had multiple physicians complain about her performance, accuse her of

lying, who was given a disciplinary memo and placed on a performance improvement plan, but

was not fired.  Ms. Kalantaripour cannot show MFA's reasons for firing her were pretext.

*Gulley v. D.C.*, 474 F. Supp. 3d 154, 167 (D.D.C. 2020) ("[Plaintiff] has the burden to prove his

comparators were similarly situated. And the lack of evidence of similarity is itself reason to

grant summary judgment."); *Akosile v. Armed Forces Ret. Home*, 141 F. Supp. 3d 75, 92 (D.D.C.

2015) ("Where, as here, a plaintiff fails to identify any similarly-situated comparators, an

inference of falsity or discrimination is not reasonable. The plaintiff having failed to put forth

any evidence that would suggest that the defendant's legitimate, non-discriminatory reasons for

his termination constitute pretext, the Court must grant the defendant's motion for summary

judgment with respect to the claim concerning his dismissal.") (internal citation and quotation

omitted).

### C.    Ms. Kalantaripour Cannot Create An Inference Of Discrimination.

The gravamen of Ms. Kalantaripour's lawsuit is that if Dr. Ehrlich and Dr. Patel told her

she did not understand what they were asking, or they did not understand her response to a

question, this somehow means they mocked her accent and, therefore, the issuance of a

disciplinary memo by Ms. McClain, and her placement on a PIP and the termination of her

employment by Ms. McClain and her immediate supervisor, Adrien Saks, were somehow tainted

with discriminatory animus.

This argument fails in the first instance, because there is no evidence that Ms. McClain or

Mr. Saks[3] took action because of discriminatory animus and, instead, did so based on clear

---

[3] Neither Plaintiff's race, sex, nor national origin prevented Mr. Saks from recruiting or hiring
Plaintiff.  (SOMF at ¶¶ 4-5)  It defies logic that Mr. Saks would hire Ms. Kalantaripour and then

performance failures. *See Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 2d 93,

110 (D.D.C. 2007), *aff'd,* 548 F.3d 137 (D.C. Cir. 2008) (granting summary judgment and

holding: "It may be that the decision to terminate the plaintiff was overly sudden or even, on

balance, unfair, but the plaintiff has provided no evidence at all that it was motivated by his

employer's discriminatory intent, and that is the question that the Court must answer.").  Even

assuming for the sake of argument, however, that Dr. Ehrlich and Dr. Patel were somehow

responsible for the employment actions at issue, it is undisputed that neither ever mocked or

made fun of Ms. Kalantaripour's accent, or said anything discriminatory to or about her.

### **Dr. Ehrlich**

> Q:    *Okay.  When you said—you just said, you don't understand what I'm saying.
> That's Dr. Ehrlich telling you, you are not understanding her, correct?*
>
> A:    *It is both ways.  Correct.*
>
> Q:    *And you think that has something to do with your accent?*
>
> A:    *Something to do with my national origin.*
>
> Q:    *Okay.  Well, can you explain how that could be?*
>
> A:    *It's like, you know, do you understand this word?  You know, because you're not
> American, you're not born here, you don't understand.*
>
> Q:    *But she never said that to you, did she?*
>
> A:    *She put it in a way that you don't understand what I'm saying.  It's a
> misunderstanding—you don't understand what I'm saying.  Do you understand
> what I'm saying?  You didn't understand me.*

---

discriminatorily terminate her employment just nine months later.  "[W]hen the person who
made the decision to fire was the same person who made the decision to hire, it is difficult to
impute to [that person] an invidious motivation that would be inconsistent with the decision to
hire." *Hicklin v. McDonald*, 235 F. Supp. 3d 242, 248 (D.D.C. 2017) (*citing Vatel v. Alliance of
Auto. Mfrs*., 627 F.3d 1245, 1247 (D.C. Cir. 2011) and *Waterhouse v. D.C*., 298 F.3d 989, 996
(D.C. Cir. 2002)).

Q:    And you interpret that to mean it has something to do with your accent?

A:    That was my observation.

Q:    Even though each of these incidents you referred to is about an issue that she believes you didn't handle correctly, right?

A:    Those are false accusations.

*        *        *

Q:    [Dr. Ehrlich] never called you a discriminatory name, did she?

