**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **NASRIN KALANTARIPOUR,** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Case No. 1:21-cv-00272-JMC** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE GEORGE WASHINGTON** | ) | |
| **MEDICAL FACULTY ASSOCIATES,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Nasrin Kalantaripour ("Ms. Kalantaripour" or "Plaintiff"), by and through counsel, hereby files this Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment. Plaintiff opposes Defendant's assertion that there is no genuine dispute of any material fact in this matter and requests that this Court deny Defendant's Motion for Summary Judgment in its entirety.

**INTRODUCTION**

Plaintiff Nasrin Kalantaripour, a Middle Eastern Asian female born in Iran, filed a Complaint alleging that Defendant Medical Faculty Associates, Inc. ("Defendant" or "MFA") discriminated against her on the basis of her sex, race, and national origin (Count I) and unlawfully retaliated against her (Count II) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, and discriminated against Plaintiff on the basis of her race in violation of the Civil Rights Act of 1866, 2 U.S.C § 1981 (Count III). Defendant has moved this Honorable Court to summarily dismiss the Complaint. This Court should deny Defendant's Motion for Summary Judgment

1

because it fails to address the totality of Plaintiff's claims, ignores and mischaracterizes relevant material facts, and is contrasted by relevant legal precedent.

Plaintiff Kalantaripour was not terminated due to her alleged poor performance, rather she was terminated due to Defendant MFA's discrimination against her based on her race, sex, and national origin. As this Opposition demonstrates, Plaintiff could not have been terminated for alleged poor performance as the Dermatology Department experienced widespread improvement in all performance areas during Plaintiff's tenure as Practice Manager. Furthermore, the evidence in this matter belies Defendant's claim that Plaintiff was terminated for poor performance.

The record of evidence in this case established an inference of discrimination on behalf of Defendant MFA due to the discriminatory harassment Plaintif suffered at the hands of Dr. Vishal Patel, an American-born male of Indian descent, and Dr. Alison Ehrlich, an American-born Caucasian female, including disparate treatment due to her membership in a protected class based on her race, sex, and national origin. Similarly, the record establishes that Plaintiff engaged in protected activity through numerous complaints to MFA's Human Resources Division in which she complained about the pervasive discriminatory and harassing actions of Dr. Patel and Dr. Ehrlich. As this Opposition will demonstrate, the decision makers within MFA were aware of Plaintiff's protected activity and MFA's adverse employment actions against Plaintiff were causally connected to her engagement in protected activity. Finally, the facts of this case establish that Defendant's alleged non-discriminatory and non-retaliatory reasons for Plaintiff's termination were mere pretext and that but for her engagement in protected activity, Plaintiff would not have been terminated. For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied in its entirety.

## STATEMENT OF FACTS

Plaintiff Kalantaripour was hired by Defendant on May 21, 2018, as the Practice Manager for MFA's Neurology, Neurosurgery, Psychiatry, and Dermatology Department.  *See* Plaintiff's Response to Defendant's Statement of Material Facts, hereinafter "Response to SOMF" ¶ 2. Plaintiff Kalantaripour has a bachelor's degree in Microbiology and an MBA in Healthcare from George Washington University and previously worked at the National Institutes of Health for eight years prior to her employment at MFA.  *See* Plaintiff's Third Supplemental Response to Defendant's Interrogatories and Request for Production of Documents, hereinafter "Pl.'s Ex. 1" ¶ 4.  As the Practice Manager, Plaintiff Kalantaripour reported to the Practice Group Administrator Adrien Saks, an American-born Caucasian male, and she assisted Mr. Saks and the managers of the various departments in their administration duties. *Id.*

In July 2018, Plaintiff Kalantaripour was asked by Adrien Saks to assist with the administration of the Dermatology Department after the Clinical Manager had been recently terminated and Plaintiff was told to assist until a new manager was hired.  Response to SOMF ¶ 10; *see also* Pl.'s Ex. 2 at P0161.  When the position of Clinical Manager was advertised, it indicated that MFA was seeking to hire a clinical lead or nurse manager, which they could not do due to MFA's issues with its lack of staff and financial constrain.  Response to SOMF ¶ 16; *see also* Deposition Transcript of Adam Friedman, an American-born Caucasian male, "Friedman Depo." at 39:18-22, 40:1-13, attached hereto as TAB A.  Notably, Plaintiff Kalantaripour had not been trained for a clinical position and did not have clinical experience nor had she been hired to serve in a clinical position.  (Deposition Transcript of Adrien Saks, "Saks Depo." at 15:6-18, attached hereto as TAB B).  Clinical training is normally reserved for individuals with medical

3

backgrounds, such as nurses, medical assistants. *Id*. at 16:12-22, 17:1-18. This was noted in a November 30, 2018 email from Jennifer Hoffpauir, an American-born Caucasian female, in which she stated "Nasrin was hired to be a Practice Manager… [s]he was not hired to be a Clinical Manager for Dermatology." Pl.'s Ex. 3 at P0425-P0426. Ms. Hoffpauir further noted that Plaintiff was "… being unfairly blamed for some problems" within the Dermatology Department that were not her responsibility. *Id*. at P0425.

Plaintiff and Mr. Saks worked closely with the Dermatology Department Chair, Dr. Alison Ehrlich, and they met twice a month on Mondays at 4:00 p.m., and Plaintiff Kalantaripour met separately with Dr. Ehrlich on Wednesdays at noon as needed. *Id*. at 66:5-16.

On July 25, 2018, Plaintiff Kalantaripour, Mr. Saks, and Dr. Ehrlich had their first meeting to discuss challenges in the Dermatology Department and strategies to address the issues. Plaintiff Kalantaripour prepared an outline of her observations during the previous two weeks since starting in the Dermatology Department and, during the meeting, explained how she intended to remedy those issues. Following the meeting, Mr. Saks sent Plaintiff Kalantaripour a text with the message, "You were excellent." Pl.'s Ex. 4 at P0108.

At the time Plaintiff Kalantaripour was asked to assist with the administration of the Dermatology Department, the Department was in a period of turmoil attributed to the recent eliminations of the Clinical Manager and Patient Services Specialist ("PSS") positions, poor employee morale, and a series of patient complaints about the operation of the Dermatology Department. To address these issues, the Patient Experience Department provided feedback to improve the overall operation of the Dermatology Department. The Manager of the Patient

Experience Department, Fadi Hachem, provided feedback to the Dermatology Department. Pl.'s' Ex. 5 at P0167-P0172.

On October 29, 2018, Plaintiff met with Fadi Hachem to discuss his recommendations and was subsequently able to make significant changes within the Dermatology Department. As a direct result of these processes and recommendations put in place by Plaintiff and her collaboration with providers, the Dermatology Department saw positive improvement in every single key performance area during Plaintiff's tenure, as indicated by the Dermatology Overall Scorecard from February 1, 2018 to January 31, 2019. *Id.* at P0170. Specifically, patient access within the Department improved by 5% while overall improvement for the MFA was 0.4%. *Id.* Thus, the Dermatology Department had the highest improvements among MFA's twelve departments over this period.

Plaintiff began to observe discriminatory practices early in her tenure, including pay disparities that seemed racially divided and higher pay and raises based on racial categories and favoritism. Plaintiff observed this racially charged pay disparity when Kayleigh Haussman, an American-born Caucasian female, received a raise despite MFA allegedly holding financial raises due to financial constraints. Friedman Depo. at 48:4-22, 49:1-3, 49:12-22, 50:1. Furthermore, MFA took action to transfer two non-Caucasian employees who worked in Washington, D.C. and had taken FMLA leave, Lashawn Eubanks-Brown (African American female) and Deborah Abdur-Rahman (African American female), to offices in Virginia in order to pressure the employees to quit their positions. (Deposition Transcript of Lashawn Eubanks-Brown, "Eubanks-Brown Depo." at 48:14-22, 49:1-21, attached hereto as Tab C); *see also* (Deposition Transcript of Deborah Abdur-Rahman, "Abdur-Rahman Depo." at 45:6-15, attached hereto as Tab D).

During her time at MFA, Plaintiff Kalantaripour faced humiliation, harassment, and discrimination, most notably from Dr. Patel and Dr. Ehrlich.   Dr. Patel, in particular, would mock Plaintiff Kalantaripour when she would speak and pretend that he did not understand her, using her accent as an excuse to discriminate against her.  Pl.'s' Ex. 1 ¶ 1.  Due to her country of birth, Plaintiff Kalantaripour has a Middle Eastern accent, although she speaks perfect English.  *Id*.  Dr. Patel would also claim that he and Plaintiff had agreed on certain issues and then would become upset when certain actions were not taken by Plaintiff, when in fact there was no agreement regarding said actions.  In total, Plaintiff Kalantaripour submitted no less than three complaints to MFA's Human Resources Department regarding Dr. Ehrlich and no less than five complaints regarding Dr. Patel.

Specifically, on November 2, 2018, Plaintiff emailed MFA's Human Resources Business Partner Jennifer Hoffpauir to report that Dr. Patel had come into Plaintiff's office to inquire about the hiring of another Medical Assistant (MA) and, when Plaintiff explained that the hiring had not been approved, Dr. Patel slammed his fist down on the table and screamed "this is not acceptable" several times.  (Deposition Transcript of Nasrin Kalantaripour, "Plaintiff Depo." at 153-154, attached hereto as Tab E).  Dr. Patel then threated to report Plaintiff to Pamela McClain, MFA's Chief Operating Officer, and Dr. Robert Kelly, the Chief Executive Officer, both American-born females.  (Deposition Transcript of Vishal Patel, "Patel Depo." at 45:12-22, 46:1-4, attached hereto as TAB F).

