**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

NASRIN KALANTARIPOUR,

Plaintiff, Case No. 1:21-cv-00272-JMC

-against-

THE GEORGE WASHINGTON
MEDICAL FACULTY ASSOCIATES,

Defendant.

# REPLY IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Medical Faculty Associates, Inc. ("MFA"), by counsel, submits its Reply in Further Support of its Motion for Summary Judgment.

MFA terminated Plaintiff Nasrin Kalantaripour's ("Plaintiff" or "Ms. Kalantaripour") employment because of her poor performance. Consistent with this fact, Ms. Kalantaripour's Opposition concedes dispositive facts and arguments, fails to create a dispute of material fact regarding the reasons she was fired and fails to demonstrate pretext.

For example, Ms. Kalantaripour concedes her boss did not discriminate or retaliate against her when he—together with then Chief Operating Officer Pamela McClain[1]—decided to fire her:

*Q: All right. So do you think Adrien Saks discriminated against you?*

*A: I did not get the sense that he discriminated, based on my observation.*

*Q: Do you think he retaliated against you?*

---

[1] It is undisputed Mr. Saks and Ms. McClain made the decision to fire Plaintiff. (MFA's SOMF at ¶ 83; Pl. Res. to SOMF at ¶ 83 "undisputed.") Further, Ms. McClain testified Plaintiff's gender, national origin and race had nothing to do with the decision to fire her. (SOMF ¶ 112) Plaintiff effectively concedes this fact, since the only record evidence she offers in dispute, is Paragraph 1 of her answers to interrogatories, which is simply an objection. (Pl. Res. to SOMF at ¶ 112, "Pl.'s Ex. 1 ¶ 1")

*A: Based on my observation, I did not get that sense.*

(SOMF ¶ 111)

Ms. Kalantaripour also concedes there were no racial or sexist comments or remarks directed toward her, and that no one made fun of or mocked her accent. Further, she fails to address and therefore concedes she did not exhaust her administrative remedies with respect to any claim Dr. Alison Ehrlich harassed or discriminated against her.

Perhaps in recognition of these fatal flaws, Ms. Kalantaripour's Opposition instead significantly misstates and mischaracterizes the record. For example, she cites to "Plaintiff's Ex. 1 ¶ 1" as evidence that (a) she was fired due to race, sex, and national origin; (b) she was discriminated against based on her accent; (c) Dr. Patel blamed her for miscommunication "a method by which he used to discriminate against Plaintiff;" and (d) she was fired due to her engagement in protected activity. (*See, e.g.*, Pl. Response to SOMF at ¶¶ 111-114, Pl. Opp. at 6-8, 26) Yet, "Plaintiff's Ex. 1 ¶ 1" is the first of a number of objections at the beginning of her answers to interrogatories and, notably, those interrogatories did not ask Plaintiff to state whether she thought she was discriminated or retaliated against, nor did they ask her to identify any facts in support of any such claims. (*See*, Ex. 1, Pl. Opp. to MSJ) In another example, Plaintiff claims Mr. Saks "confirmed that Plaintiff reported to him she believed she was being discriminated against due to her race and national origin prior to her termination." (Pl. Opp at 36, citing Saks Depo. At 34:6:10 (emphasis added)). Yet, the cited testimony says no such thing:

*Q: You stated previously that Ms. Kalantaripour reported to you that she had been discriminated against on the last day of her employment, correct?*

*A: That's correct.*

*Objection. That mischaracterizes the testimony a bit.*

*Q: I'll ask, do you recall—on the last day of her employment, did Ms. Kalantaripour state that she was—claim that she was being discriminated against?*

*A: Yes, after we had terminated her.*

(Attached here as Ex. 1 for ease of reference, Saks Dep. at 34:6-18, also SOMF ¶¶ 110)

Not only did Plaintiff misstate the deposition testimony on which she relies for a key issue in the case, she completely ignored the actual testimony:

*Q: Did Ms. Kalantaripour ever inform you that she believed she was being discriminated against?*

*A: No, not-well, actually, on the very last day when she was terminated.*

(Ex. 1, Saks Dep. at 31:6-9)

In the final analysis, Ms. Kalantaripour's attempts to mischaracterize the record are unavailing. No reasonable juror could conclude Ms. Kalantaripour was discriminated against or retaliated against and summary judgment should be granted on all of her claims.

## ARGUMENT

### I. MS. KALANTARIPOUR DOES NOT DEMONSTRATE PRETEXT

Ms. Kalantaripour's performance was found lacking by numerous people:

- Dr. Adam Friedman said she could not do the job. (SOMF ¶ 45)
- Dr. Vishal Patel repeatedly complained about Ms. Kalantaripour's poor performance. (SOMF ¶ 19)
- Dr. Ilana DeLuca complained Ms. Kalantaripour's performance adversely impacted patient care. (SOMF ¶ 49)
- Elizabeth Hazuka, a Medical Assistant, complained Ms. Kalantaripour lied to patients and staff. (SOMF ¶ 81)
- Pamela McClain, the Chief Operating Officer, issued Ms. Kalantaripour a disciplinary memo, noting her lack of responsiveness and poor follow up communication. (SOMF ¶ 68)
- Fadi Hachmen, Manager of Patient Experience, counseled Ms. Kalantaripour about better utilizing various staff members in the Department. (SOMF ¶ 32)

- Adrien Saks, the Practice Group Administrator and Ms. Kalantaripour's direct supervisor, issued her a performance improvement plan noting inconsistency and a lack of transparency and mistrust. (SOMF ¶¶ 75-78)

In her Opposition, Ms. Kalantaripour responds that the views of seven different people are wrong, or that the failings were outside her job duties. She also claims, on the one hand, that the Dermatology Department (the "Department") was doing well, while on the other, relying on alleged dysfunction in the Department for which she was responsible to excuse her performance. At the end of the day, Ms. Kalantaripour simply disagrees with the MFA's assessment of her performance. But, this is not pretext and Ms. Kalantaripour's claims of discrimination should be rejected. *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("It is settled that 'it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)); *Faison v. D.C.*, 893 F. Supp. 2d 143, 157 (D.D.C. 2012) ("In determining pretext, it is the perception of the decision-maker that is relevant. A court does not focus on whether the reasons offered by the employer were correct but instead evaluates whether the selecting official honestly believed the reasons offered.") (internal citation omitted); *Young v. Perry*, 457 F. Supp. 2d 13, 19 (D.D.C. 2006) ("[P]laintiff's perception of h[er]self, and of h[er] work performance, is not relevant. It is the perception of the decisionmaker which is relevant.") (internal citation omitted).