A:    I don't recall calling discriminatory name.

Q:    She never called you a racist name, did she?

A:    I don't recall.

Q:    She never made any derogatory comments about you being Iranian, did she?

A:    I don't recall.

Q:    She never made any derogatory comments about you being Persian, did she?

A:    I don't recall

Q:    She never made any derogatory comments about you not being from America, did she?

A:    I don't recall.

*        *        *

Q:    And she never made any derogatory comments to you about the fact you were a woman, did she?

A:    No. Not that I recall.

(SOMF ¶¶ 90, 93, 97)

### **Dr. Patel**

Q:    Okay. Now, we went through each of the six incidents in which you claim Dr. Patel treated you inappropriately, and I asked you in each one whether you told

14

*me everything that he said, and you did. And in none of those incidents did he mock your accent, did he?*

A:    *He said he doesn't understand me. He said he's misunderstanding. Do you even understand what this says?*

Q:    *And he never once made a racist comment to you, did he?*

A:    *No.*

Q:    *And he never once made a sexist comment to you, did he?*

A:    *Except saying your hair looks good.*

Q:    *And he never once made a derogatory comment about your national origin, did he?*

A:    *I don't recall.*

\*        \*        \*

Q:    *And when you say in your complaint that he mocked your accent, is it correct to understand what you mean is that he said he didn't understand you?*

A:    *He did not say it in a way that, I don't understand. I mean, I don't understand. The way he was implying, the way he was saying over and over is just the way he brought it up, like I don't understand what you're saying. What does it mean?*

Q:    *So he never mimicked you accent or made fun of it?*

A:    *I don't recall.*

(SOMF ¶¶ 90, 93)

Likewise, neither Dr. Friedman, Ms. McClain or Mr. Saks, ever made fun of or mocked Ms. Kalantaripour's accent. (SOMF ¶¶ 89-93) There is no evidence that might create an inference of discrimination in this case, and Ms. Kalantaripour's interpretive gloss regarding the alleged conduct cannot change that fact. *See Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (describing "occasional name-calling, rude emails, lost tempers and workplace disagreements" as "the kind of conduct courts frequently deem uncognizable under Title VII").

15

**D.    Ms. Kalantaripour Was Not Subjected To A Hostile Work Environment.**

Ms. Kalantaripour offers a formulaic label of a hostile work environment in her Complaint, though does little to allege she was actually subjected to a hostile work environment. This may be because the evidence demonstrates that the conduct alleged was not because of race, gender or national origin and, even if it was, it does not rise to the high level required to demonstrate severe or pervasive harassment.

The standards for judging a hostile work environment claim are sufficiently demanding to ensure that Title VII does not become a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998). Accordingly, not everything that makes an employee unhappy is a "hostile work environment." Of course, a "plaintiff must always prove that the conduct at issue was not merely tinged with offensive ... connotations, but actually constituted discrimination ... because of' the employee's protected status." *Peters v. District of Columbia*, 873 F.Supp.2d 158, 188–89 (D.D.C. 2012) (*quoting Oncale*, 523 U.S. at 81). "It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination." *Id.* (*citing Lewis v. D.C.*, 653 F.Supp.2d 64, 80 (D.D.C. 2009)).

A hostile work environment rises to the level of unlawful discrimination only when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 96 (D.D.C. 2007). The court must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Park v. Howard Univ.*, 71 F.3d 904, 906 (D.C. Cir. 1995). The alleged harassment must be

16

objectively severe or pervasive to a reasonable person in the plaintiff's position—a plaintiff's allegations that she subjectively believed she was harassed are not enough. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Obviously, "[t]he prohibition of harassment on the basis of [protected category]…forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Oncale*, 523 U.S. at 81.