On November 2, 2018, Plaintiff spoke with Jennifer Hoffpauir regarding Dr. Patel's discriminatory and harassing behavior and followed up with an email on November 5, 2018, regarding her interaction with Dr. Patel.  Pl.'s Ex. 6 at P0174.

On or around November 7, 2018, Dr. Patel handwrote his schedule on a piece of paper and provided the handwritten schedule to Plaintiff.  Pl.'s Ex. 7 at P0216.  After Dr. Patel provided Plaintiff with this schedule, he subsequently yelled at Plaintiff in front of a patient and complained about the schedule that he himself had written, accusing Plaintiff that her alleged issues with miscommunication had caused a scheduling issue.  Plaintiff then showed Mr. Saks the handwritten schedule by Dr. Patel, to which Mr. Saks told Plaintiff to keep all relevant paperwork because Dr. Patel tended to change his mind.  *Id*.

Further, on November 27, 2018, Plaintiff experienced discriminatory and abusive treatment from Dr. Ehrlich when he barked orders at Plaintiff in a very hostile and intimidating tone, making Plaintiff extremely uncomfortable.  Dr. Ehrlich's abusive and discriminatory treatment of Plaintiff occurred in front of MFA's front desk staff.  The incident with Dr. Ehrlich was so upsetting to Plaintiff Kalantaripour that she emailed Mr. Saks to report the harassment. Mr. Saks responded by text, "Don't let Ehrlich get you down. You are doing great!"  Pl.'s Ex. 8 at P0109.

The following day, on November 28, 2018, Plaintiff Kalantaripour sent Ms. Hoffpauir an email about an incident in which Dr. Ehrlich harassed her.  Pl.'s Ex. 9 at MFA-NK0148-0150.

On November 29, 2018, Plaintiff Kalantaripour met with Ms. Hoffpauir to discuss the ongoing difficulties Plaintiff Kalantaripour was facing from Dr. Ehrlich's harassment.  Ms. Hoffpauir indicated that she wished to speak with Shanice Johnson, an American-born African American female employee who witnessed Dr. Ehrlich's discriminatory and abusive treatment, in order to investigate Plaintiff's complaint.  *Id*. at MFA-NK0150.  However, Plaintiff's complaints before MFA's Human Resources Division were immediately dismissed. Pl.'s Ex. 1 ¶ 1.  By

contrast, when Elizabeth Hazuka, an American-born Caucasian female employee, complained about Dr. Ehrlich's behavior to Ms. Hoffpauir, a full-scale investigation was conducted with interviews of over twenty MFA staff. *Id*; *see also* Pl.'s Ex. 10 at P0176-P0184. Plaintiff also experienced discriminatory treatment when Dr. Patel regularly mocked her accent and pretended that he could not understand what Plaintiff was saying in order to use Plaintiff's accent as an excuse to discriminate against her. Pl.'s' Ex. 1 ¶ 1.

On November 29, 2018, Ms. Hachem escalated a patient incident in Dermatology to Ms. McClain. Pl.'s Ex. 11 at MFA-NK0136-0139.

On November 30, 2018, Ms. McClain further escalated the patient incident in Dermatology, escalated by Ms. Hachem the day prior, to Dr. Robert Kelly, the then-Chief Executive Officer. *Id*. Specifically, a patient was upset due to their inability to make an appointment due to the staffing issues at MFA. This problem had been brought to the attention of upper management many times, though the problem was ignored, and upper management said that they could not hire any new staff and that the current staff had to collaborate with the staff they had.

On October 16, 2018, Mr. Saks noted the Dermatology Department's severe staffing shortage in an email to Ms. McClain, stating that "patient complaints have increased since we eliminated a PSS and now there are more providers to schedule for" and "the "[l]ack of consistent support for either Dr. DeLuca or Dr. Patel is impacting their ability to be effective and productive in clinic." Pl.'s Ex. 12 at P0162.

On one hand, MFA alleged that Plaintiff utilized the MAs too much, yet then complained that she does not utilize them enough. *Id.* at MFA-NK0137. In addition, in order to be a team

player and address the staff shortage issue, Plaintiff had volunteered to answer the phones if needed while she and Mr. Saks were working.

On December 4, 2018, Plaintiff and Ms. Hoffpauir discussed a hostile and abusive interaction between Plaintiff and Dr. Patel that day in which Dr. Patel raised his voice and yelled at Plaintiff because he was upset about a last-minute change to an MA's schedule, despite the fact that the main duties of a Clinical Manager was to ensure patient care. Patel Depo. at 48:12-22, 49:1-22, 50:1-11. The ability to move MAs around in order to over the clinic is essential in providing care to patients. Importantly, there was no prior directive prohibiting use of MAs to cover the clinic.

On December 6, 2018, Plaintiff emailed Ms. Hoffpauir as a follow-up to Dr. Patel's December 4, 2018, hostile and abusive treatment of her.

On December 11, 2018, Plaintiff circulated the MA schedule for the week of December 12-17, 2018. In the schedule, Plaintiff had to account for MFA's continuing staff shortage in how she assigned the MAs. Dr. Ilana DeLuca, an American-born Caucasian female who is Dr. Patel's wife, complained about the MA schedule to Ms. Hoffpauir. Pl.'s Ex. 13 at MFA-NK0119-0121. Dr. DeLuca sent an email to Ms. Hoffpauir and stated, "I have had continued staffing issues since I began working here in October and have now reached the point where I am unable to provide appropriate patient care given the decision as outlined [in my email to Plaintiff]." *Id.* Plaintiff Kalantaripour adjusted Dr. DeLuca's schedule to reflect the shortage of staff, as Plaintiff had no other options. Dr. DeLuca's email requested a medical assistant schedule in December and indicated that she was assured by Mr. Saks and Dr. Ehrlich that she would have a specific medical assistant to work with her after the New Year—not before. *Id.* Notably, Dr. DeLuca spoke with

Mr. Saks and Dr. Ehrlich, and did not speak with Plaintiff. Additionally, because the process took longer to hire a medical assistant, MFA allowed temporary staff to be hired for coverage as needed while in the process of hiring medical assistants.

On December 18, 2018, Plaintiff learned from Dr. DeLuca's MA for that day, that they could not make it to the Bethesda office where Dr. Deluca was scheduled to work. In response, Plaintiff directed MA Tony Garcia to go to the Bethesda office and assist Dr. DeLuca. Plaintiff Depo. at 164-165. Plaintiff Kalantaripour spoke with Dr. DeLuca and informed her that Mr. Garcia was on the way to assist her, and Dr. DeLuca did not indicate that she had any issue with Mr. Garcia assisting her. *Id*. Upon learning that Mr. Garcia was being sent to the Bethesda office, Dr. Patel flew into a rage and again came into Plaintiff Kalantaripour's office and yelled at Plaintiff in an abusive manner. *Id*. Dr. Patel brought with him Dr. Adam Friedman's assistant, Kayleigh Hausmann. *Id*. Plaintiff informed Dr. Patel that it was not appropriate to get Ms. Hausmann involved in the situation and also informed Dr. Patel that she would not say anything without Mr. Saks in the room as a witness. *Id*. Dr. Patel responded by stating that he wanted Dr. Friedman to be in the room. *Id.* Mr. Saks arrived at the meeting and informed Dr. Patel that nothing had been agreed upon in the meeting that they all previously held regarding sending medical assistants to other clinics for coverage. *Id*. Following Dr. Patel's abusive actions, Plaintiff met with Mr. Saks in his office, where Mr. Saks asked Plaintiff how she was holding up and informed her that he would let Ms. McClain know about the incident. *Id*.

Plaintiff Kalantaripour only attended one of the weekly Dermatology operation meetings and was continually excluded from those meetings which discussed the operation and management of the department that Plaintiff was managing. Specifically, Plaintiff was not present during any

operation meetings attended by Dr. Friedman. Friedman Depo. at 43:15-18. Although Plaintiff was excluded from Dermatology operation meetings, the employees hired to replace Plaintiff, Marcus Christian, an American-born African American male, and Natalie Murray, an American-born African American female, attended several meetings following Plaintiff's termination. *Id*. at 44:9-22, 46:2-8; *see also* Saks Depo. at 66:9-16. As Mr. Saks stated in his deposition, there were *ad hoc* Dermatology operation meetings that would take place without Plaintiff, despite the fact that she was tasked with managing the department. Saks Depo. at 65:10-22, 66:1-7. Furthermore, these meetings would discuss relevant details regarding the operation of the Dermatology Department, including staffing, finances, customer satisfactions, and ideas to improve revenue and patient care. *Id*.