Pretext means the employer's explanation for the employment decision was false and the real reason was discriminatory. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 n.3 (D.C. Cir. 1988). Pretext can be shown by demonstrating: (1) the employer treated similarly situated employees of a different protected category more favorably; (2) the employer is lying about the facts forming the predicate for termination; (3) changes and inconsistencies in the stated reasons; and (4) the employer failed to follow established procedures. *Brady v. Sergeant at Arms*, 520 F.3d 490, 495-496, n.3 (D.C. Cir. 2008); *Moeller v. LaFleur*, 246 F.Supp.3d 130, 140 (D.D.C.

2017) (Plaintiff must provide evidence suggesting "that the employer's stated reasons were 'phony'") (quotation omitted); *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.").

Instead of demonstrating pretext, Ms. Kalantaripour offers a hodgepodge of disagreements and alleged excuses.

**Patient Surveys Do Not Show Ms. Kalantaripour Was A Good Performer.** Ms. Kalantaripour's main argument is that because she believes the Dermatology Department received good scores on an unexplained patient survey she offers, this somehow means the numerous performance deficiencies noted by at least six different people were false, and that intentional sex, race or national origin discrimination was the real reason.[2] (Pl. Opp. at 18-19) Ms. Kalantaripour's argument misses the mark.

Ms. Kalantaripour relies on Press Ganey patient experience scorecards for this argument. Press Ganey provides survey tools to help healthcare organizations track patient experience. https://www.pressganey.com/products/patient-experience/dynamic-surveying. (Ex. 1, Saks Dep. at 101) The surveys offer a comparison of an organization's patient experience, with that of other healthcare organizations. *Id.* at 101-102.

[2] Ms. Kalantaripour never actually states how, even assuming the patient survey somehow demonstrates the performance assessments of seven different people were wrong, this translates into intentional discrimination. She simply asks the Court to assume that it does. This is not the correct standard. Even if Ms. Kalantaripour were to prove the myriad performance assessments were inaccurate or unfair, this does not mean they were given for discriminatory reasons. *Redding v. Austin*, 525 F. Supp. 3d 173, 179 (D.D.C. 2021) (issue is not correctness or desirability of reasons offered, but whether employer honestly believes those reasons) (*quoting Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1986)); *Brady*, 520 F.3d at 495 (central issue is whether plaintiff produces evidence for a reasonable jury to find that employer's stated reason was not the actual reason and that employer intentionally discriminated against plaintiff).

Of course, Ms. Kalantaripour's opinion about what the surveys show and her speculation that if patient satisfaction scores improved, this had something to do with her performance, is of no account. *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (self-serving statements of opinion are not credited). This is particularly true here, where Ms. Kalantaripour offers nothing to show that, assuming scores did improve, it was because of and not despite her performance. She simply asks the Court to accept her speculation as fact. *Clifton v. Fed. Nat'l Mortgage Ass'n*, 36 F.Supp. 2d 20, 24 (D.D.C. 1999) (subjective belief cannot be the basis for judicial relief). Further, Ms. Kalantaripour's argument ignores the reality that it is the employer's perception that matters, not hers. *Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 151 (D.D.C. 1998) ("An employer is entitled to rely on his own perception of an employee's work performance.") Put differently, Ms. Kalantaripour does nothing to demonstrate, even if patient experience improved according to survey results, this somehow undermines the performance assessments of numerous MFA employees. Indeed, as Mr. Saks testified, these patient surveys were just one aspect of overall performance:

> *Q: So my question regarding Ms. Kalantaripour's termination, why was the decision made to terminate Ms. Kalantaripour's termination (sic), despite the fact that the dermatology's patient satisfaction was improving?*
>
> *A: Patient satisfaction is only one area that we use to evaluate someone's performance. There are many reasons for the increases that are illustrated on this card. We had only just started using Press Ganey. And so across the board, the MFA saw improvements in all of these areas. And the department itself was losing millions of dollars. And we had complaints from staff and providers constantly. And all the reasons are illustrated in the performance improvement plan and the disciplinary action that was delivered to Ms. Kalantaripour.*

(Ex. 1 Saks Dep. at 105:16-22, 106:1-11)

Further underscoring the fact that Ms. Kalantaripour's interpretive gloss on the patient satisfaction surveys does not undermine MFA's assessment of her significant performance

deficiencies, the surveys offered by Ms. Kalantaripour do not actually show improvement in key areas for which she was responsible as Practice Manager. For example, the YTD mean score for "ease of getting the clinic on the phone" was 59.3 in August 2018, and 58.2 in January 2019. (P. Ex. 5 at P0169-170) Similarly, "ease of scheduling" was 70.4 YTD in August 2018, but 69.4 YTD in January 2019. *Id.* Moreover, it is important to recognize that while certain of the surveys do show improvement, all remain in the lowest percentiles nationally, with things like scheduling at the very bottom. (P. Ex. 5, P0170; Saks Dep. at 102-103, describing the scorecard as "very negative") In other words, Ms. Kalantaripour seeks to undermine MFA's evaluation of her performance by arguing, in effect, that while she was Practice Manager, things were not as bad as they were previously, but they were still bad. MFA had a right to demand excellence from Ms. Kalantaripour and to insist on improvement in the Department that would bring it in line with other departments across the country. It was not required to settle for some limited improvement. Further, certain of the surveys reflect a significant improvement in the patient experience, particularly with respect to evaluation of providers, after Dr. Friedman became head of the Department. (P Ex. 5, compare P0168 (Dr. Ehrlich Head) with P0172 (Dr. Friedman Head).