Plaintiff contends Dr. Ehrlich[4] yelled at her three times from July 2018 to May 2019. (SOMF ¶ 96) Ms. Kalantaripour concedes, as she must, that each time Dr. Ehrlich allegedly yelled at her it was due to work related issues. (SOMF ¶ 97)

Ms. Kalantaripour alleges that Dr. Patel raised his voice six times between October 2018 (when he was hired) and March 2019 (when her employment was terminated), each related to work issues in general and her performance shortcomings in particular. He supposedly raised his voice towards her regarding (1) her failure to hire staff; (2) scheduling issues; (3) twice after she moved his Medical Assistant to other providers; (4) once because she did not order pizza for staff in Bethesda but did for staff in D.C.; and (5) once because she did not know his prescription provider number. (SOMF ¶¶ 98-105)

As set forth above, there is no evidence that might tend to show these incidents were because of Ms. Kalantaripour's race[5], gender or national origin and, even if there were, they cannot rise, individually or collectively, to the high standard required to demonstrate a hostile work environment. *Mitchell v. Powell*, No. 17-CV-00182 (APM), 2018 WL 6735800, at *6 (D.D.C. Dec. 24, 2018) ("yelling" at plaintiff regarding job-related issues "surely made

---

[4] As set forth below, any allegation that Dr. Ehrlich discriminated or harassed Ms. Kalantaripour should be dismissed, because her EEOC Charge makes no mention of any such discrimination and she has not exhausted her administrative remedies with respect to such claims.

[5] Ms. Kalantaripour testified she is white. (SOMF ¶ 106)

Plaintiff's day-to-day unpleasant, they do not rise to the level of a hostile work environment");

*Morgan v. Washington Metro. Area Transit Auth.*, No. CV 15-0401 (RC), 2016 WL 6833926, at

*10 (D.D.C. Nov. 18, 2016) ("frequently yell[ing] at [plaintiff]" without connection to protected

category was "'mere offensive utterance[s]'" "which courts have found to be insufficiently

severe to support a hostile work environment claim") (internal citation omitted); *see also*

*Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345

(2006) ("Title VII . . . does not set forth a general civility code for the American workplace.")

(quotation marks omitted)).  Indeed, "personality conflicts . . . are not actionable" under Title

VII.  *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 68.  *See Brooks v. Grundmann,* 748 F.3d

1273, 1277 (D.C. Cir. 2014) ("isolated expression of frustration" where employee "yelled,"

"violently threw a book" and "slamm[ed] down his hand" did not support hostile-work-

environment claim).

Similarly, to the extent Ms. Kalantaripour relies on this alleged conduct to claim

disparate treatment, this claim must fail, as any such conduct is not an adverse employment

action.  *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir.  2009) (adverse employment action is

a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing significant

change in benefits) (citations and quotations omitted); *Patterson v. Johnson,* 505 F.3d 1296,

1298 (D.C. Cir. 2007) (minor impositions on responsibilities do not constitute adverse

employment actions).

Ms. Kalantaripour was not subjected to severe or pervasive harassment because of her

race, gender or national origin, and her hostile work environment claims should be dismissed.

*Gray v. Foxx*, 637 F. App'x 603, 605, 608 (D.C. Cir. 2015) (affirming summary judgment where

evidence that supervisor "yelled and screamed" at plaintiff during her employment was not sufficient to establish a hostile work environment); *Knight v. Mabus*, 134 F. Supp. 3d 348, 356–57 (D.D.C. 2015) (granting summary judgment where plaintiff "has not alleged sufficiently severe or pervasive treatment to support his hostile work environment claim").

## II.    MFA DID NOT RETALIATE AGAINST MS. KALANTARIPOUR.

Ms. Kalantaripour must demonstrate: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. *Wiley v. Glassman*, 511 F.3d 151 (D.C. Cir. 2007).  She carries the ultimate burden of showing the adverse employment action would not have happened "but for" the protected activity.  *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). "[U]nder the Supreme Court's recent ruling in *Nassar*, it is now clear that a … retaliation claim cannot rely on a mixed motive theory."  *Rattigan v. Holder*, 982 F. Supp. 2d 69, 81 (D.D.C. 2013).  In other words, "traditional principles of but-for causation" apply, and a plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 133 S. Ct. at 2533.[6]

---

[6] Both Title VII and Section 1981 "bar employers from retaliating against employees for opposing any unlawful, discriminatory practices."  *Jones v. D.C. Water & Sewer Auth.,* No. CV 12-1454 (JEB), 2016 WL 659666, at *5 (D.D.C. Feb. 18, 2016) (internal citations omitted).  As with discrimination claims under Title VII and Section 1981, "courts have treated the elements, burdens of production and persuasion, and defenses as 'essentially the same.'"  *Jones*, 2016 WL 659666, at *5 (*citing Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (analyzing Title VII and § 1981 claims together)).  *See Ginger v. D.C*., 477 F. Supp. 2d 41, 47 (D.D.C. 2007), aff'd, 527 F.3d 1340 (D.C. Cir. 2008) ("The plaintiffs make employment discrimination and retaliation claims under Title VII and 42 U.S.C. § 1981. The analysis is the same for both types of claims.").