On January 10, 2019, Dr. Patel emailed Plaintiff regarding ordering surgical instruments. Pl.'s Ex. 14 at P0186. Plaintiff was not responsible for ordering clinical equipment for Dr. Patel's department, but she was responsible for approving the supply order and kept a list of staff that ordered different supplies for the department while the larger orders were handled by Nancy McCormick. Notably, Plaintiff had to check with Mr. Saks before ordering the requested supplies. *Id*. Since the directive of ordering the instruments was not previously discussed with Plaintiff, she called Mr. Saks that day and spoke to him about Dr. Patel's request. Saks Depo. at 69:17-22, 70:1-4. Mr. Saks instructed Plaintiff not to worry about the order and he would take care of it since he still needed to speak with Dr. Ehrlich to finalize the decision to place the order. Furthermore, Mr. Saks had final authority to approve the order to be submitted by Plaintiff. *Id*. 73:11-22, 74:8-11.

On January 14, 2019, there was an inclement weather event and a few staff called out. Plaintiff Kalantaripour was working on the coverage for the clinic MAs, phones, and front desk.

Plaintiff Kalantaripour gave her credit card to Kayleigh Hausmann to order pizza for the staff and let the staff know that their lunch was covered. Pl.'s Ex. 15 at P0381-P0384. At 11:44 a.m., Dr. Patel texted Plaintiff Kalantaripour saying that staff in Bethesda were wondering if they were being provided lunch as well. *Id.* at P0381. Plaintiff Kalantaripour then called Dr. Patel to let him know that she was working on providing lunch and would like his input of what to order as she did not know the places to eat in that location. Plaintiff Kalantaripour also mentioned that MFA can have their lunch ordered and delivered or picked up by around noon. *Id.* When Plaintiff called Dr. Patel again, Dr. Patel began screaming at Plaintiff as soon as he picked up the phone and stated that she had neglected the employees at the Bethesda office, despite the fact that Plaintiff had provided her credit card information to Ms. Hausmann to order pizza and had discussed alternative methods for lunch with Dr. Patel. *Id.* On the same day, Plaintiff reported Dr. Patel's hostile behavior to Ms. Hoffpauir in an email, stating that "this has to stop" with regard to Dr. Patel's "causing issues and being verbally inappropriate." Pl.'s Ex. 16 at P0406-0407.

On January 17, 2019, Mr. Saks sent an email indicating that the order for surgical instruments requested by Dr. Patel was in process and he would provide the estimated time of arrival. Pl.'s Ex. 17 at P0188.

On January 22, 2019, Dr. Patel sent Plaintiff an email inquiring about the status of the order and Plaintiff subsequently contacted Mr. Saks for the status of the order. Pl.'s' Ex. 18 at P0190. Mr. Saks then informed Plaintiff that he had not yet placed the order and instructed her to place the order and get assistance from Ms. McCormick if needed. *Id.* At that time, Mr. Saks had indicated that he did not agree with the $46,000 price of the order. Saks Depo. at 74:12-16; *see also* Pl.'s Ex. 19 at P0192-P0194. Mr. Saks also indicated in this email, that MFA's other Mohs

surgeon, Dr. Redbord, an American-born Caucasian female, was already using the existing instruments for surgery, diminishing Dr. Patel's claim that Plaintiff had put the patients in jeopardy and that the clinic had to be cancelled due to not having enough surgical equipment. *Id*. at P0192.

On January 22, 2019, Plaintiff called and spoke to the Purchasing Department and later emailed a purchase order. The Purchasing Department notified Plaintiff that it required additional information and Plaintiff sent the required information later that day. Pl.'s Ex. 20 at MFA-NK0042-0043. On the same day, January 22, 2019, Plaintiff informed Dr. Patel that she had placed the order for the surgical instruments and had provided the additional information requested by the Purchasing Department. *Id*.

On January 23, 2019, Ms. McClain issued Plaintiff a written Performance Counseling Memorandum as a result of this incident. Pl.'s Ex. 21 at MFA-NK0040. The purchase order had to be approved by Plaintiff, Mr. Saks, and Ms. McClain before the Purchasing Department would process the order. Pl.'s Ex. 22 at P0196. Although Plaintiff Kalantaripour and Mr. Saks had approved the purchase order immediately and forwarded it to Ms. McClain, she delayed approving the purchase order until January 28, 2019. *Id*.

On January 28, 2019, Mr. Saks emailed Ms. McClain requesting that she approve the order and stating that "the purchase order for the full amount is in CORE waiting for your approval." *Id*. Accordingly, Plaintiff was issued a Performance Counseling Memorandum by Ms. McClain accusing Plaintiff of jeopardizing patient care when, in fact, it was Ms. McClain herself that caused the delay in ordering the surgical instruments by waiting four days to approve the purchase order. Notably, when Ms. McClain provided Plaintiff with the Performance Counseling Memorandum,

she informed Plaintiff that Dr. Patel and Dr. Friedman had their own agenda and had spoken to Dr. Kelly about assigning Plaintiff the Memorandum.  Pl.'s Ex. 23 at P0094.

On February 14, 2019, Plaintiff Kalantaripour was informed that she was being placed on a performance improvement plan ("PIP") by Ms. McClain and Mr. Saks.  Pl.'s Ex. 24 at MFA-NK0058-0060.  Mr. Saks presented Plaintiff with her assigned PIP on February 14, 2019.  *Id.*

One week after the PIP was issued, Plaintiff met with Dr. Freidman to discuss the residents' schedule and to get Dr. Friedman's input regarding the PIP in order to improve her performance. Plaintiff recorded this conversation in which Plaintiff asked Dr. Friedman about his thoughts on her assigned PIP and Dr. Friedman told Plaintiff "you were thrown into a really untenable situation . . . you were handed the reigns to a sinking ship, which makes it very difficult . . . this wasn't the job you were even meant to do, which is unfair to you, and you came in under a different assumption . . . and then you were thrown into something that you didn't even ask for."  Pl.'s Ex. 25 (Recording labeled P0288 at minute 3:05).  Dr. Friedman further commented that Plaintiff was a "very capable person" who was "very much victimized," and that Plaintiff's situation was unfair to her.  *Id.*  (Recording labeled P0288 at minute 7:28).

Plaintiff Kalantaripour requested a meeting with Ms. Hoffpauir to discuss her assigned PIP, but Ms. Hoffpauir did not meet with Plaintiff Kalantaripour until March 4, 2019, during which Plaintiff raised concerns about discrimination and being treated unfairly. MFA extended Plaintiff's PIP through March 2019, hired an individual to replace Plaintiff Kalantaripour and required that Plaintiff train the new employee.  Pl.'s Ex. 24 at MFA-NK0058-0060.

In April 2019, despite her exemplary performance, Plaintiff Kalantaripour's employment was terminated by Ms. McClain.  Pl.'s Ex. 26 at MFA-NK0061.  Unlike with Ms. Hazuka, an

American-born Caucasian employee, MFA's Human Resources Division never addressed the numerous complaints filed by Plaintiff against Dr. Patel and Dr. Ehrlich or conducted any investigation regarding Plaintiff's complaints.  Pl.'s Ex. 10 at P0176-P0184.  As a direct and proximate cause of MFA's discriminatory and retaliatory termination of her employment, Plaintiff has suffered loss of employment, lost wages, reputational damage, as well as emotional distress. Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") and has exhausted all administrative remedies prior to filing this suit.

## ARGUMENT

### I.        Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  There is a genuine issue as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  If factual issues can "reasonably be resolved in favor of either party," there is a need for a trial.  *Id*. at 250.  The Court, therefore, "should review all of the evidence in the record," *Reeves v. Sanderson Plumbing Products, Inc*, 530 U.S. 133, 150 (2000), viewing the evidence in the light most favorable to the non-moving party and according that party the benefit of all reasonable inferences.  *Anderson*, 477 U.S. at 255.

At this stage of the proceedings, the Court is not to make credibility determinations or weigh the evidence.  *Reeves*, 530 U.S. at 150.  If the evidence presented on a dispositive issue is subject to conflicting interpretations or reasonable persons might differ as to its significance,

summary judgment is improper. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Only if, after examining the evidence, the Court finds that a party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," is summary judgment appropriate. *Celot Ex. Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jackson v. Finnegan*, 101 F.3d 145, 150 (D.C. Cir. 1996). Summary judgment should only be granted in clear cases. *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986) (citation omitted).

## II.    Plaintiff Established Evidence that MFA Discriminated Against Her Based on Her Race, Sex, and National Origin and Created a Hostile Work Environment

Defendant argues in its Motion for Summary Judgment that MFA did not discriminate against Plaintiff and that Plaintiff cannot show that MFA's reasons for her termination were false and discriminatory. As the following paragraphs and the evidence of record in this case show, Defendant's argument is false. To establish a *prima facie* case of discrimination, an employee must demonstrate: "(1) that [s]he was a member of a protected class, (2) that [s]he was qualified for the job from which [s]he was terminated, (3) that [her] termination occurred despite [her] employment qualifications, and (4) that a substantial factor in [her] termination was [her] membership in the protected class. *Hollins v. Fannie Mae*, 760 A.2d 563, 572 (D.C. 2000) (analyzing race discrimination); *Czekalski, v. Peters*, 475 F.3d 360 (D.C. Cir. 2007); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To prevail on a hostile work environment claim, a plaintiff must show: (1) that she is a member of a protected class; (2) that she has been subjected to unwelcome harassment; (3) that the harassment was based on membership in the protected class; and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment. *D.C. Dep't*

16

*of Pub. Works v. D.C. Office of Human Rights*, 195 A.3d 483, 495 (D.C. 2018). Courts employ a totality-of-the-circumstances test in evaluating such claims, consulting such factors as "the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275 (1998)).