In short, Ms. Kalantaripour's subjective belief about what the surveys demonstrate, is simply not relevant. *Hogan v. Hayden*, 406 F. Supp. 3d 32, 46 (D.D.C. 2019) (plaintiff's subjective belief is irrelevant, the issue is whether the employer believed the employee's performance was deficient) (relying on *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 10 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002); *Hairston v. Vance-Cooks*, 773 F.3d. 266, 273 (D.D.C. 2014) ("the key question in this context 'is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'" (citation

omitted).[3] Given the significant undisputed record evidence from multiple sources, it is clear MFA honestly believed Ms. Kalantaripour's performance was deficient. (*See*, e.g., SOMF at ¶¶ 16-20, 25-29, 32, 37, 42, 45, 47, 49, 66-68, 71-72, 75, 81) The fact that performance in the Department generally began to improve does not call into question MFA's view of Plaintiff's performance, much less show it is false. *McCleary-Evans v. Md. Dept. Of Trans.*, 780 F.3d 582, 585 (4th Cir. 2015) (bare allegation of discrimination without factual support, did not create inference of discrimination, particularly in light of obvious alternative explanation).

**Ms. Kalantaripour Was Not Truthful About Ordering Instruments.** On January 10, 2019, Dr. Patel directed Ms. Kalantaripour to order surgical instruments. When he did not hear back from her, he reached out on January 22, 2019, and asked for an update. Ms. Kalantaripour replied clearly, directly and falsely: "I have placed the order." (SOMF ¶¶ 58-60) The order was not in fact placed until January 23, 2019. (SOMF ¶ 66) Accordingly, Ms. Kalantaripour was issued a disciplinary memo. (SOMF ¶ 68)

In attempting to demonstrate pretext, Ms. Kalantaripour claims in her Opposition that Mr. Saks "instructed [her] not to worry about the order and that he would take of it…" (Pl. Opp. at 23) She also claims ordering instruments was not part of her job description. *Id.* These arguments continue Plaintiff's pattern of failing to take responsibility for her actions and, more

---

[3] Likewise, Ms. Kalantaripour's reliance on an occasional compliment, recognition of good performance when it happened, or even an acknowledgement that the job was very difficult and she faced a difficult task, does nothing to demonstrate MFA's overall assessment of her performance was false and that intentional discrimination was the real reason. *Velikonja v. Mueller*, No. 03-0832, 2004 U.S. Dist. LEXIS 26090, *14 (D.D.C. Dec. 21, 2004), *rev'd in part on other grounds*, 466 F.3d 122 (D.C. Cir. 2006) ("[W]hile plaintiff might be right that [defendant] erroneously found her behavior to be much more egregious than it actually was and that this error in judgment led to an excessively severe disciplinary action, this is simply not the relevant inquiry. Whether the situation seems unfair to plaintiff is not the issue. . . ."). To the contrary, it shows that when Plaintiff did well, MFA recognized it, and when she did not, MFA sought to hold her accountable and drive improvement. This is not discrimination.

importantly, fail to demonstrate pretext—in fact, they are simply a variation on Ms. Kalantaripour recurrent theme, she disagrees with her employer's characterization of her performance.

With respect to allegedly being instructed by Mr. Saks "not to worry" and he would take care of the order, this is both false and another blatant mischaracterization of the record. Ms. Kalantaripour claims Mr. Saks' alleged instruction is found at page 73 and 74 of his deposition. (Pl. Opp. at 23) But those pages say nothing of the sort:

*Q: So you stated previously that it would depend on the dollar amount regarding whether or not Ms. Kalantaripour would have to seek authorization from you to make an order. Would this amount of $46,000, would this be an amount that Ms. Kalantaripour could order on her own or would she need authority from you to make that order?*

*Objection, vague.*

*A: She would be able to place the order. And then it would get approved at that dollar amount, probably by more than me. It would go through finance.*

*Q: You kind of cut out. Can you state that answer again, or at least the first part?*

*A: So she had the authority to submit the order, but then it would need to be approved by myself, and most likely, someone above me at that dollar amount.*

*Q: So Ms. Kalantaripour did not have the final authority to make this $46,000 amount request, correct?*

*Objection, mischaracterizes the testimony.*

*A: She had the authority to place the order, and then it would get approved in the system.*

*Q: And who in the system would approve that?*

*A: As I said before, myself and someone over me.*

*Q: Did you ultimately approve this order for $46,000?*

*A: I believe I was out of the office when the order was placed, so it was not approved by me, but by Pam McClain.*

*Q: And Ms. McClain had the authority to make the order, correct?*

*A: She was the chief operating officer.*

*Q: Were there any issues regarding the cost of $46,000, was that ever attempted to change or do you recall if that dollar amount stayed consistent throughout the order?*

*Objection, vague.*

*A: I believe it states in this e-mail trail that we divided--or Nasrin divided the order into at least two parts.*

(Ex. 1, Saks Dep. at 73-74)

Ms. Kalantaripour has misstated the record. And pushing the envelope further, she asserts, without record support, "Plaintiff did not place the purchase order until January 22, 2019, based on Mr. Saks' assurances that he would address the order himself." (Pl. Opp. at 23) Of course, the record does not contain a single such assurance, much less the multiple assurances Ms. Kalantaripour now claims.