### A.     Ms. Kalantaripour Did Not Engage In Protected Activity.

Ms. Kalantaripour's Complaint does not allege she engaged in protected activity.  While it states she complained about Dr. Ehrlich and Dr. Patel, it pointedly does not say she complained they was discriminating against her.  Compl. ¶¶ 11,14, 15, 16, 17, 20.  Consistent with this fact, the documentary evidence shows that Ms. Kalantaripour complained about their treatment, but never mentioned discrimination.  For example, on November 28, 2019, Ms. Kalantaripour sent an e-mail to Jennifer Hoffpauir in HR:

> I just wanted to share with you the interaction that I had with Dr. Ehrlich yesterday. I am already dealing with a lot of changes in the department and I really trying to focus on staffing and retention. Her being unprofessional toward me and anyone doesn't help the situation. I was working in the Bethesda office yesterday. From the time she walked in, she seemed to be in a bad mood and irritated. She came in and in a very disrespectful tone demanding to print out her schedule. Her voice and her body language was made me very uncomfortable. It was very obvious to everyone in the office including the patients and the front desk staff (Suzi).  Then she was asking me why her schedule was blocked for two slots. I told her that she wanted those specific slots blocked and was done on her request. (She does that very often).  She thought about it for few minutes. She then, she quickly "remember" that she was in my office with Shanice and asked me to change the visit type and I (Nasrin) didn't know how to do it.  I asked if she recalled that, Shanice said no and she also said that Dr. Ehrlich changes her schedule a lot. Later on, she tried to get Shanice to confirm her story. Shanice tried to avoid her and leave the room. I could see that shanice was very uncomfortable to answer, but Dr. E insisted an answer from Shanice. Shanice said yes with hesitation.  Dr. E and Shanice have never been in my office together. Her treatment toward me and forcing someone to confirm her story is not ethical. Later on when I met with her, she was telling me that she met with Pam and Pam doesn't know what my goal is and what my role in organization. She mentioned that she understand how frustrated I was. I am definitely swapped but not frustrated at work.  I am a very confident person, but she made feel very insecure. I really don't know what to take out of this.
>
> Thank you so much,

(SOMF ¶ 30)

On December 2, 2018, Ms. Kalantaripour again complained about Dr. Ehrlich:

As I promised here is another unpleasant and unprofessional interaction that I had with Dr. Ehrlich. We had a faculty meeting on Wednesday Nov 28th at 6:00pm. While most of the attendees including me were waiting around the conference table for Dr. Ehrlich, she walked in all red and angry with one of the laboratory supplies catalog in her hand. She walked around the table, slammed the catalog in front of me and said YOU TAKE OF THIS! I was stunned by the unexpected event, not even knowing what was going on. I just tried to keep my calm and said let's discuss later. Meanwhile, the whole room went quite. The whole meeting she was sitting across of me with such s hostility. Adrien, even mentioned that later that how her behavior was toward me. There were a few major issues were brought up in the meeting;

1) Liz Robinson brought up that the Residents' scheduled for January weren't open, I am not sure who else but Kayleigh confirmed that schedule wasn't open. I was sure that the schedule was open, and mentioned that in the meeting. Dr. Ehrlich said it wasn't acceptable. ( the schedule was opened on 11/19 and double checked the schedule to catch any mistakes). Baseless accusations!

2) the issue was about Cantherone ordering. This issue has been discussed with Dr. Ehrlich and Dr. Sotomayor since September. They both were aware of the ordering problem. I even called the distributor in Canada and place the order on Dr. Ehrlich. I mentioned to her that we Just need to provide the payment information and it had to match the name on the order ( it had to be a physician). She said that she won't use her credit card. She said that we don't need the medicine as we can use other methods to freeze warts. ( I forwarded you the email chain regarding the issue).

3) staffing issue was another subject we discussed. We all know that we have been having this issue. We are working on it and we are making a headway. It has been a very difficult time for everyone in the department, completely understandable.