Given the overlap between these theories, Plaintiff Kalantaripour will address each below, but without repeating the facts and argument for the interrelated analysis.

### A. Plaintiff Kalantaripour is a Member of a Protect Class Due to Her Race, Sex, and National Origin

Defendant does not contest that Plaintiff is a member of a protected class based on her national origin. Def.'s Motion at 2. Further, it is uncontested that Plaintiff was born in Iran and that MFA staff were aware that Plaintiff was Iranian. Plaintiff Depo. at 11:20-21; *see also* Patel Depo. at 10:10-17; Saks Depo. at 14:15-22, 15:1-4. Plaintiff was also a member of a protected class based on her race and sex as a female of Middle Eastern Asian (or Persian) descent. Plaintiff Depo. at 11:20-21; *see also* Patel Depo. at 10:10-17; Saks Depo. at 14:15-22, 15:1-4. In *Saint Francis College v. Al-Khazraji*, the U.S. Supreme Court found that the U.S. Court of Appeals for the Third Circuit had properly rejected a district court determination that Arabs were not protected under Section 1981 because Arabs are classified as Caucasians under the current racial classifications of Congress. *See Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 107 S. Ct. 2022 (1987). The Supreme Court explained that the legislative history of Section 1981 indicated that it was enacted with the intention of preventing discrimination against persons based on ethnicity, as well as race. *Id*. at 613. ("Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic

characteristics. . . [regardless of] whether or not it would be classified as racial in terms of modern scientific theory"). Thus, as woman of Middle Eastern Asian (or Persian) descent who was born in Iran, Plaintiff is a member of a protected class based on her race, sex, and national origin.

**B.  Plaintiff Kalantaripour was Qualified for the Practice Manager Position**

Defendant MFA does not challenge or dispute that Plaintiff was qualified to be Practice Manager for MFA's Neurology, Neurosurgery, Psychiatry, and Dermatology Department.  At all times during her tenure at MFA, Plaintiff was, in fact, qualified for the job from which she was terminated.

**C.  Plaintiff Kalantaripour was Terminated Despite Her Qualifications**

Defendant MF does not contest that Plaintiff was terminated despite being qualified for the Practice Manager position within MFA's Neurology, Neurosurgery, Psychiatry, and Dermatology Department.  Plaintiff was, in fact, terminated despite her employment qualifications.

**D.  Plaintiff Was Not Terminated Due to Poor Performance**

Defendant claims in its Motion for Summary Judgment that MFA terminated Plaintiff due to her alleged poor performance.  Def.'s Motion at 7.  As the record of evidence demonstrates in this case, Defendant's argument is simply not true.  MFA's own Dermatology Scorecard Detail from February 1, 2018 to January 31, 2019 shows that the Dermatology Department improved in every single performance category during Plaintiff's tenure as Practice Manager.  Pl.'s Ex. 5 at P0170.  The Dermatology Department experienced the highest noted improvement among all of MFA's departments during Plaintiff's tenure as Practice Manager, particularly among patient access.  *Id*.  This drastic improvement was confirmed by Mr. Saks during his deposition, in which he testified that "across the board, the MFA saw improvements in all of these scores."  Saks Depo.

at 106:1-5.  Mr. Saks further confirmed that Plaintiff had been Practice Manager from May of 2018 onward during this period of improvement.  *Id*. at 105:9-11.  The across-the-board improvement within the Dermatology Department during Plaintiff's time as Practice Manager belies MFA's contention regarding Plaintiff's alleged poor performance.  Furthermore, it strains credulity for Defendant to suggest that Plaintiff suffered with significant performance issues while the Dermatology Department improved in every single scorecard category during Plaintiff's tenure as Practice Manager.

Defendant cites in its Motion, a December 10, 2018, email from Dr. Friedman in which he allegedly told Ms. Hoffpauir that Plaintiff could not do the job "plain and simple."  Def.'s Motion at 7.  Notably, Defendant fails to note that this email was sent after Plaintiff had engaged in protected activity by filing complaints against Dr. Patel and Dr. Ehrlich in November and December of 2018.  Pl.'s Ex. 6 at P0174; *see also* Pl.'s Ex. 9 at MFA-NK0148-0150.  Moreover, Defendant fails to note Mr. Saks' November 27, 2018 text message to Plaintiff in which he told Plaintiff "[d]on't let Ehrlich get you down. You are doing great!"  Pl.'s Ex. 8 at P0109.  This contemporaneous evidence from Plaintiff's direct supervisor is supplemented by the conversation between Plaintiff and Dr. Freidman in February 2019, one week after Plaintiff was placed on the PIP.  The recoding of this conversation demonstrates that Dr. Friedman told Plaintiff "you were thrown into a really untenable situation . . .  you were handed the reigns to a sinking ship, which makes it very difficult . . .  this wasn't the job you were even meant to do, which is unfair to you, and you came in under a different assumption . . .  and then you were thrown into something that you didn't even ask for."  Pl.'s Ex. 25 (Recording labeled P0288 at minute 3:05).  Dr. Friedman further told Plaintiff that she was a "very capable person" who was "very much victimized," and

that her current situation was unfair.  *Id.* (Recording labeled P0288 at minute 7:28).  Furthermore, Plaintiff never received any complaint regarding her work performance from her direct supervisor, Mr. Saks.

The alleged instances of poor performance identified by MFA were actually for duties that were not part of Plaintiff's job description.  In attempting to place Plaintiff's work performance in a negative light, Defendant states that Dr. Patel "received numerous patient complaints" and found Ms. Kalantaripour to be "unreliable and untrustworthy."  Def.'s Motion at 3.  The record of evidence in this matter demonstrates that Plaintiff was not responsible for patient complaints within the Dermatology Department.  When Plaintiff assumed responsibility for the administrative functions in the Dermatology Department, Mr. Saks sent an email on July 8, 2018, stating that "for now, patient complaints can be directed to Neurosurgery Nurse Manager Ann Robey."  Pl.'s Ex. 2 at P0161.  Thus, Ms. Robey, rather than Plaintiff, was responsible for addressing patient complaints within the Department.

Regarding statements by MFA employees that Plaintiff was untrustworthy, Dr. Patel admitted during his deposition that this statement was merely his opinion and that he had no proof of Plaintiff lying or admitting to lying to him.  Patel Depo. at 30:5-15.  Furthermore, when asked if Plaintiff had ever admitted to lying to any staff within the Dermatology Department, Dr. Patel plainly stated "No."  *Id*. at 68:20-22, 69:1-3.  Defendant cites a March 5, 2019, email from Ms. Hazuka to Dr. Friedman in which Ms. Hazuka claims, without evidence, that Plaintiff would lie to patients.  Def.'s Motion at 4.  During his deposition, Dr. Friedman testified that he did not review Ms. Hazuka's email prior to forwarding it to Mr. Saks and could not recall whether he independently confirmed any of the statements made by Ms. Hazuka in the email.  Friedman Depo.

at 54:19-22, 56:2-8.  In fact, the statements from Ms. Hazuka's email were false and inaccurate. A March 4, 2019 text message from the Melanie Santos to Plaintiff proves that Ms. Santos' flight was actually scheduled for March 6, 2019, due to a storm and the Dermatology Department's calendar for March 2019 shows that Ms. Santos was not on the leave schedule.  Pl.'s Ex. 27 at P0077-P0078.

Plaintiff's ability to run the daily operations and administrative functions of the Dermatology Department was severely restrained by the Department's lack of sufficient staff. MFA's Dermatology Department suffered from chronic staffing issues and was constantly understaffed throughout Plaintiff's employment, which undermined Plaintiff's tenure as Practice Manager through no fault of her own.  Mr. Saks testified in his deposition that MFA was "very short-staffed" during Plaintiff's employment and that it "was a challenge distributing staff in a way that met the needs of the various providers."  Saks Depo. at 43:1-11.  Mr. Saks further testified that MFA's staff shortage "was a daily source of concern and frustration."  *Id*. at 43:10-11.  Mr. Saks noted the Dermatology Department's staffing shortage in an October 16, 2018 email to Ms. McClain in which he stated that "the "[l]ack of consistent support for either Dr. DeLuca or Dr. Patel is impacting their ability to be effective and productive in clinic."  Pl.'s Ex. 12 at P0162.  At no point in this email or in his deposition did Mr. Saks state that Plaintiff was the cause for MFA's lack of staffing.  The record of evidence in this matter demonstrates that Plaintiff was unfairly blamed for issues and problems stemming from the Dermatology Department's chronic staff shortages that were out of Plaintiff's control.  In fact, when asked how the staff shortages affected Plaintiff, Dr. Patel testified that "it was hard for physicians' staff, administrative staff, managers any time we don't have a 100 percent complement of a team" because the Dermatology

Department "had been dealing with staff shortages."  Patel Depo. at 53:11-17.  As part of MFA's plot to make Plaintiff's work performance look poor, Plaintiff was unfairly held responsible for staffing issues that were out of her control and that negatively affected her own work as Practice Manager.    Accordingly, Plaintiff has shown that "[D]efendant's allegations of inadequate performance are false" with regard to Plaintiff's termination.  *Dang v. Inn at Foggy Bottom*, 85 F. Supp. 2d 39 (D.D.C. 2000).