Even if there was some confusion about whether Mr. Saks or Ms. Kalantaripour had ordered the instruments, this would not change the analysis—and Ms. Kalantaripour's argument serves only to show she refuses to accept legitimate performance feedback. The issue is not whether Ms. Kalantaripour thought Mr. Saks was ordering the instruments or vice versa, it is how she communicated with Dr. Patel about it, first claiming she had ordered the instruments when she had not, then avoiding his direct questions about when the order was placed, and trying to put him off by telling him she did not want to "bore" him with details regarding something of significant import to him.

The e-mails provide a clear and compelling explanation why Ms. Kalantaripour was disciplined and what was wrong with her communication style—which had nothing to do with her accent:

1/22/19 3:56 PM Dr. Patel: Hi Nasrin, I am following up on this e-mail from 1/10 (to Ms. Kalantaripour), as I have not received a response or confirmation of this from you. Can you please update me on the status of this order?....

1/22/19 4:00:55 PM Ms. Kalantaripour: Hi Dr. Patel, I have placed the order. However, the purchasing has requested more information which we are working on. I will update you as soon as I have more information.

1/22/19 4:03 PM Dr. Patel: Hi Nasrin, Can you clarify when the order was placed? And I am not sure I understand your email--who is requesting more information and about what? Is Tony aware? We need certain instruments for cases next week that we have scheduled in DC.

1/23/19 9:31:01 AM Ms. Kalantaripour: Dr. Patel, No Need to bore you with this process. However, I will try to rush the order. I will get Tony involve when is necessary and appropriate.

1/23/19 10:12 AM Dr. Patel: Hi Nasrin, I am sorry, I don’t understand what is boring or difficult. I am just wanting to know when the order was placed and what the anticipated timeline for receiving the items. I have a complicated case next week and one the following week…These instruments are critical for these cases…Again, as I requested and am kindly asking again, can you clarify the date the order was submitted?...

1/23/19 11:26 AM Ms. Kalantaripour: Dr. Patel, I am working on getting the order of $46,000+ approved. This is a big order for a department that isn’t doing well financially.[4] As I mentioned, I will inform you as soon as I hear an update on the order. I am pushing to get the order in and delivered as early as possible (by next week). If there is any delays I will let you know so you can plan accordingly.

1/23/10 2:21 PM Ms. McClain: Nasrin, I just spoke with purchasing. The order was just submitted on 1/23/19. It was rejected for wrong cost center. Purchasing is rejecting it now. Due to the dollar threshold it will come to me for approval. On Friday we need to discuss how this was handled.

1/23/19 2:26 PM Ms. Kalantaripour: Hi Pam, Yes, I rejected the order since the wrong cost center was used. I spoke with Liz and Jamila from the purchasing department. I will divide the order to two orders, hopefully we can get the smaller order by next week. And, the remaining order can take longer to arrive.

(Previously SOMF ¶¶ 58-66, Attached here as Ex. 2 for ease of reference, 1/22-23/19 e-mail exchange regarding instruments)

---

[4] Ms. Kalantaripour’s statement demonstrates her knowledge that the Department was not performing well.

Regardless of who ordered the instruments, or even when they were actually ordered, Ms. Kalantaripour was appropriately counseled for her failure to respond clearly and forthrightly to a simple and direct question: when were the instruments ordered? Her disagreement with the basis for this discipline does not demonstrate pretext. *Ramseur v. Perez*, 80 F.Supp. 3d 58, 74 (D.D.C. 2015) (employee disagreement with evaluation does prove pretext)*; Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 41 (D.D.C. 2014) ("Plaintiff's opinion that she was competent and performed well in her position is simply not relevant.").

Similarly, her claim that ordering instruments was not in her job description is more of the same. First, like a number of her assertions, she offers no record support for this claim. (Pl. Opp. at 23) Second, she advances an unsupported position without regard to and in contradiction of the actual record evidence. (SOMF 57) Finally, the argument ignores the undisputed fact that she told Dr. Patel she had ordered the instruments, job description or not, and ignores the fact that she declined to answer his direct questions and was disciplined as a result. Indeed, she did not tell Dr. Patel or Ms. McClain—in response to the discipline—that it was not her job to order instruments. Nor does she bother to explain why, if it was not her job to order instruments, she did not say this to Dr. Patel on January 10, when he told her to order the instruments, or on January 22, when she told him she had done so.[5]

[5] Plaintiff also argues in passing, and without cites to record evidence, that Dr. Patel changed his mind and this is somehow indicative of discriminatory animus and/or shows pretext. Yet, the exhibits cited to by Plaintiff (Pl.'s Ex. 7 and Pl.'s Ex. 1 ¶ 1) provide no support for this argument (or even relate to Dr. Patel changing his mind), nor does Plaintiff actually connect the fact that Dr. Patel may have changed his mind to her national origin or sex or explain how it might undermine the reasons she was fired.

**Ms. Kalantaripour's Alleged Comparators Are Not Similarly Situated.** Ms. Kalantaripour also attempts to demonstrate pretext by arguing two employees were moved to a different location while on FMLA leave, and former MFA employees Azeddine Khechmoune and Shamsun Nahar are allegedly of "Middle Eastern Asian Descent" and were treated poorly. (Pl. Opp. at 26-27) These arguments fare no better in demonstrating pretext than does her subjective belief in her own performance.

First, Plaintiff does nothing to show that either of these individuals are actually valid comparators, and she does not even mention her significant concession that she cannot identify any similarly situated employees:

*Q: Can you identify for me any employee who had the same number of complaints about them that you did and didn't get fired?*

*Mr. Branch: Objection, calls for speculation.*

*A: I don't know.*

(SOMF ¶ 109) *Phillip v. Holladay Prop. Servs.*, 937 F. Supp. 32, 37 (D.D.C. 1996) (comparators must have same supervisor…subject to the same standards and have engaged in the same conduct without differentiating circumstances distinguishing conduct or employer's treatment for it).