4) Paycheck issue was another is one that you are aware of and hopefully with the help from the payroll, we can get to the bottom of this.

I Thursday to talked to Melanie Santos and she told me how there have been issues in the department ever since she has been there. She also mentioned that Dr. Ehrlich is setting me (Nasrin) off for failure by blaming everything on me.

Jenny, as you are aware I came to Dermatology to assist during the transition period. I made it my responsibility to help with the day to day operation of the department. This is not ok or acceptable to be put in this position. This is not a healthy work environment. I will continue to assist dermatology in any way I can because I care about the staff, the patients. all the providers and I made a commitment. I really appreciate all your support. You and Adrien have been very supportive of me and I really appreciate that.

I met with Pam on Friday, she was very supportive.[7]

(SOMF ¶ 33)

---

[7] Ms. Kalantaripour states that Mr. Saks and Ms. McClain were "very supportive."

Ms. Kalantaripour then complained to HR about Dr. Patel:

Hi Jenny,

Just following up our meeting regarding scheduling adjustment and Dr. Patel's reaction.  First I wanted to remind of the incident the happened on Tuesday morning:

As I mentioned, I received a text from Tiandra at 6:09am that she couldn't make it to work. Tiandra was assigned to work with Dr. Redbord doing Mohs. As you are aware, we are short staffed. We had three new MAs in clinic that day. Tony is the only MA that knows Mohs and will be doing Mohs with Dr. Patel. As a Practice Manager, I have to be able to make changes in order to provide patient care. I assigned Tony to Dr. Redbord in the morning and in the afternoon being with Liz in Residents' clinic. Unfortunately, when I told Dr. Patel that morning, he got very upset. He raised his voice and threating me that he would go to Alison and Adrien. He said that I had to ask him first and his answer would be no anyway. This is not the first time he raising his voice as I mentioned to be before. Also, this isn't the first time that he is threating me. He always mention that he would go to a higher authority if he doesn't get what he wants. In previous times, he has mentioned that he knows Dr. Kelly and he would go directly to him.

I am reaching out to you for the following reasons;

1) First, his behavior isn't acceptable. I understand that he is a doctor in a physician run organization, but humiliating and threating staff isn't ok in any level and degree.
2) Second, I need to be able to make last minutes decisions/adjustment based on the staffing situation to ensure proper patient care. I had the same situation today and I had to make adjustments to MAs we had a call out. Later today, I received an email from Dr. Friedman regarding that (I will forward that email to you). I am working on the next week's schedule and have the same issue. I need this to be clarified and resolved ASAP. The next week's schedule needs to go out, I won't be able to do anything until this is resolved. We all need to be on the same page on how to move forward with the scheduling. If I do the scheduling, I should be able to make adjustment as need it. If not someone else needs to do the scheduling, as this isn't an efficient, nor in the best interest of the department.

(SOMF ¶ 39)

Ms. Kalantaripour's e-mail complaints are quoted at length because they demonstrate (1) she never mentioned discrimination; (2) she confirms there were scheduling and performance issues in Dermatology; and (3) she obviously knew how to complain if she actually believed

22

discrimination was involved. Similarly, in her deposition, Ms. Kalantaripour was unable to

identify a specific complaint of discrimination:

> Q:    Now, in this case, you contend that you were fired for complaining; is that right?
>
> A:    Retaliation, yes.
>
> Q:    Okay. And what were you—can you identify for me the complaints you contend you were fired because of?
>
> A:    Starting November 2nd, I was taken out of the e-mail and left out of the emails that were critical for doing my job. I was refused to—left off the operation, dermatology operation meetings that were critical for me doing my job, related to my job. I was told some of the staff, they cannot help me, and including Elizabeth Hazuka that was helping with the scheduling. I was to I—Kayleigh Hausmann, that was hired to do resident schedule, that is not her job. I was—basically whenever I tried to do my job, to utilize MAs, I was yelled at. There was a—you know, if one of us placed a complaint, there were complaints going to HR. HR was sending the e-mail that I was sending to them to the provider I complained about. And I did not see that happen with other employees. And when Elizabeth Hazuka complained about Dr. Ehrlich, they did not say she was doing that to everyone. When residents—I was told by Adrien Saks one of the residents went and complained about Dr. Ehrlich and Dr. Ehrlich—you know, they asked her to step down from her position. They did not tell her, the resident, that oh, Dr. Ehrlich is doing this to everyone, so you can't—you know, ignore the complaint. And there was favoritism in the department. Certain employees were (indiscernible)—like Elizabeth Hazuka was getting paid 10 to $15,000 more paid for job that she was not as qualified and had no experience being a medical assistant. She got the job, but she was getting paid 10—to $15,000 more than employees that had years of experience. Kayleigh Hausmann, another Dr. Friedman's and Dr. Patel's helper, Dr. Patel's—even babysitting outside of work, she was –she got raise befer ever her year ended. And other employees asked for a raise before a year, nobody was getting raise, but she—but certain employees were getting raise, were getting paid more, is---