Dr. Patel made several misrepresentations to Plaintiff and deviated from standard MFA procedures in order to make Plaintiff's work performance appear poor.  Dr. Patel emailed Plaintiff on October 19, 2018, stating that because a second MA was awaiting approval to be hired, the Department would "work with one consistent MA on Tuesday and one consistent MA on Thursday who is well trained and able to act as a lead MA."  Pl.'s Ex. 28 at P0129.  Dr. Patel stated that "I will utilize Tiandra and/or Gillian depending on the day and adjust my schedule to accommodate for their experience and comfort."  *Id*.  Dr. Patel then contradicted his own instructions to Plaintiff in an email on November 26, 2018, in which he told Plaintiff "you and I have discussed on several occasions that Tiandra cannot be my primary MA" despite specifically informing Plaintiff that he would utilize Tiandra as his primary MA in an earlier email.  Pl.'s Ex. 29 at P0210.  Moreover, Dr. Patel handwrote his schedule on a piece of paper and provided the handwritten schedule to Plaintiff on or around November 7, 2018.  Pl.'s Ex. 7 at P0216.  After providing Plaintiff with this handwritten schedule, Dr. Patel then blamed Plaintiff, in front of a patient, for mistakes regarding this schedule and accused Plaintiff of miscommunicating the schedule to him due to her accent. *Id*.  Dr. Patel directly contradicted his own instructions to Plaintiff and his own handwritten schedule in order to place Plaintiff in a negative light regarding her work performance.

22

Defendant asserts that Plaintiff's "lack of candor and non-responsiveness" resulted in Ms. McClain issuing Plaintiff a disciplinary memo due to Plaintiff's failure to properly order surgical instruments. Def.'s Motion at 8. Defendant's assertion with regard to this disciplinary memo is false as the record of evidence demonstrates that Plaintiff was not at fault for failing to properly order surgical equipment, and ordering these instruments was not part of Plaintiff's job duties. The referenced disciplinary memo is the written Performance Counseling Memorandum that Ms. McClain issued Plaintiff on January 23, 2019. Pl.'s Ex. 21 at MFA-NK0040. With regard to the surgical instruments, Dr. Patel emailed Plaintiff on January 10, 2019, regarding ordering surgical instruments, despite that not being part of Plaintiff's job description. Pl.'s Ex. 14 at P0186. After receiving Dr. Patel's email, Plaintiff called Mr. Saks on the same day and spoke to him regarding the request. Saks Depo. at 69:17-22, 70:1-4. Mr. Saks instructed Plaintiff not to worry about the order and that he would take care of it since he still needed to speak with Dr. Ehrlich and finalize the decision to place the order. *Id*. 73:11-22, 74:8-11.

On January 17, 2019, Mr. Saks sent an email indicating that the order for instruments requested by Dr. Patel was in process and stated he would provide the estimated time of arrival. Pl.'s Ex. 17 at P0188. On January 22, 2019, Dr. Patel sent Plaintiff an email inquiring about the status of the order. Pl.'s' Ex. 18 at P0190. Plaintiff then contacted Mr. Saks for the status of the order, as he had stated that he would take care of the order. *Id*. Mr. Saks then informed Plaintiff that he had not yet placed the order and instructed Plaintiff to place the order herself and get assistance from Ms. McCormick if needed. *Id*. Thus, Plaintiff did not place the purchase order until January 22, 2019, based on Mr. Saks' assurances that he would address the order himself.

On January 22, 2019, Plaintiff informed Dr. Patel that she had placed the order for the surgical instruments. Pl.'s Ex. 20 at MFA-NK0042-0043. Importantly, the purchase order had to be approved by Plaintiff, Mr. Saks, and Ms. McClain before the Purchasing Department would process the order. Although Plaintiff Kalantaripour and Mr. Saks had approved the purchase order immediately and forwarded it to Ms. McClain on January 22, 2019, Ms. McClain delayed final approval of the purchase order until January 28, 2019. Pl.'s Ex. 22 at P0196. Mr. Saks emailed Ms. McClain on January 28, 2019, stating that "the purchase order for the full amount is in CORE waiting for your approval." *Id*. Ms. McClain issued Plaintiff the written Performance Counseling Memorandum on January 23, 2019, *after* Plaintiff and Mr. Saks had properly approved the purchase but *before* Ms. McClain had provided final approval. Pl.'s Ex. 21 at MFA-NK0040. Despite the fact that Ms. McClain's failure to provide final approval until January 28, 2019 was the actual cause for the delay in ordering the surgical instruments, Plaintiff was accused of jeopardizing patient care and issued the Performance Counseling Memorandum by Ms. McClain. Thus, Defendant MFA mischaracterizes Plaintiff's issued Performance Counseling Memorandum as it was the actions of Ms. McClain herself that caused the delay in the ordering of the requested surgical instruments, despite the fact that the instruments arrived on time.

### E. Plaintiff Kalantaripour was Subject to Discrimination and Harassment Based on Her Race, Sex and National Origin, Which Was a Substantial Factor in Her Termination

Defendant claims that Plaintiff's disparate treatment claim must fail because Defendant's "conduct is not an adverse employment action." Def.'s Motion at 18. In order to avoid uncomfortable truths, MFA attempts to sidestep the sheer volume of material facts disputing MFA's claim that its proffered justifications for terminating Plaintiff were valid. As the foregoing

paragraphs demonstrate, Plaintiff suffered discriminatory conduct and disparate treatment from Defendant, including MFA's adverse employment action of terminating Plaintiff.

The evidence is clear, Plaintiff was not terminated for her poor performance, but rather because of her membership in a protected class based on her race, sex, and national origin. An employee may support an inference that her employer's termination was actually the result of racial discrimination by citing "the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff" *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115-18 (D.C. Cir. 2016) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015)) (internal quotation marks omitted). Here, the record of facts establishes a pattern of poor treatment from MFA toward other non-Caucasian and non-American-born employees. MFA moved two non-Caucasian MFA employees who worked in Washington, D.C. and had taken FMLA leave, Ms. Eubanks-Brown and Ms. Abdur-Rahman, to offices in Virginia in order to pressure the employees to quit. Eubanks-Brown Depo. at 48:14-22, 49:1-21; *see also* Abdur-Rahman Depo. at 45:6-15. Ms. Abdur-Rahman testified that Ms. McClain, Mr. Saks, and Dr. Friedman made the decision to move her and Ms. Eubanks-Brown's workplace to Virginia after their taking of FMLA leave because "that way [MFA] can stop them, because they're going to have a hard time getting back and forth to DC and taking off to go to the doctor." Abdur-Rahman Depo. at 57:10-22, 58:1-7. Notably, no Caucasian employee was reassigned to a different office in Virginia as a result of taking FMLA leave.

Ms. Abdur-Rahman further stated in a group text conversation with Plaintiff and Ms. Eubanks-Brown that this move was MFA "just being hateful" and "all of Dr. Friedman and Adrian's plan to make us miserable and try to make things hard for us." Pl.'s Ex. 30 at P0417.

Ms. Abdur-Rahman stated that Mr. Saks was "as nasty and mean as a racist" and that "so many people in this building … [h]ave told us so many stories about how he has treated them and other people." *Id*. Ms. Abdur-Rahman confirmed the contents of these text messages during her deposition, testifying that she did send that text message, that she knew "what kind of person he is" with regard to Mr. Saks, and that she had "seen the way he'll talk down to a person of color" and "the way he's talked to me." Abdur-Rahman Depo. at 57:1-7, 83:5-22, 84:1-19. Ms. Abdur-Rahman also testified that she has witnessed "people treat people of color totally different" within MFA. *Id*. at 83:11-19.

Defendant's pattern of poor treatment toward non-Caucasian and non-American-born employees continued with MFA's discriminatory treatment of two employees, Azeddine Khechmoune and Shamsun Nahar. Plaintiff Depo. at 191:1-13. Ms. Nahar, a non-American-born female of Middle Eastern Asian descent, submitted her resignation letter to MFA on November 22, 2019, due to the discriminatory treatment she suffered. Pl.'s Ex. 31 at P0356. Ms. Nahar stated in a text message conversation with Plaintiff that she "really felt as like [an] outsider" within MFA's Dermatology Department and that she was "not a part of that department." *Id*. at P0359. Ms. Nahar specified that MFA blamed a late invoice "because of [her] miscommunications," echoing Plaintiff's claim that MFA employees would use her accent to pretend they could not understand Plaintiff as a means to discriminate against her. *Id*. at P0361-P0362; *see also* Pl.'s' Ex. 1 ¶ 1. MFA staff, specifically Dr. Patel, would often change information that they communicated with non-American-born employees such as Plaintiff and Ms. Nahar and then blame the apparent "miscommunication" on their accents. Pl.'s' Ex. 1 ¶ 1. As Ms. Abdur-Rahman testified, Plaintiff stated that she was discriminated against "because of where I'm from" and that it was "because of

my accent that they are treating me different." Abdur-Rahman Depo. at 26:22, 27:1-7. With regard Mr. Khechmoune, a non-American-born employee of Middle Eastern Asian descent, he was terminated from MFA in September 2019 due to similar discriminatory treatment. Pl.'s Ex. 31 at P0378-P0379. After seven years of employment with MFA, Mr. Khechmoune was placed on a PIP on Dr. Patel's request. Pl.'s Ex. 32 at P0325-P0327.