Second, Plaintiff does nothing to show that Ms. McClain or Mr. Saks, the decision makers in this case, fired either of these employees.

Finally, Plaintiff again significantly misstates the record, falsely claiming she told Mr. Saks that Dr. Patel had included false information in a performance improvement plan. (Pl. Opp. at 27) Yet, the record says nothing of the sort. In his February 26, 2019 e-mail reviewing a performance document for Mr. Khechmoune, Dr. Patel notes his surprise that some of Mr. Khechmoune's work was considered satisfactory, and his concern that the document contains

complaints only from him. But, he makes no mention of Ms. Kalantaripour, nor does he say she did not meet with Mr. Khechmoune as she claims. (Pl. Opp. Ex. 32) Even if there were some reference to Ms. Kalantaripour in Dr. Patel's e-mail, she does nothing to demonstrate how addressing a performance issue with another employee somehow shows she was discriminated against, other than to offer her speculation that Mr. Khechmoune was also discriminated against. This is insufficient to demonstrate pretext. *Richard v. Bell Atlantic Corp.*, 167 F. Supp. 2d 34, 42 (D.D.C. 2001) (assumption and speculation do not constitute the "sufficient" and "substantial" evidence she is required to produce to defeat summary judgment).

**MFA Consistently Followed Procedures.** Ms. Kalantaripour also attempts to demonstrate pretext by arguing MFA did not follow its own procedures "in not investigating any of Plaintiff's numerous complaints." Opp. at 15. This argument fails.

First, Plaintiff does nothing to show through record evidence what MFA's policies and/or procedures were regarding conducting investigations of employee complaints, and the investigation report identified by Plaintiff (Pl.'s Ex. 10) does not demonstrate the existence of any particular policy. Since Plaintiff does not establish the policy and/or procedure at issue, she cannot claim or establish that MFA violated it.

Second, Plaintiff concedes she didn't complain of discrimination until the last day of her employment, after her employment was terminated. Plaintiff claims that MFA did not investigate her "numerous complaints," but these numerous complaints were not complaints of discrimination; rather, they were complaints of, essentially, interpersonal disputes wholly unconnected to her national origin or sex, *to wit*: that Dr. Ehrlich was unprofessional, in a bad mood, irritated (SOMF ¶30); that Plaintiff was wrongfully attacked for scheduling issues (SOMF ¶ 31); that Dr. Ehrlich slammed her fists (SOMF ¶ 33); and that Dr. Patel raised his voice

(SOMF ¶41). *See generally Robbins v. D.C.*, 67 F. Supp. 3d 141, 146 (D.D.C. 2014), *aff'd*, 650 F. App'x 37 (D.C. Cir. 2016) ("general complaints about unfair treatment do not constitute protected activity under Title VII").

Third, even assuming, *arguendo*, Plaintiff could establish that MFA had a policy that required its human resources department to investigate each and every employee "complaint," the record evidence establishes that MFA did investigate. Indeed, it is undisputed that Plaintiff spoke to Ms. Hoffpauir multiple times via multiple methods (via email, in person, etc.) regarding her concerns (SOMF ¶¶ 31, 33, 35, 39, 41) and that Ms. Hoffpauir spoke to Dr. Patel (SOMF ¶ 39-40) and Ms. Hazuka (SOMF ¶ 43) regarding Plaintiff's concerns and the issues raised regarding the Dermatology Department.[6]

## II. MS. KALANTARIPOUR EFFECTIVELY CONCEDES SHE CANNOT DEMONSTRATE AN INFERENCE OF DISCRIMINATION.

Ms. Kalantaripour fails to address and therefore concedes the undisputed facts that no one made any discriminatory comments to or about her, and no one made fun of or mocked her accent. (SOMF ¶¶ 90, 93) She therefore effectively concedes she cannot raise any inference of discrimination. Instead of addressing this issue, Ms. Kalantaripour asserts her job duties were filled by Marcus Christian, an African American man, and Natalie Murray, an African American woman. (Pl. Opp. at 29)

This argument fails, however, and is another example of Ms. Kalantaripour's distortion of the record. The testimony cited does not in fact say Mr. Christian and Ms. Murray replaced her:

[6] Even if MFA deviated from those procedures (and it did not), that fact, standing alone, is not sufficient to demonstrate pretext. *Williams v. Verizon Washington, D.C. Inc.*, 304 F.Supp. 3d 183, 200 (D.D.C. 2018); *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) (violation of an employer's own regulations and procedures may not be enough to show pretext.).

*Q: And then to clarify, did either Ms. Murray or Mr. Christian replace Ms. Kalantaripour in her role?*

*Objection. Calls for speculation. You can answer, if you are able.*

*A: Yeah, it's difficult to answer because, you know, the role that Natalie Murray stepped into is somewhat different than I believe the role that Ms. Kalantaripour was in. I can't say with certainty in terms of job description and the actual title, but her, you know, she—Ms. Murray took on some of the responsibilities Ms. Kalantaripour had done.*

*Q: Okay. Yeah, just to clarify, because I know there's some issues with the titles, I guess I would ask who specifically, or its multiple people, who took over Ms. Kalantaripour's responsibility within MFA after she—after her employment was terminated?*

*Objection. Asked and answered. And calls for speculation. You can answer, Dr. Friedman, if you are able.*

*A: It would be difficult to give a clear answer to that.*

(Pl. Opp. Ex. A, Friedman Dep. at 45-46)

Ms. Kalantaripour's "replacement argument" fails for an additional reason, namely that because MFA proffered a legitimate reason for its actions, whether Plaintiff has stated a prima facie case is no longer at issue. *Brady v. Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008). What Ms. Kalantaripour is compelled under the law to show, is that MFA's legitimate reasons for firing her were not the real reason for the termination decision. The fact that some of the duties handled by Ms. Kalantaripour were allegedly assumed by an African American woman and African American man, does nothing to call that decision into question. That is particularly so where, as here, Ms. Kalantaripour has done nothing to develop the record, first actually demonstrating she was replaced by the two people she now claims and, assuming she was, providing any context around that decision that might call into question the reasons for her termination.