(SOMF ¶ 109)

These sorts of complaints about workplace issues are not protected activity and cannot

support a retaliation claim. *Welzel v. Bernstein*, 436 F.Supp.2d 110, 122–23 (D.D.C. 2006)

(complaints about "unprofessional and abusive behavior" and general complaints about unfair

treatment absent a stated belief that such behavior violates Title VII are "not protected under

Title VII").  Indeed, Ms. Kalantaripour's complaint that Dr. Ehrlich was "unprofessional," "seemed to be a bad mood and irritated," was "not ethical," "slammed" a catalog in front of her, and made a "baseless accusation" against her did not refer to harassment or discrimination based on any protected category.  Similarly, Ms. Kalantaripour's complaint that Dr. Patel was frustrated with her and raised his voice at her did not refer to harassment or discrimination based on any protected category.  *Lemmons v. Georgetown Univ. Hosp.*, 431 F.Supp.2d 76, 92–93 (D.D.C. 2006) (granting summary judgment where sole protected activity plaintiff identified was her complaint of harassment against her supervisor that did not refer to harassment or discrimination based on any protected category under Section 1981); *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 128 (D.D.C. 2015) ("Although the opposition clause is undoubtedly broad, it is not limitless, and [n]ot every complaint garners its author protection under Title VII.  For example, ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.") (internal citation omitted).  *See also Sitar v. Ind. Dep't of Tranp.,* 344 F.3d 720, 727–28 (7th Cir. 2003) (stating that complaining about being "picked on," without mentioning discrimination or otherwise indicating that "gender was an issue," does not constitute protected activity, even if the employee "honestly believe [s][he] is the object of discrimination").

Instead of identifying even an approximate date on which she allegedly complained about discrimination, Ms. Kalantaripour testified only that she told Mr. Saks and Ms. Hoffpauir, on the day she was fired, that she was discriminated against.  (SOMF 88)[8]

---

[8] Ms. Kalantaripour testified she recorded this conversation, and placed it a number of other conversations she says she recorded at MFA, on a USB drive.  While the termination meeting recording was produced, the USB drive was not, Plaintiff claims it was lost in a move, despite the fact that she moved after filing her EEOC Charge.

Accordingly, Ms. Kalantaripour's retaliation claim fails because she never engaged in statutorily protected behavior before her employment was terminated. *Hunter v. D.C.*, 905 F. Supp. 2d 364, 378 (D.D.C. 2012), *aff'd sub nom. Hunter v. D.C. Gov't,* No. 13-7003, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013) (to constitute protected activity, "the complaint must in some way allege discrimination made unlawful by Title VII"; complaints of mismanagement and fraudulent activity and complaints about "discrimination," without reference to a protected category, does not constitute protected activity). "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).

**B.      No Causal Connection Between Protected Activity and Termination.**

Even assuming, *arguendo*, that Ms. Kalantaripour did engage in protected activity at some point, she cannot causally connect her placement on a PIP or the termination of her employment with such activity. *Timmons v. U.S. Capitol Police Bd.*, 407 F. Supp. 2d 8, 12 (D.D.C. 2005) (granting summary judgment on retaliation claim where "decision to deny plaintiff a promotion was based upon considerably more evidence than just the input of these officers [who had knowledge of plaintiff's complaint of gender discrimination and who had roles in denying the promotion]"); *Furey v. Mnuchin*, 334 F. Supp. 3d 148, 170 (D.D.C. 2018) ("While plaintiff did engage in protected activity . . .  the entire chain of events leading to plaintiff's termination [including performance deficiencies, warnings that plaintiff was underperforming, and placement on a PIP] reveals that the weak proximity of those events cannot prove but-for causality. Therefore, plaintiff has not come forward with sufficient evidence to enable a reasonable juror to find that her EEO activity was the impetus behind her termination, and the Court will grant defendant's motion for summary judgment.").