In a February 26, 2018 email, Dr. Patel framed Mr. Khechmoune's interactions with MFA employees in negative light in order to place him on a PIP, stating "I am surprised to see that it is noted that [Mr. Khechmoune's] work with Dr. Redbord is satisfactory and adequate" and suggesting that "we frame the memo to say that MFA has inquired to Dr. Patel and Dr. Redbord when we will be able to do Mohs for melanoma and increase the number of Mohs cases we going for financial reasons?" *Id*. at P0326. When asked to contribute to Mr. Khechmoune's PIP memorandum, Plaintiff informed Mr. Saks via email that Dr. Patel was including false information about her involvement in meetings with Dr. Patel and Dr. Friedman. *Id* at P0325. Plaintiff knew that Mr. Khechmoune's placement on a PIP was a discriminatory act taken by Defendant to end his employment with MFA and did not wish to contribute to the discriminatory PIP.

Plaintiff further suffered discriminatory treatment from Defendant when she was excluded from weekly operation meetings within the Dermatology Department. As Dr. Friedman testified, Plaintiff was not present during any of the operation meetings that he attended. Friedman Depo. at 43:15-18. Mr. Saks testified in his deposition, there were *ad hoc* Dermatology operation meetings that would take place without Plaintiff and without Plaintiff's knowledge, despite her role as Practice Manager. Saks Depo. at 65:10-22, 66:1-7. Thus, Plaintiff was excluded from crucial meetings that dealt with relevant details regarding the daily operation of the Dermatology

27

Department, such as staffing, finances, customer satisfactions, and ideas to improve revenue and patient care. *Id*. No Caucasian or American-born employee was similarly excluded from these meetings, including an employee hired to replace Plaintiff, Natalie Murray. *Id*. at 44:9-22, 46:2-8; *see also* Saks Depo. at 66:9-16.

As previously noted, Plaintiff suffered unwelcome harassment at the hands of Dr. Patel when he entered Plaintiff's office, slammed his fist down on her table, screamed at Plaintiff, and threatened to report Plaintiff to Ms. McClain on November 2, 2018. Plaintiff Depo. at 153-154; *see also* Patel Depo. at 45:12-22, 46:1-4. Dr. Patel further harassed and spoke to Plaintiff in an extremely hostile manner on December 4, 2018, when he raised his voice and yelled at Plaintiff regarding a last-minute change to an MA's schedule and blamed an alleged miscommunication on Plaintiff's accent. Patel Depo. at 48:12-22, 49:1-22, 50:1-11. Ms. Abdur-Rahman witnessed hearing yelling in the hallway when Dr. Patel raised his voice toward Plaintiff in Plaintiff's office in November 2018. Abdur-Rahman Depo. at 30:19-22, 31:1-3. Ms. Abdur-Rahman also spoke with Plaintiff after Dr. Patel had yelled at her in her office and noticed that Plaintif "was just shaking – she was a complete wreck. She was bright red. Her eyes were full of water." *Id*. at 31:11-13. Ms. Abdur-Rahman further testified that Plaintiff told her Dr. Patel "has yelled at me before," "screamed at me before," and "got up in my face" to the point that Plaintiff showed Ms. Abdur-Rahman a letter opener in her desk and explained that "this is what I keep when I'm here, if I'm working on something by myself and he's still here, and I'm still here, I keep it right here handy… I'm that afraid of him." *Id*. at 29:18-20, 30:4-14.

As Ms. Abdur-Rahman's testimony shows, Dr. Patel caused Plaintiff to undoubtedly experience discriminatory harassment so severe and pervasive that it affected the terms,

conditions, or privileges of Plaintiff's employment.  *See Taylor v. FDIC,* 132 F.3d 753, 766 (D.C. Cir. 1997).  This discriminatory harassment was amplified by Dr. Ehrlich when she screamed orders at Plaintiff in an extremely hostile manner on November 27, 2018, to the point that Plaintiff complained to Ms. McClain.  Pl.'s Ex. 9 at MFA-NK0148-0150.  Defendant MFA created an environment so heavily charged with discrimination that it destroyed the emotional well-being of several of its minority employees, including Plaintiff, Ms. Abdur-Rahman, Ms. Eubanks-Brown, Mr. Khechmoune, and Ms. Nahar and treated them as second-class citizens.  *See Bundy v. Jackson*, 641 F.2d 934, 944 (D.C. Cir. 1981).

**F. The Record of Evidence Establishes that Plaintiff Kalantaripour Was Discriminatorily Discharged and Replaced With Persons Outside Her Protected Class**

Defendant argues that it relied on legitimate non-discriminatory reasons for its action in terminating Plaintiff's employment.  Def.'s Motion at 8.  Contrary to Defendant's argument, the record of evidence in this matter shows that MFA discriminatorily discharged Plaintiff.  An employee can establish a *prima facie* case of discriminatory discharge by establishing that she "was discharged and that [s]he was replaced by a person outside [her] protected class." *Dang*, 85 F. Supp. 2d at 39.  Here, the record of evidence establishes that after Plaintiff's termination, she was replaced by two employees of comparable qualifications outside of her protected class. Following her termination, Plaintiff's responsibilities as Practice Manager were given to Marcus Christian, an American-born African American male, and Natalie Murray, an American-born African American female.  Friedman Depo. at 44:9-22, 46:2-8; *see also* Abdur-Rahman Depo. at 63:8-19, 64:21-22, 65:1-20.  Ms. Abdur-Rahman further clarified that Ms. Murray replaced Plaintiff and became her manager after Plaintiff's termination and that both Ms. Murray and Mr.

Christian took on Plaintiff's previous job responsibilities as Practice Manager. Abdur-Rahman Depo. at 63:17-19, 65:15-20. Plaintiff's replacement by two American-born employees that were respectively outside of her protected classes of race, sex, and national origin further prove that Plaintiff was discriminatorily discharged by Defendant and that the record of facts sufficiently supports Plaintiff's claims of discrimination to survive summary judgment.

This Court has previously denied motions for summary judgment regarding Title VII claims of discrimination in similar circumstances and should do the same in the case at bar. *See Dancy v. American Red Cross*, 972 F. Supp. 1 (D.D.C. 1997) (holding that plaintiff demonstrated that genuine questions of material fact exist on her claims of race discrimination and retaliation and denying defendant's motion for summary judgment on plaintiff's Title VII claims). Accordingly, Defendant's Motion for Summary Judgment should be denied in its entirety.

**III.      MFA's Alleged Non-Discriminatory Reasons for Plaintiff's Termination Were Pretextual**

Defendant MFA offers pretext for why it fired Plaintiff to hide the substantial, causal role that discriminatory harassment based on Plaintiff's membership in protected classes due to her race, sex, and national origin, played in her termination. *Hollins*, 760 A.2d 563, 571-572 (the employee must show that "employer's proffered reasons for the employment action was pretextual . . . [and] that employer has unlawfully discriminated" against the employee) (internal quotation marks and citations omitted). The U.S. Supreme Court held that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 150. Plaintiff set forth above and in her Response to Defendant's Statement of Material Facts, which Plaintiff incorporated here by reference, the extent to which Defendant's claim that Plaintiff

was terminated for poor performance was false and MFA's investigation into Plaintiff's complaints of discrimination was non-existent.

Plaintiff can show pretext by "persuading the court that a discriminatory reason more likely motivated the employer or . . . showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Pretext can be demonstrated by "showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [employer's] proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Dalesandro v. United States Postal Serv.*, EEOC Appeal No. 01A50250 (Jan. 30, 2006) (citing *Morgan v. Hilti, Inc.,* 108 F3d 1319, 1323 (10th Cir. 1997). As this Opposition has demonstrated in the foregoing paragraphs, Plaintiff was not terminated for poor performance and Defendant's stated justifications are false and unworthy of credence.

MFA's rationale underlying its placement of Plaintiff on a PIP and termination of Plaintiff's employment is wholly unworthy of credence. The instances of poor performance by Plaintiff identified in the PIP letter were actually for duties that were not part of her job description. The PIP letter includes a reference to Dr. Patel's request to order surgical instruments for his clinic, even though ordering these instruments was not part of Plaintiff's job duties. Pl.'s Ex. 24 at MFA-NK0058-0060. As previously stated, MFA's characterization of this requested purchase order is false. Both Plaintiff and Mr. Saks immediately approved the purchase order and forwarded it to Ms. McClain, who delayed final approval of the purchase order until January 28, 2019. Pl.'s Ex. 22 at P0196. Mr. Saks even emailed Ms. McClain on January 28, 2019, to inform her that "the purchase order for the full amount is in CORE waiting for your approval." *Id*. Furthermore, there

was an ongoing disagreement between Mr. Saks and Dr. Patel regarding the total amount of the purchase order.  Pl.'s Ex. 19 at P0192-P0194.  Accordingly, MFA falsely blamed Plaintiff for the delay in ordering the requested surgical instruments in Plaintiff's assigned PIP letter.