Moreover, Ms. Kalantaripour does nothing to demonstrate who hired Ms. Murray and Mr. Christian and when, what their previous job duties were, where they worked, what if

anything they actually did after Ms. Kalantaripour was fired, or anything else. Instead, she simply asks the Court to assume that because neither Ms. Murray nor Mr. Christian were supposedly the same national origin as Plaintiff—though she offers no evidence of their national origin—this necessarily means MFA's significant record of performance issues and complaints was not the real reason she was fired. Speculation is not evidence. *See, e.g.*, *Manuel v. Potter*, 685 F.Supp.2d 46, 63 (D.D.C. 2010) (granting summary judgment to defendant because plaintiff failed to provide any evidence undermining his supervisors' claim that they "honestly believed" plaintiff's work "was deficient" when they issued him a negative performance review). And a plaintiff's subjective assessment of his own performance is not evidence of pretext. *See Dorns v. Geithner*, 692 F.Supp.2d 119, 135 (D.D.C. 2010) (plaintiff produced no evidence beyond speculation; granting the defendant summary judgment because "the plaintiff ha[d] produced no evidence beyond her own subjective opinion that she performed at a higher level" than her performance reviews reflected); *Kelly v. Mills*, 677 F.Supp.2d 206, 228–29 (D.D.C. 2010) (critical inquiry at pretext stage is whether employer honestly believed plaintiff's work performance was poor).

## III. MS. KALANTARIPOUR EFFECTIVELY CONCEDES SHE DID NOT ENGAGE IN PROTECTED ACTIVITY

Plaintiff has identified *one* instance where she complained about discrimination: in a meeting with Mr. Saks and Ms. Hoffpauir on March 22, 2019, after her employment was terminated. Opp. at 36. It is undisputed Plaintiff's employment was terminated on March 22, 2019. *See* SOMF ¶82 and Pl's Resp. at ¶ 82.[7] Plaintiff cites to Pl's Ex. 33 at P0290 – the

---

[7] As a further example of Plaintiff's mischaracterization of the record, Plaintiff claims this complaint was made "less than a month before MFA's termination of Plaintiff in April 2019." Opp. at 36. Not only is it undisputed that Plaintiff's employment was terminated on March 22, 2019, the termination letter cited to by Plaintiff, Pl's. Ex. 26, is dated March 22, 2019 and states:

recording of the termination meeting with Plaintiff, Ms. Hoffpauir, and Mr. Saks—to support her claim she engaged in protected activity. Although Plaintiff said "[she] was discriminated against" in Pl's Ex. 33 at P0290, she said this only *after* Mr. Saks said "we have to end your employment here today." Furthermore, and as discussed above, at Saks. Dep. at 34:6-10 cited to by Plaintiff, Mr. Saks unequivocally testified that Plaintiff complained to him only after her employment had been terminated.

As detailed in MFA's opening brief, her complaint —after she was fired—could not have been the reason for her termination because the decision to terminate her employment has already been made and she had already been told that her employment was being terminated. *Copeland v. Arklay LLC*, 273 F. Supp. 3d 69, 77 (D.D.C. 2017) (summary judgment granted where only protected activity was EEOC complaint that was filed after termination, and where "no reasonable fact finder would think" complaints during employment that coworkers "locked her out of the network and were unkind toward her" were complaints of "unlawful harassment"); *Marshall v. Potter*, 634 F. Supp. 2d 66, 73 (D.D.C. 2009) (plaintiff must show employer had knowledge of protected activity and adverse action occurred soon thereafter or introduce direct evidence that the adverse action would not have occurred but for the protected activity) (internal citation omitted) (granting summary judgment where only protected activity identified in the record "did not occur until *after* plaintiff had been terminated" and where "because the protected activity followed all the alleged retaliatory acts, there can be no inference of causality, and thus, plaintiff cannot claim retaliation").

---

"This letter is to communicate that your employment relationship with the Medical Faculty Associates (MFA) will end effective March 22, 2019."

The other complaints identified by Plaintiff, that Dr. Ehrlich was unprofessional, in a bad mood, irritated (SOMF ¶30), that Plaintiff was wrongfully attacked for scheduling issues (SOMF ¶ 31), that Dr. Ehrlich slammed her fists (SOMF ¶ 33), and that Dr. Patel raised his voice (SOMF ¶41), do not constitute protected activity, and the fact that Plaintiff now labels these complaints as "complaints of discrimination and harassment" does not make it so. *Welzel v. Bernstein,* 436 F.Supp.2d 110, 122–23 (D.D.C. 2006) (complaints about "unprofessional and abusive behavior" and general complaints about unfair treatment absent a stated belief that such behavior violates Title VII are "not protected under Title VII"). *Lemmons v. Georgetown Univ. Hosp.*, 431 F.Supp.2d 76, 92–93 (D.D.C. 2006) (granting summary judgment where sole protected activity plaintiff identified was her complaint of harassment against her supervisor that did not refer to harassment or discrimination based on any protected category under Section 1981); *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 128 (D.D.C. 2015) ("Although the opposition clause is undoubtedly broad, it is not limitless, and [n]ot every complaint garners its author protection under Title VII. For example, ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.") (internal citation omitted). *See also Sitar v. Ind. Dep't of Tranp.*, 344 F.3d 720, 727–28 (7th Cir. 2003) (stating that complaining about being "picked on," without mentioning discrimination or otherwise indicating that "gender was an issue," does not constitute protected activity, even if the employee "honestly believe [s][he] is the object of discrimination").[8] Accordingly, Plaintiff's retaliation claim fails.