This is particularly true here, where it is undisputed Ms. McClain and Mr. Saks were not aware of any alleged protected activity when they placed Ms. Kalantaripour on a PIP or terminated her employment.  (SOMF ¶¶ 74, 87, 114)

In fact, Ms. Kalantaripour concedes Mr. Saks did not discriminate or retaliate against her:

Q:    *All right.  So do you think Adrien Saks discriminated against you?*

A:    *I did not get the sense that he discriminated, based on my observation.*

Q:    *Do you think he retaliated against you?*

A:    *Based on my observation, I did not get that sense.*

(SOMF ¶ 111)

The lack of knowledge by the decision makers dooms the retaliation claim.  *Talavera v. Shah,* 638 F.3d 303, 313-14 (D.C. Cir. 2011) (affirming summary judgment when decisionmaker denied knowledge of EEO activity under oath and plaintiff "offered only evidence from which a reasonable jury would have had to speculate that [the decision-maker knew] of the activity"); *Walker v. Children's Nat'l Med. Ctr.*, 236 F. Supp. 3d 136, 146 (D.D.C. 2017) (granting summary judgment where there was no evidence to rebut an employee's manager's affidavit of lack of knowledge); *Harris v. McDonald*, No. 17-594, 2017 WL 4217101, at *5 (D.D.C. Sept. 19, 2017) (finding "insufficient proof of retaliatory intent to warrant a trial" without evidence beyond speculation that decisionmakers knew of protected activity) (citing *Morris v. McCarthy*, 825 F.3d 658, 674 (D.C. Cir. 2016) (holding that "an employee cannot survive summary judgment if a jury can do no more than 'speculate' that her employer knew of her protected activity") (citation omitted)).

Further, neither Dr. Patel nor Dr. Ehrlich made the decision to terminate Ms. Kalantaripour's employment and Ms. Kalantaripour has not and cannot present any evidence that

they knew of the complaints or harbored any retaliatory animus towards her because of the alleged complaints.  *See Román v. Castro*, 149 F. Supp. 3d 157, 172 (D.D.C. 2016) (granting summary judgment on retaliation claim where no evidence that decision maker was "influenced by his knowledge of [plaintiff's] protected activity [and complaints of discrimination against others] or by any retaliatory motive").

To the extent Ms. Kalantaripour relies on her complaint—after she was fired—her claim must fail, as it could not have been the reason for her termination because the decision to terminate her employment has already been made and she had already been told that her employment was being terminated.  *Copeland v. Arklay LLC*, 273 F. Supp. 3d 69, 77 (D.D.C. 2017) (summary judgment granted where only protected activity was EEOC complaint that was filed after termination, and where "no reasonable fact finder would think" complaints during employment that coworkers "locked her out of the network and were unkind toward her" were complaints of "unlawful harassment"); *Marshall v. Potter*, 634 F. Supp. 2d 66, 73 (D.D.C. 2009) ("To establish a causal connection between the adverse action and the protected activity, a plaintiff must show that the employer had knowledge of the protected activity and that the adverse action occurred soon thereafter or introduce direct evidence that the adverse action would not have occurred but for the protected activity.") (internal citation omitted) (granting summary judgment where only protected activity identified in the record "did not occur until *after* plaintiff had been terminated" and where "because the protected activity followed all the alleged retaliatory acts, there can be no inference of causality, and thus, plaintiff cannot claim retaliation").

**C.     Ms. Kalantaripour Cannot Show That "But For" Her Complaint She Would Not Have Been Fired, Or That MFA's Reasons For Firing Her Were Pretext.**

Given the strong evidence that demonstrating that MFA fired Ms. Kalantaripour because of her poor performance, and that the decisionmakers were not aware of any alleged protected activity, she cannot show any alleged protected activity was the "but for" cause of her termination, or that MFA's reasons were pretextual. *Gregg v. Hay Adams Hotel*, 942 F. Supp. 1, 8 (D.D.C. 1996) (plaintiff must show that "but for" protected activity adverse action would not have occurred); *Dhuria v. Trustees of U.D.C.*, 827 F. Supp. 818, 829 (D.D.C. 1993) (awareness of protected activity essential element).