Plaintiff's assigned PIP letter also relies on Dr. Patel's and Ms. Hazuka's false descriptions of Plaintiff's work performance and alleged untrustworthiness despite the fact that Dr. Patel testified he had no proof of Plaintiff lying or admitting to lying to any person within the Dermatology Department.  Patel Depo. at 30:5-15, 68:20-22, 69:1-3.  Additionally, Plaintiff's PIP letter does not list any issues or negative feedback regarding Plaintiff's scheduling within the Dermatology Department, despite the fact that Plaintiff was responsible for managing schedules in her role as Practice Manager.  Surely, if Plaintiff had been performing poorly with regard to her scheduling duties, those issues would have been listed in her assigned PIP letter.  Rather, MFA's proffered statements within the PIP letter are "unworthy of credence."  *Hollins*, 760 A.2d at 573 (internal quotation marks and citations omitted).

By contrast, the record of this case is replete with contemporaneous evidence that the Dermatology Department improved in all performance areas under Plaintiff's tenure as Practice Manager.  The Dermatology Department experienced positive improvement in every single key performance area from February 1, 2018 to January 31, 2019, which coincided with Plaintiff's time as Practice Manager.  Pl.'s' Ex. 5 at P0167-P0172.  Furthermore, Plaintiff received several positive compliments regarding her work from her direct supervisor, Mr. Saks, and Defendant has not introduced any evidence showing Mr. Saks directly complaining about Plaintiff's performance as Practice Manager.  These contemporaneous compliments include Mr. Sak's telling Plaintiff that she was "excellent" during an assigned presentation and that she was "doing great" in her position

as Practice Manager.  Pl.'s Ex. 4 at P0108: *see also* Pl.'s Ex. 8 at P0109.  The noticeable lack of contemporaneous evidence from Plaintiff's direct supervisor regarding her alleged poor performance as Practice Manager further reveals that MFA's proffered justifications for its adverse actions are unworthy of credence.

Also, strongly indicative of pretext is the treatment of Plaintiff compared to that of Ms. Hazuka, a similarly situated employee not in Plaintiff's protected class.  A plaintiff can show evidence of pretext by showing "the employer's better treatment of similarly situated employees outside the plaintiff's protected group."  *Wheeler*, 812 F.3d 1109, 1115-18 (quoting *Walker*, 798 F.3d 1085, 1092 (internal quotation marks omitted).  Ms. Hazuka, an American-born Caucasian female who filed a similar complaint against Dr. Ehrlich, received a full-scale investigation based on her complaint, unlike Plaintiff.  For employees to be deemed similarly situated "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Phillip v. Holladay Prop. Servs*., 937 F. Supp. 32,37 (D.D.C. 1996) (citing *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992).  Both Plaintiff and Ms. Hazuka shared the same supervisor in Ms. McClain, MFA's Chief Operating Officer, and both filed complaints specifically detailing Dr. Ehrlich's hostile behavior.  Pl.'s Ex. 10 at P0176-P0184. Pl.'s Ex. 1 ¶ 1.  Importantly, only Ms. Hazuka's complaint resulted in an actual investigation by MFA's Human Resources Division.  Pl.'s Ex. 10 at P0176-P0184.  Despite filing more complaints with MFA's Human Resources Division than Ms. Hazuka, not one of Plaintiff's complaints resulted in an official investigation.  *Id*; *see also* Eubanks-Brown Depo. at 39:19-23; Abdur-

Rahman Depo. at 42:21-22, 43:1-3.  Notably, neither Plaintiff nor Mr. Khechmoune, both non-American-born employees of Middle Eastern Asian descent, were interviewed as part of Ms. Hazuka's investigation, despite working with Dr. Erlich at the time.  Pl.'s Ex. 10 at P0176-P0184.

Furthermore, Defendant deviated from standard MFA policy in not investigating any of Plaintiff's numerous complaints, giving rise to an inference of pretext.  Pl.'s Ex. 1 ¶ 1; *see also Jones v. Ottenberg's Bakers, Inc.*, 999 F. Supp. 2d 185 (D.D.C. 2013) (Indeed, "deviations from standard procedures" may even "give rise to an inference of pretext" at the summary judgment stage). (citing *Harrington v. Aggregate Indus. N.E. Region*, 668 F.3d 25, 33 (1st Cir. 2012).  An employer's "failure to follow its own polices may support an inference of pretext." *Floyd v. State of Missouri Dept. of Soc. Serv*, 188 F.3d 932 (8th Cir. 1999) (citing *Young v. Warner-Jenkinson Co*., 152 F.3d 1018, 1024 n. 6 (8th Cir. 1998).  At no point in its Motion for Summary Judgment does Defendant provide *any* justification for not conducting a single investigation regarding Plaintiff's numerous complaints.

While Plaintiff's complaints before MFA's Human Resources Division were immediately dismissed, MFA conducted a full-scale investigation regarding the complaint of Ms. Hazuka, complete with interviews of over twenty MFA staff, including Ms. Eubanks-Brown and Ms. Abdur-Rahman.  Pl.'s Ex. 10 at P0176-P0184.  As Ms. Eubanks-Brown testified in her deposition, she was one of the twenty-four persons within the Dermatology Department interviewed as part of Ms. Hazuka's complaint.  Eubanks-Brown Depo. at 33:3-5, 34:15-22, 36:1-17.  By contrast, both Ms. Eubanks-Brown and Ms. Abdur-Rahman testified that they were never interviewed as part of any investigation into a complaint filed by Plaintiff.  *Id*. at 39:19-23; *see also* Abdur-Rahman Depo. at 42:21-22, 43:1-3.  As part of the investigation into Ms. Hazuka's complaint, MFA

reminded Dr. Ehrlich "that engaging in any type of retaliatory behavior is not acceptable and may result in further action" and instructed those interviewed as part of the investigation "to report any type of negative or retaliatory action immediately." Pl.'s Ex. 10 at P0178. Conspicuously, MFA never gave such warnings or instructions as a result of *any* of Plaintiff's complaints against Dr. Patel or Dr. Ehrlich. The U.S. Court of Appeals for the District of Columbia Circuit has found pretext in similar circumstances and this Court should do the same. *See Ozburn-Hessey Logistics, LLC v. Nat'l Labor Relations Bd.*, 833 F.3d 210 (D.C. Cir. 2016) (finding pretext where the company's discharge decision was "inconsistent with" other disciplinary decisions and "deviated from" the company's standard policies and procedures).

## IV.        MFA Retaliated Against Plaintiff Kalantaripour

As set forth in detail above and in Plaintiff's Response to Defendant's Statement of Material Facts as to Which there is no Genuine Dispute, Plaintiff established that she reported illegal discrimination and harassment to MFA's Human Resources division after which MFA retaliated by terminating Plaintiff's employment. The Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits an employer from taking retaliatory action against an employee that opposes acts of discrimination or harassment. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452-57 (2008). To establish a *prima facie* case of retaliation, a plaintiff must show that: "(1) [s]he engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C.Cir.2007).

### A. Plaintiff Kalantaripour Engaged in Protected Activity and MFA Subsequently Terminated Her

Defendant argues that Plaintiff's filed Complaint does not allege that she engaged in protected activity. Def.'s Motion at 20. However, the record of evidence in this matter and the applicable caselaw demonstrate that Defendant's argument is false. Contrary to Defendant's claim, the record of evidence in this matter shows that Plaintiff did mention discrimination when complaining about her treatment. Defendant quotes Plaintiff's email complaints at length in its Motion for Summary Judgment but leaves out the fact that Plaintiff directly informed her supervisors verbally that she was being discriminated against. *Id*. at 20-22. During a meeting between Plaintiff, Mr. Saks, and Ms. Hoffpauir on March 22, 2019, Plaintiff discussed the treatment she received from Dr. Patel and Dr. Ehrlich by stating that "I think the whole thing was unfair… I was ***discriminated*** against… and that's all I can say." Pl.'s Ex. 33 at P0290 (Recording labeled P0290 at minute 1:48) (emphasis added). Mr. Saks also confirmed that Plaintiff reported to him that she believed she was being discriminated against due to her race and national origin prior to her termination. Saks Depo. at 34:6-10. Notably, this statement by Plaintiff to Mr. Saks and Ms. Hoffpauir occurred less than a month before MFA's termination of Plaintiff in April 2019. Pl.'s Ex. 26 at MFA-NK0061.

This Court has recognized that "[t]o alert the defendant that [s]he is opposing discrimination, the [plaintiff] need not . . . employ any 'magic words,' such as 'discrimination,' for 'the communication of a complaint of unlawful discrimination . . . may be inferred or implied' from the surrounding facts." *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1 (D.D.C. 2006) (quoting *Carter-Obayuwana v. Howard University*, 764 A.2d 779 (D.C. 2001). Accordingly, Defendant's "submission of evidence indicating that plaintiff did not explicitly allege

discrimination based on race… or national origin is not dispositive" in the case at bar.    *Mazloum v. District of Columbia Metropolitan Police Dept*, 517 F. Supp. 2d 74 (D.D.C. 2007).    Here, Plaintiff specifically described Dr. Ehrlich's behavior towards her as "unprofessional," "not ethical" in her November 28, 2018, email to Ms. Hoffpauir and described Dr. Patel's behavior as "humiliating" and stated that "[t]his is not the first time that he is threatening me" in her December 4, 2018, email to Ms. Hoffpauir.    Pl.'s Ex. 9 at MFA-NK0148-0150; *see also* Def.'s Motion at 22.    Importantly, Ms. Abdur-Rahman testified that Plaintiff told her that she was being discriminated against by MFA "because of where I'm from" and that it was "because of my accent that they are treating me different."    Abdur-Rahman Depo. at 26:22, 27:1-7.