---

[8] Even assuming, *arguendo*, that these complaints did constitute protected activity, which they do not, these complaints made in November and December 2018 (SOMF ¶¶ 30, 31, 33, 39, 41) are far too remote in time from her March 22, 2019 termination to establish a causal connection. "In order to establish temporal proximity, the connection must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (noting that a

## IV. <u>THERE ARE NO GENUINE ISSUES OF MATERIAL FACT THAT WOULD PREVENT THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANT.</u>

Plaintiff fails to actually identify any disputed material facts that might prevent the entry of judgment against her. *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988) (counsel who fails to identify and isolate disputed facts cannot complain when court declines to do it for her). Indeed, it is clear there are no such facts and summary judgment should be granted.

MFA's SOMF contains 114 paragraphs. Of those 114 paragraphs, 39 are undisputed by Plaintiff.[9] Of the 75 remaining paragraphs, Plaintiff claims the facts set forth in those paragraphs are disputed to some degree, but a close review of Plaintiff's responses reveals they are not actually disputed because: the record cites proffered by Plaintiff do not actually dispute the fact asserted by Defendant; or Plaintiff misstates the substance of the record cite proffered by her.[10] A few of Plaintiff's misstatements deserve particular mention:

- In paragraph 15 of Defendant's SOMF, Defendant identified Dr. Patel's November 2, 2018 complaint about Plaintiff to Mr. Saks and others. Plaintiff claims this fact is "disputed" and Plaintiff cites to "Pl,'s Ex. 6 at P0174" to support the fact that Plaintiff allegedly complained to Mr. Saks and Human Resources about Dr. Patel "yelling at [her], threatening to speak with Plaintiff's [sic] CEO regarding her employment, aggressively pounding on Plaintiff's desk, and hugging Plaintiff without her consent." However, this record cite actually says nothing of the sort, and only references an "interaction with Dr. Patel." As a result, Plaintiff does not actually dispute paragraph 15 of Defendant's SOMF.

---

three- or four-month period between the adverse action and protected activity is insufficient to show a causal connection). Similarly, Plaintiff does nothing to demonstrate a causal connection between any alleged complaint and the termination of her employment, much less show that "but for" any alleged complaint, she would not have been fired.

[9] *See* No. 1, 2, 3, 5, 6, 7, 11, 13, 14, 23, 34, 35, 39, 54, 55, 58, 59, 61, 62, 63, 65, 72, 73, 79, 82, 83, 84, 89, 91, 92, 96, 97, 98, 99, 100, 102, 103, 104, 107.

[10] *See* No. 4, 8, 9, 10, 12, 15, 16, 17, 18, 19, 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 36, 37, 38, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 56, 57, 60, 64, 66, 67, 68, 69, 70, 71, 74, 75, 76, 77, 78, 80, 81, 85, 86, 87, 88, 90, 93, 94, 95, 101, 105, 106, 108, 109, 110, 111, 112, 113, 114.

- In paragraph 19 of Plaintiff's Response, Plaintiff cites to Pl.'s Ex. 7 at P0216 and claims that it says: "Dr. Patel met with Plaintiff the week before and wrote down the schedule the way he wanted the schedule to be structured. In his email, Dr. Patel complained about new patient surgeries. However the schedule that Dr. Patel complained about was created by Dr. Patel during his conversation with Dr. Joshi." First, document P0216 appears to be nothing more than undated and unauthenticated notes. There is nothing on the face of this document to identify the author as Dr. Patel (as Plaintiff suggests) or when it was drafted, nor has Plaintiff proffered any evidence whatsoever that Dr. Patel drafted this document and that it was the schedule. Importantly, Plaintiff did not show this document to Dr. Patel during his deposition, nor has Plaintiff proffered an affidavit from either Dr. Patel or herself to identify this document. (Further, Plaintiff provides no record cite to support her bald conclusions in the last two sentences in Paragraph 19.) As a result, Plaintiff does not actually dispute paragraph 19 of Defendant's SOMF.

- In paragraphs 20 and 21, Plaintiff states: "Disputed as to Dr. Patel's retaliation against Plaintiff after she filed a complaint regarding his interactions with her in November 2018." To support this, Plaintiff again cites to Pl.'s Ex. 7 at P0216, but P0216, as detailed above, is hand-written notes which have nothing to do with "Dr. Patel's retaliation against Plaintiff" or any complaint Plaintiff allegedly filed "regarding his interactions with her in November 2018" and so does not actually dispute paragraphs 20 and 21 of Defendant's SOMF.

- In paragraph 38 and 41, Plaintiff cites to Pl.'s Ex. 1 ¶1, which are Plaintiff's Answers to Interrogatories, to support her claim that: "Dr. Patel blamed Plaintiff for an apparent miscommunication, a method by which he would often use to discriminate against Plaintiff due to her accent and national origin." However, there is no "¶1" in Pl.'s Ex. 1, nor is there any *record evidence* in Pl.'s Ex. 1 to support her claim. Further, Plaintiff cites to Pl.'s Ex. 31 at P0356 for the proposition that "this was similar to the discrimination Ms. Nahar described that was 'because of [her] miscommunications' regarding her accent," but P0356 says no such thing. Pl.'s Ex. 31 at P0361 says: "They show me one invoice is paid laid [sic] because of my miscommunication." None of the communications with Ms. Nahar in Pl.'s Ex. 31 have anything to do with – or even mention – Ms. Nahar's accent, discrimination, or Dr. Patel. Plaintiff has misstated the record evidence, and does not actually dispute paragraphs 38 and 41 of Defendant's SOMF.