Of course, "..it is not sufficient for [the] plaintiff to demonstrate that a reasonable jury could find that retaliatory animus ... was *a* cause for [the adverse action]. Rather, [the] plaintiff must demonstrate that there is a genuine issue of material fact as to whether retaliatory animus was *the* cause for the [adverse action]." *Rattigan v. Holder*, 982 F.Supp.2d 69, 81 (D.D.C. 2013), *aff'd*, 780 F.3d 413 (D.C. Cir. 2015) (emphasis in the original). Ms. Kalantaripour offers only her speculation that she was fired or placed on a PIP for allegedly complaining about discrimination. This is insufficient to defeat summary judgment.

## III.     PLAINTIFF DID NOT EXHAUST HER CLAIMS AGAINST DR. EHRLICH

"It is well established that an individual complaining of alleged violations of Title VII must first exhaust his or her administrative remedies before proceeding to federal district court." *Langley v. Napolitano*, 677 F. Supp. 2d 261, 267 (D.D.C. 2010). "This requirement serves the important purposes of giving the charged party notice of the claim and narrow[ing] the issues for prompt adjudication and decision." *White v. Vilsack*, 888 F. Supp. 2d 93, 97 (D.D.C. 2012) (internal citation omitted). "An employee must exhaust the administrative process for <u>each</u> discrete action for which she seeks to bring a claim." *Huang v. Wheeler*, 215 F.

Supp. 3d 100, 111 (D.D.C. 2016) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 113, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)) (emphasis in original). A court "has

authority over ... claims like or reasonably related to the allegations of the [EEOC] charge and

growing out of such allegations." *White v. Vilsack*, 888 F. Supp. 2d 93, 97 (D.D.C. 2012).

Consequently, there must be a factual relationship between the claims asserted in the judicial

complaint and the claims alleged in the EEOC charge. *Peters v. Renaissance Hotel Operating

Co.,* 307 F.3d 535, 550 (7th Cir. 2002). "This means that the EEOC charge and the complaint

must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Id.*

Here, Ms. Kalantaripour's Charge of Discrimination does not contain any claims against

– or even mention -- Dr. Ehrlich, yet the Complaint contains discrete allegations of

discrimination and harassment against her. *See* SOMF, Ex. 2, pg. 243-244, Ex. 25 and 26.

Indeed, claims against Dr. Ehrlich were not advanced as an instance or example of

discrimination in the Charge and so have not been exhausted. These claims should be dismissed.

*See* Compl. at ¶¶11, 12, 13, 17, 37. *Uzlyan v. Solis*, 706 F. Supp. 2d 44, 54-55 (D.D.C. 2010)

(dismissing claims against supervisor where "alleged event was never advanced as an instance of

discrimination" during the administrative process, and holding "[b]ecause this instance of alleged

discrimination was not exhausted through the administrative process, it cannot be advanced

here.").

## <u>CONCLUSION</u>

MFA fired Ms. Kalantaripour because of her poor performance. The record is replete

with evidence that five different people believed she was not performing her job. Ms.

Kalantaripour has not and cannot produce "sufficient evidence for a reasonable jury to find that

the [MFA's] asserted non-discriminatory reason was not the actual reason and that [MFA]

intentionally discriminated against [her] based on [her race, gender or national origin]." *Brady v.*

*Office of Sergeant at Arms*, 520 F.3d at 495.  Summary judgment should be entered in favor of

MFA on all Plaintiff's claims.

Dated: January 21, 2022                    Respectfully submitted,

                                                         /s/ *Raymond C. Baldwin*
                                                         Raymond C. Baldwin (Bar No. 461514)
                                                         Samantha L. Brooks (Bar No. 1033641)
                                                         SEYFARTH SHAW LLP
                                                         975 F Street N.W.
                                                         Washington, DC 20004
                                                         (202) 463-2400
                                                         rbaldwin@seyfarth.com
                                                         sbrooks@seyfarth.com
                                                         *Attorneys for Defendant*

30