In light of such evidence, a reasonable jury could conclude that there is a genuine issue of material fact as to whether MFA was "on notice that [Plaintiff's] request to file a complaint was in opposition to discriminatory conduct."    *Mazloum*, 517 F. Supp. 2d at 74.    Because Plaintiff informed Defendant that Dr. Patel and Dr. Ehrlich were unlawfully discriminating and harassing her both verbally and through MFA's Human Resources Division, Plaintiff has "satisfied all the prerequisites for protected activity."    *Carter-Obayuwana v. Howard University*, 764 A.2d 779 (D.C. 2001).

Besides directly informing her supervisors verbally that she was being discriminated against, Plaintiff filed numerous complaints with MFA's Human Resources Division, stating the very facts argued here regarding Dr. Patel's and Dr. Ehrlich's illegal discrimination and harassment.    Here, there is no reasonable dispute that Plaintiff engaged in protected activity and that MFA took adverse action against her in the form of termination.    Further, these facts establish that Plaintiff had a "reasonable good faith belief" that MFA had conducted illegal discrimination

37

and harassment against her and "alerted [MFA] that [s]he was lodging a complaint" concerning the illegal harassment and discrimination. *Ukwuani v. Dist. of Columbia*, 241 A.3d 529, 546 (D.C. 2020); *see also Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012) ("An employee is protected from retaliation even if the employer's conduct alleged to be discriminatory is lawful, so long as the employee reasonably believed the employer's action was discriminatory.").

In the case at bar, the problem was not that Plaintiff did not honestly believe what she was reporting regarding Dr. Patel's and Dr. Ehrlich's discriminatory and harassing behavior, it was that MFA would not listen to Plaintiff. Thus, the remaining questions with regard to retaliation is whether there is a causal link between Plaintiff's protected activity and her termination. As the following paragraph demonstrates, this causal link exists.

### B. MFA Terminated Plaintiff Because She Engaged in Protected Activity

Defendant offers a pretext for why it terminated Plaintiff to hide the causal link between her protected activity and MFA's termination decision. Specifically, Defendant claims that Plaintiff was terminated for alleged poor performance and that the decisionmakers for placing her on a PIP and terminating her employment were not aware of any protected activity. Def.'s Motion at 28. However, as this Opposition previously stated in Section II, the evidence in this case proves that Plaintiff was not terminated for poor performance. In fact, the recommendations put in place by Plaintiff and her collaboration with providers resulted in improvement within the Dermatology Department in every single key performance area as indicated by the Dermatology Overall Scorecard from February 1, 2018 to January 31, 2019. Pl.'s' Ex. 5 at P0170.

Causal connection may be established by showing that that "the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after

that activity." *Mitchell v. Baldrige*, 759 F.2d 80 (D.C. Cir. 1985); *see also McKenna v. Weinberger*, 729 F.2d 783 (D.C. Cir. 1984) (causal connection established by knowledge of employee's protected activity closely followed by adverse personnel action). The record of evidence shows that Plaintiff began her protected activity of filing complaints to Ms. Hoffpauir in November 2018 and that Defendant MFA was aware of these complaints. Def.'s Motion at 20; *see also* Plaintiff Depo. at 153-154. Plaintiff complained of Dr. Patel's discriminatory and hostile behavior to Ms. Hoffpauir and Mr. Saks on November 2, 2018, December 6, 2018, and December 12, 2018. Pl.'s Ex. 6 at P0174; *see also* Pl.'s Ex. 9 at MFA-NK0148-0150; Patel Depo. at 48:12-22, 49:1-22, 50:1-11; Plaintiff Depo. at 164-165. Plaintiff also complained of Dr. Ehrlich's discriminatory and hostile behavior on November 28, 2018 and December 2, 2018. Pl.'s Ex. 9 at MFA-NK0148-0150; *see also* Def.'s Motion at 20-21.

Defendant argues that there is no causal connection between Plaintiff's protected activity and MFA's adverse actions. Def.'s Motion at 25. However, Defendant's argument is false and the record of evidence in this matter establishes an inference of causation through temporal proximity. "[The United States Court of Appeals for the District of Columbia] Circuit still maintains that close temporal proximity alone is sufficient to establish the causation element of the *prima facie* case for retaliation." *Gray v. Foxx*, 74 F.Supp.3d 55, 73 (D.D.C. 2014) (citing *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000)). While the maximum lapse between the protected activity and retaliatory action has not been established, courts have accepted temporal proximities of three to five months. *Castle v. Bentsen*, 867 F. Supp. 1, 3 (D.D.C. 1994). Plaintiff Kalantaripour complained of discrimination and harassment in November and December of 2018 and was issued a written Performance Counseling Memorandum on January 23, 2019, despite

approving the purchasing order regarding the surgical instruments. Pl.'s Ex. 24 at MFA-NK0058-0060. Additionally, Plaintiff was placed on a PIP on February 14, 2019, approximately two months after her most recent complaint of discrimination. *Id*. MFA retaliated at the earliest opportunities it could against Plaintiff by reprimanding her for a delay in ordering surgical instruments that was not her fault and placing her on a PIP with false pretenses.

Even if Defendant's adverse actions were not so close in time to her protected activity, Plaintiff could still show causation through an intervening pattern of antagonism by Defendant. "'Temporal proximity is but one method of proving retaliation. Evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection.'" *Payne v. Dist. of Columbia*, 4 F.Supp.3d 80, 89 (D.D.C. 2013) (quoting *Buggs v. Powell*, 293 F.Supp.2d 135, 149 (D.D.C. 2003); *see also Payne*, 4 F.Supp.3d 89 ("where there is a lack of temporal proximity, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference.") The record of evidence in this matter establishes a pattern of antagonism against Plaintiff following her protected activities. After she first complained about discrimination and harassment to Ms. Hoffpauir and Mr. Saks in November 2018, Plaintiff began to experience increased discriminatory and harassing behavior from Dr. Ehrlich and Dr. Patel and was subsequently placed on the PIP on February 14, 2019. Pl.'s Ex. 24 at MFA-NK0058-0060. During the first six months of Plaintiff's employment, she had a good relationship with several MFA employees, including texts sent from Mr. Saks stating that "[y]ou were excellent" following a July 25, 2018, Dermatology Department meeting and that Plaintiff was "doing great!" Pl.'s Ex. 4 at P0108; *see also* Pl.'s Ex. 8 at P0109. Nonetheless, in response to Plaintiff's engagement in protected activity, MFA employees began

to retaliate against Plaintiff, including when Ms. McClain issued Plaintiff a written Performance Counseling Memorandum on January 23, 2019, for a delay in ordering surgical instruments that was in fact Ms. McClain's fault.  Pl.'s Ex. 21 at MFA-NK0040.  As previously noted, although the purchase order had been approved by Plaintif, Ms. McClain delayed approving the purchase order until January 28, 2019, demonstrating that Plaintiff was not at fault for any delay in ordering the instruments and the Performance Counseling Memorandum was issued with retaliatory animus.  Pl.'s Ex. 22 at P0196.  Following Ms. McClain's retaliatory issuing of the Performance Counseling Memorandum, Plaintiff was placed on a PIP by Defendant MFA for the first time in her career.  Pl.'s Ex. 24 at MFA-NK0058-0060

A court "need not question whether [the adverse action] was a prudent course for [Employer] under the circumstances. It is enough if retaliation was 'a substantial factor,' even if not the only factor."  *Propp*, 39 A.3d at 866 (internal quotation marks and citation omitted).  Here, Plaintiff's protected activities were undoubtedly a substantial factor in MFA's termination of her employment and as previously noted, MFA's alleged non-discriminatory reasons for Plaintiff's termination are pretextual.  Plaintiff's argument regarding the pretextual nature of MFA's explanation for terminating her employment is also set forth above in Section III.

The inevitable conclusion to be drawn is that MFA fired Plaintiff because of her repeated protected activity and Defendant's excuses to the contrary are pretextual.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff Nasrin Kalantaripour requests that Defendant's

Motion for Summary Judgment be denied in its entirety.

Dated: February 22, 2022

                                                */s/ Michael S. Ludwig*
                                                Michael S. Ludwig
                                                D.C. Bar No. 1670977
                                                The Law Offices of David A. Branch &
                                                Associates, PLLC
                                                1828 L Street, N.W., Suite 820
                                                Washington, D.C. 20036
                                                Phone: (202) 785-2805
                                                Fax: (202) 785-0289
                                                Email: michaelludwig@dbranchlaw.com

## <u>CERTIFICATE OF SERIVCE</u>

I hereby certify that this 22nd day of February 2022, I caused a copy of the foregoing to be served electronically via the Court's CM/ECF e-filing system upon counsel for Defendant listed below:

Raymond C. Baldwin (Bar No. 461514)
Samantha L. Brooks (Bar No. 1033641)
Seyfarth Shaw LLP
975 F Street, N.W.
Washington, D.C. 20004
Phone: (202) 463-2400
Email: rbaldwin@seyfarth.com
Email: sbrooks@seyfarth.com

*Attorneys for Defendant.*

       */s/ Michael S. Ludwig*
Michael S. Ludwig