- In paragraphs 40, 46, 53, and 71, Plaintiff cites to Patel Dep. at 30:5-15 to support her claim that Dr. Patel's statements about Plaintiff lying to him "were merely his opinion" and "that he has no proof of Plaintiff lying or admitting to lying to him." Dr. Patel did not so testify. When asked if Plaintiff ever admitted to Dr. Patel to "lying to [him] or changing the facts to [him]", Dr. Patel said: "I can only recall that she made a comment about feeling overwhelmed and not wanting to make mistakes. And that was one of the reasons why I suggested in a way of trying to help with these responsibilities to put her in a position to succeed and how I might be able to help to do so." Patel Dep. at 30. Plaintiff then cites to Patel Dep. at 68: 20-22 and 69: 1-3 to support her claim that "when asked if Plaintiff had ever admitted to lying to any staff within the Dermatology Department, Dr. Patel plainly stated 'No.'" Again, Plaintiff has wholly mischaracterized

Dr. Patel's testimony. When asked if Ms. Hoffpauir or other MFA employees told him that Plaintiff admitted to lying to them, Dr. Patel said: "No, I don't think anybody specifically noted that she admitted to lying, but we had multiple discussions of feeling that people were lied to by her." Again, Plaintiff has misstated the record evidence, and does not actually dispute paragraphs 40, 46, 53, and 71 of Defendant's SOMF.

- In paragraphs 109, 112, 113, and 114, Plaintiff again cites to Pl.'s Ex. 1 ¶1, which are Plaintiff's Answers to Interrogatories, to support her claims that: "Plaintiff can identify several complaints that she filed against Dr. Patel and Dr. Ehrlich that were dismissed by Defendant MFA and ultimately resulted in Plaintiff's termination;" "Plaintiff was terminated due to her race, sex, and national origin and not due to any alleged poor performance;" "Plaintiff was discriminated against due to her accent and terminated due to her race, sex, and national origin;' "and "MFA retaliatory termination of Plaintiff's employment due to her engagement in protected activity." As stated above, there is no "¶1" in Pl.'s Ex. 1, nor does Plaintiff cite to any *record evidence* in Pl.'s Ex. 1 to support her claims. Furthermore, Plaintiff's claims in these paragraphs are legal conclusions that do not dispute paragraphs 109, 112, 113, and 114 of Defendant's SOMF.

In sum, Plaintiff has failed to raise a genuine issue of material fact that would prevent the entry of summary judgment in MFA's favor and, indeed, the lengths Plaintiff has gone to attempt to cloud the issues for the Court simply serve to underscore the substantive weakness of her claims.

## V. <u>PLAINTIFF FAILS TO ADDRESS AND THEREFORE CONCEDES A NUMBER OF DISPOSITIVE ARGUMENTS.</u>

Plaintiff does not address and therefore concedes MFA's arguments that: (1) Plaintiff did not exhaust her claims against Dr. Ehrlich; (2) she was not subjected to any racial or sexist comments, and that and no one mocked her accent; and (3) Mr. Saks did not discriminate against her. These concessions compel the grant of summary judgment. *Texas v. United States*, 49 F. Supp. 3d 27, 39 (D.D.C. 2014), *aff'd*, 798 F.3d 1108 (D.C. Cir. 2015) ("where a party files an opposition that addresses only *some* of the arguments raised in the underlying motion . . . it is well-established that courts may deem the unaddressed arguments as conceded"); *Young Habliston v. Finra Regul., Inc.*, No. CV 15-2225 (ABJ), 2017 WL 396580, at *2 (D.D.C. Jan. 27, 2017) ("Plaintiffs failed to oppose many of these arguments, so the motion has been

largely conceded."); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 79 F. Supp. 3d 60, 78 (D.D.C. 2015) ("[Defendant] did not respond to any of these arguments in its summary judgment briefing, thereby conceding the argument that these damages are unavailable as a matter of law."); *Hopkins v. Women's Div., Gen. Bd. Of Global Ministries*, 238 F.Supp.2d 174, 178 (D.D.C. 2002) ("It is well understood…that when a plaintiff files an opposition to a motion ... addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

## CONCLUSION

MFA fired Ms. Kalantaripour because of her poor performance. Consistent with this fact, Ms. Kalantaripour fails to create an inference of discrimination and fails to demonstrate MFA's reasons for firing her are pretext and that intentional discrimination was the real reason. Similarly, she fails to demonstrate that any of her myriad e-mails she sent complain about discrimination and, even if they did, fails to causally connect any such e-mails with the termination of her employment, or show that "but for" any complaint, she would not have been fired. *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). Indeed, she has not established that Ms. McClain, one of the decision makers, was even aware of any alleged complaint of discrimination, and she concedes Mr. Saks, her boss, did not discriminate or retaliate against her.

Summary judgment should be granted in favor of MFA.

Dated: March 8, 2022

Respectfully submitted,

/s/ *Raymond C. Baldwin*

Raymond C. Baldwin (Bar No. 461514)
Samantha L. Brooks (Bar No. 1033641)
SEYFARTH SHAW LLP
975 F Street N.W.
Washington, DC 20004
(202) 463-2400
rbaldwin@seyfarth.com
sbrooks@seyfarth.com
*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of March, 2022, a copy of the foregoing Reply in Further Support of Motion for Summary Judgment was filed and served via CM/ECF on:

David A. Branch
Michael Ludwig
Law Offices of David A Branch & Associates, PLLC
1828 L Street, NW, Suite 820
Washington, DC 20036
(202) 785-2805

*Counsel for Plaintiffs*

*/s/ Raymond C. Baldwin*
Raymond C. Baldwin