## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NASRIN KALANTARIPOUR,

               Plaintiff,

    v.

GEORGE WASHINGTON MEDICAL
FACULTY ASSOCIATES,

             Defendant.

Case No. 21-cv-272 (JMC)

## <u>MEMORANDUM OPINION</u>

Plaintiff Nasrin Kalantaripour sues her former employer, Medical Faculty Associates, Inc. ("MFA"),[1] for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. MFA terminated Kalantaripour, an Iranian-born woman, from her job as a Practice Manager after ten months in the role. MFA claims that Kalantaripour was terminated for poor performance. Kalantaripour alleges that her termination was discriminatory on the basis of her race, national origin, and sex, and in retaliation for having complained about the discrimination she was allegedly subjected to at MFA, which she also alleges amounted to a hostile work environment. MFA has moved for summary judgment. For the reasons explained below, the Court will **GRANT** MFA's motion for summary judgment and dismiss Kalantaripour's case.[2]

---

[1] Despite being named as "George Washington Medical Faculty Associates" in Plaintiff's complaint, Defendant states that its correct name is "Medical Faculty Associates, Inc." ECF 14 at 1. The Court refers to Defendant as such throughout this opinion.

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.    BACKGROUND

### A.  Factual Background

The facts discussed in this section are undisputed except where noted. Nasrin Kalantaripour is an Iranian-born woman of Middle Eastern-descent. ECF 14-4 at 6.[3] Kalantaripour has a "slight accent," but speaks perfect English. ECF 14-2 ¶¶ 34, 89. From May 2018 to March 2019, she was employed by MFA, a physicians' practice in the Washington, D.C. metropolitan area, to be the Practice Manager for Neurology, Neurosurgery, Psychiatry, and Dermatology. *Id.* ¶¶ 1–2; ECF 14-4 at 4. Her direct supervisor was Adrien Saks, a white male. ECF 14-2 ¶¶ 3, 107. Saks had recruited her to apply and was also part of the team that hired Kalantaripour. *Id.* ¶ 4; ECF 14-4 at 66–68. As a Practice Manager, Kalantaripour was responsible for the day-to-day operations and administrative functions in the Neurology, Neurosurgery, Psychiatry, and Dermatology departments. ECF 14-2 ¶ 7. Beginning in July 2018, following staff shake-ups at MFA, Kalantaripour was assigned "responsibility for administrative functions in Dermatology." ECF 15-2 at 94.

#### 1.   *Departmental Issues Regarding Scheduling*

Kalantaripour's responsibilities following July 2018 included determining daily staffing for the Dermatology department at MFA's various offices, including of the medical assistants who assisted doctors at the practice.[4] ECF 14-2 ¶¶ 8–9; ECF 14-5 at 14. As Saks testified, at the time

---

[3] As to her race, Kalantaripour variously describes herself as "white," "Middle Eastern," and "Persian." ECF 14-4 at 6–7.

[4] In her response to MFA's statement of facts, Kalantaripour disputes the fact that she was "responsible for managing the schedules of medical assistan[ts]." ECF 15-1 ¶¶ 8–9. The Court finds that she has not genuinely disputed this fact. Kalantaripour supports her assertion with the claim that "clinical managers were responsible for clinical staff and clinical affairs," the implication being that Kalantaripour, whose title was Practice Manager, was not responsible for those duties. *Id.* Kalantaripour also points to materials, including an organizational chart, describing Kalantaripour as a Practice Manager who supervised administrative staff, rather than the clinical staff in Dermatology whose schedules are the basis of many of the complaints about Kalantaripour's performance issues in this case. ECF 15-2 at 221. But

MFA was very-short staffed, and it was a "challenge distributing staff in a way that met the needs of the various providers." ECF 15-2 at 17. Some of those providers included Dr. Vishal Patel, Dr. Alison Ehrlich, Dr. Ilana DeLuca, and Dr. Adam Friedman. ECF 14-2 ¶¶ 11–13, 48.

Dr. Patel was hired in October 2018, and within a short time of his hiring voiced concerns about staffing issues in Dermatology and Kalantaripour's handling of her duties. ECF 14-2 ¶ 15. On November 2, 2018, he sent an email to Saks, Kalantaripour, and Ehrlich, in which he noted "multiple errors in scheduling," a lack of "sufficient [medical assistants] for providers," and a "lack of authority and direction to help oversee the clinic." ECF 14-4 at 73. The email mentioned that Patel had received six complaints from patients about difficulty scheduling visits at the clinic, and made recommendations about next steps for hiring medical assistants. *Id.* That same day, Patel came to Kalantaripour's office to share his frustration about the department's failure to approve hiring of additional staff. Kalantaripour claims—and MFA does not seriously dispute—that during the meeting, Patel "got very upset," and "slam[med] on [her] desk," ECF 14-2 ¶ 99. He threatened to go to Kalantaripour's superiors and tell them that the current situation was "unacceptable." ECF 14-4 at 33.

On November 7, Patel emailed Kalantaripour, stating that she had failed to correct his schedule as "discussed last week." *Id.* at 76. He claimed that it was the "4th time we [had] discussed this since I started," but "patients [were] still being scheduled incorrectly." *Id.* He also emailed Jennifer Hoffpauir, a member of MFA's human resources department to raise his concerns about "dysfunction and unprofessionalism" in the Dermatology department and his "attempt[s] to

---

Kalantaripour's assertions are misleading in multiple ways. First, Kalantaripour admits that there was no Clinical Practice Manager for Dermatology at the time, and she had been asked by Saks to assist in the Dermatology department until a new one was hired. ECF 15 at 3; ECF 15-2 at 94. Consistent with having assumed these duties in Dermatology, Kalantaripour admitted in her deposition that one of her jobs was to "distribute staff among two offices," ECF 14-4 at 31, and Saks testified at his deposition that Kalantaripour "manage[d] the schedules of certain MFA employees, such as medical assistants," ECF 14-5 at 10–11. Kalantaripour also describes herself in her deposition as "do[ing] my job as the clinical manager." ECF 14-4 at 41.

address this with Dr. Ehrlich and Nasrin Kalantaripour without any changes or improvement." ECF 14-7 at 8. Sometime in November, he approached Kalantaripour in a hallway and started "yelling" and "screaming" at her about alleged errors in his schedule. ECF 14-4 at 37–38. On November 26, Patel complained in an email to Saks, Ehrlich, and Kalantaripour that there were no staff at MFA's Maryland office to assist with patients. *Id.* at 79. That day he separately emailed Kalantaripour, claiming that she had incorrectly assigned him a medical assistant, despite purportedly "discuss[ing] on several occasions that the [assistant] cannot be [his] primary [medical assistant]." *Id.* at 77.

On December 4, 2018, after one of the medical assistants called out sick, Kalantaripour assigned Tony Garcia—a medical assistant who worked closely with Patel—to cover the shift. ECF 14-4 at 39–40; ECF 14-6 at 17. Upon learning that Garcia had been rescheduled, Patel called Kalantaripour. He again yelled at Kalantaripour, saying that the last-minute schedule changes were "inappropriate," and that Kalantaripour was "moving [his medical assistants] to another clinic." ECF 14-4 at 40–41; *see* ECF 14-7 at 3. After this conversation, Kalantaripour spoke about the incident with Jennifer Hoffpauir in human resources. *See* ECF 14-4 at 85. In a follow-up email to Hoffpauir on December 6, she described the incident as follows: She noted that Patel "got very upset," and "raised his voice and threat[ened]" that he would go to Kalantaripour's superiors. *Id.* Kalantaripour noted that "this [was] not the first time" Patel raised his voice or threatened that "he would go to a higher authority if he d[idn't] get what he want[ed]." *Id.* Kalantaripour stated that she believed that his behavior "humiliated and threat[ened] staff," and was not "okay in any level and degree." *Id.* As for Patel's side of the story, he claims that prior to this incident, he had spoken with Kalantaripour "on three or four different occasions . . . that it was inappropriate for her to pull" Garcia "away from [him] and assign him different tasks." ECF 14-7 at 3. While Kalantaripour

disputes that her scheduling decisions were inappropriate, and contests that Garcia was supposed to only work with Patel, she does not dispute that Patel had spoken with her multiple times about her scheduling of Garcia. *Compare* ECF 14-2 ¶ 27, *with* ECF 15-1 ¶ 27.

Patel voiced his criticisms not only to Kalantaripour, but to her superiors Saks and MFA's Chief Operating Officer Pamela McClain. He emailed them on December 7 claiming that Kalantaripour was regularly failing to provide him his medical assistant schedules in advance. ECF 14-7 at 15. He also copied Saks on a December 9 email to Kalantaripour asking her about purported issues with his medical assistant scheduling. *Id.* at 19. Saks was also present when Patel and Kalantaripour's differences regarding scheduling again came to a head on December 18, after Kalantaripour sent Tony Garcia to MFA's Maryland office to assist a different doctor, while Garcia was purportedly helping Patel prepare for a complicated surgical case the next day. ECF 14-2 ¶ 51; *see* ECF 15-1 ¶ 51 (providing justifications for Kalantaripour's decision but not disputing that Garcia was assisting Patel in preparing for this procedure). At a meeting, which included Saks and other staff members, Patel again yelled at Kalantaripour about her scheduling decisions. ECF 14-4 at 43. A week later, Patel again emailed McClain and Dr. Adam Friedman about Kalantaripour, stating that despite Patel's "fifth request in [a] row now, we again did not receive a [medical assistant] schedule," and that the providers "had multiple unacceptable problems arise from [Kalantaripour's] failure to send ou[t] a schedule or inform involved faculty of changes." ECF 14-7 at 22. Patel's verbal critiques also applied to more trivial errors or omissions by Kalantaripour. He also raised his voice to her for reasons like failing to remember his prescription account number and ordering lunch for staff in the D.C. office during a snow day but not for the staff in the Maryland office. ECF 14-2 ¶¶ 103–04.

During this time, Patel was not the only staff member who voiced issues with Kalantaripour's performance. Fadi Hachem, MFA's Manager of Patient Experience, emailed McClain on November 29 about "issues Dermatology has been having," which included patient complaints about scheduling, and that Hachem had "talked with [Kalantaripour] previously about better utilizing . . . staff since the work is not evenly distributed." ECF 14-3 at 6. On December 4, Elizabeth Hazuka, the medical assistant to Dr. Friedman, complained to Jennifer Hoffpauir about having to "organize medical assistants last minute," because Kalantaripour was not "arriv[ing] before clinic starts on days when we have new employees starting." ECF 14-3 at 18–19. Dr. Friedman later wrote Hoffpauir that he was "sorry to say [Kalantaripour] cannot do this job. Plain and simple." ECF 14-9 at 5. Dr. DeLuca emailed Kalantaripour about issues with her schedule, and subsequently forwarded the exchange to Hoffpauir, saying that she had "continued staffing issues" and "ha[d] now reached a point where I am unable to provide appropriate patient care given the decisions being made." ECF 14-4 at 87–88.

Dr. Ehrlich, then-chair of the department, was also critical of Kalantaripour. Kalantaripour alleges that Ehrlich yelled at her three times between July 2018 and her termination in March 2019. ECF 14-2 ¶ 96. On November 27, Ehrlich confronted her about scheduling in a "very disrespectful tone," which made Kalantaripour "feel very insecure." ECF 14-3 at 22. Kalantaripour says that Ehrlich was "very upset" and "yell[ed]" at her," ECF 14-4 at 13, and that she acted "very unprofessional." ECF 14-3 at 22. Ehrlich again yelled at Kalantaripour during a faculty meeting the next day, purportedly about scheduling and the need to order supplies. Kalantaripour described the interaction to MFA's human resources staff as "unpleasant and unprofessional." ECF 14-4 at 83. Kalantaripour was not the only one who had complained about Ehrlich's behavior. Patel had complained to Hoffpauir on November 14 about Ehrlich's behavior with staff. ECF 14-7 at 3;

ECF 14-2 ¶ 22; ECF 15-1 ¶ 22 (failing to dispute that Patel complained about Ehrlich's treatment of staff). Elizabeth Hazuka also had previously complained about Ehrlich's treatment of staff, which MFA had investigated in July and August 2018, and found that Ehrlich "consistent[ly], regular[ly], and nearly universal[ly]" "berat[ed] staff, providers, residents, and medical students." ECF 15-2 at 119.

### 2. *Surgical Implement Ordering Incident*

On January 10, 2019, Dr. Patel emailed Kalantaripour and Saks regarding an order of surgical instruments. Saks was out of the office, but Patel stated to Kalantaripour that "[Saks] instructed us to move forward with" the order, and asked Kalantaripour to "please let me know how we can quickly move forward with placing the order." ECF 17-2 at 5–6. Kalantaripour did not respond to Patel, and Patel followed up on January 22, saying to Kalantaripour, "I have not received a response or confirmation of this order from you." ECF 14-4 at 93. He asked her whether "you were able to speak with [Saks] and confirm and/or place the order." *Id.* In her January 22 response to Patel, Kalantaripour stated that "I have placed the order," but noted that "purchasing h[ad] requested more information which we are working on." *Id.* at 92. Patel asked Kalantaripour to clarify "when the order was placed." *Id.* She responded on January 23 saying, "[n]o need to bore you with the process," but that she "w[ould] try to rush the order." *Id.* Patel again asked Kalantaripour, now copying McClain, to "clarify the date the order was submitted." *Id.* at 91. In response, Kalantaripour again did not say when the order was submitted, but noted that it was a "big order for a department that isn't doing well financially," and that she would inform Patel when she heard an update. *Id.* McClain weighed in, and said that "[she] just spoke with Purchasing," and that the "order was just submitted on 1/23/19." *Id.* at 90.

Later that day, Patel forwarded an email to McClain which, according to Patel, regarded "another example of the issues with [Kalantaripour]," where she had not "respond[ed] and d[id] not address my questions." ECF 14-7 at 24. Shortly afterwards, McClain sent Kalantaripour a letter criticizing her handling of the supply order. McClain stated that Patel had asked Kalantaripour to place the order two weeks prior, but "only after [Patel] asked for [the order's] status, you responded that the instruments had been ordered," yet "[p]urchasing confirmed the order was just submitted . . . almost two weeks later." ECF 14-4 at 95. McClain stated that Kalantaripour's handling of the incident was "not acceptable," and was an "example of similar behavior the physicians have expressed to me—lack of responsiveness, poor follow-up[,] and communication." *Id.*

### 3. Performance Improvement Plan and Termination

On February 14, Kalantaripour was placed on a performance improvement plan (PIP) by Saks and McClain. ECF 14-2 ¶¶ 72–73. The memorandum assigning the PIP stated that Kalantaripour was "not meeting the expectations of [her] position as Practice Manager," and identified two areas for improvement: (1) "Communication and Follow up" and (2) "Collaboration." ECF 14-5 at 26–27. As to communication, the memorandum stated that "[t]imely communication and follow up is lacking," and that there had been a "lack of full transparency in" Kalantaripour's communications, leading "the parties with whom [she] communicate[d] to believe that actions or activities are complete or near completion when in reality they are not." *Id.* at 26. The memorandum cited, among other examples, Kalantaripour's handling of the ordering of Patel's surgical implements, and claimed that because the order was not placed until "at least January 22nd," the delay had "jeopardized several cases [Patel] had scheduled for January 31," although the memorandum acknowledged the order did indeed arrive in time. *Id.* As to collaboration, the memorandum stated that "many department members have lost respect for you,"

and urged Kalantaripour to better "communicate with employees" and "build[] more positive relationships with . . . staff." *Id.* at 27.[5]

After the PIP was issued, staff continued to complain about Kalantaripour's performance. Elizabeth Hazuka emailed Dr. Friedman about "Continued Problems with Nasrin [Kalantaripour]," which included several purported incidents where Kalantaripour had made mistakes regarding scheduling, including issues regarding Kalantaripour's opening of the "wrong resident's schedule for April." ECF 14-8 at 8–9.[6] Hazuka stated her belief that "[Kalantaripour] will lie to patients and staff directly and will not admit to making any mistakes." *Id.* Friedman forwarded these concerns to Saks. *Id.*

McClain and Saks subsequently made the decision to fire Kalantaripour, and her employment with MFA was terminated on March 22, 2019. ECF 14-2 ¶¶ 82–84. The termination letter stated that she was terminated for a failure to "satisfactorily demonstrate the ability to meet expectations as stipulated in [her PIP]." *Id.* ¶ 84. Saks and Hoffpauir met with Kalantaripour that day to provide her the notice of termination. ECF 14-5 at 24. At the meeting, Saks told Kalantaripour that MFA had not "seen the kind of . . . improvement we were looking for from you during the period of this PIP," and as a result, MFA had "to terminate [her] employment here today." Pl.'s Ex. 33 at 0:42–47, 1:27–33.[7]

---

[5] While Kalantaripour disputes that the facts of her performance as stated in the PIP were accurate and claims that the PIP was based on "false descriptions of [her] work performance and alleged untrustworthiness," she does not dispute that she was assigned the PIP and that it stated the above critiques about her performance. ECF 15-1 ¶¶ 76–78.

[6] Kalantaripour argues that Hazuka's criticism in this email was "false and inaccurate," but she only offers evidence to disprove Hazuka's criticisms regarding the scheduling of one of the medical assistants. ECF 15-1 ¶ 81. Kalantaripour does not provide any evidence to contest Hazuka's critiques about the errors with the medical residents' schedules.

[7] Plaintiff originally included a link to an audio recording of this conversation as part of her summary judgment opposition exhibits. *See* ECF 15-2 at 217 (citing this file as Plaintiff's Exhibit 33). At the time of the Court's review, the link to the file was not operational. At the Court's request, Plaintiff sent the Court and opposing counsel a copy of this audio file, which the Court will refer to hereinafter as Plaintiff's Exhibit 33. Plaintiff also sent a copy of another

In response, Kalantaripour told Saks and Hoffpauir that she "th[ought] the whole thing was unfair," and that "I was discriminated against, and that's all I can say." *Id.* at 1:42–53.

### B. Procedural History

At some time before this lawsuit, Plaintiff filed a complaint with the Equal Opportunity Employment Commission.[8] Kalantaripour then filed suit against MFA in the Superior Court of the District of Columbia. ECF 1-2. Kalantaripour alleged race, sex, and national origin discrimination and retaliation under Title VII, and race discrimination and retaliation under 42 U.S.C. § 1981. *See* ECF 1-2 ¶¶ 33–60. MFA removed the action to this Court based on diversity of citizenship and answered the complaint. ECF 1; ECF 5. After the conclusion of discovery, MFA filed a motion for summary judgment, ECF 14, which Kalantaripour opposes, ECF 15.

## II.    LEGAL STANDARD

### A. Rule 56

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

audio file featuring a discussion between Plaintiff and Dr. Friedman, which the Court refers to as Plaintiff's Exhibit 25.

[8] The EEOC charge does not appear in the summary judgment record. MFA admits that Kalantaripour filed an EEOC charge regarding at least some of her treatment at MFA. *See* ECF 14-1 at 35–36. However, MFA asserts that the EEOC charge does not contain any mention of Kalantaripour's treatment by Dr. Ehrlich, and that any claims based on Ehrlich's conduct under Title VII are barred for failure to exhaust. *Id.* at 24 n.4; *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (requiring administrative exhaustion of Title VII claims). In response, Kalantaripour claims merely that she "exhausted all administrative remedies prior to filing this suit." ECF 15 at 15. The dispute is difficult to resolve given that neither party has provided the EEOC charge as part of the summary judgment exhibits. *See* ECF 14-1 at 36 (citing to "SOMF, Ex. 2 pg. 243-244, Ex. 25 and 26," documents that do not appear in the record in this case). However, because Title VII exhaustion is a non-jurisdictional affirmative defense that MFA bears the burden of pleading and proving, *see Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997), MFA's failure to put the charge into the record means that the Court "will assume" for the purposes of resolving the motion that Kalantaripour exhausted her remedies with respect to Ehrlich's conduct, *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 314 n.52 (D.D.C. 2015). The Court finds that this decision makes no practical difference to the resolution of this case given that the Court dismisses all of Kalantaripour's claims.

law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

A party that moves for summary judgment must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, it falls to the nonmoving party to establish that a genuine dispute exists regarding a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). To do so, the nonmoving party must demonstrate that "there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party." *Talavera*, 638 F.3d at 308 (quoting *Anderson*, 477 U.S. at 249). The nonmoving party must produce more than a "scintilla of evidence" in support of its positions, *Anderson*, 477 U.S. at 252, and its evidence must consist of more than unsupported allegations or denials, *see Celotex*, 477 U.S. at 322 n.3 (citing Fed. R. Civ. P. 56(e)). If the evidence the nonmoving party cites is "merely colorable" or "not significantly probative," summary judgment may be granted in favor of the moving party. *Anderson*, 477 U.S. at 249–50.

In making their arguments for or against summary judgment, both parties are responsible for pointing the Court to specific evidence in the record that supports their positions. Fed. R. Civ. P. 56(c)(1)(A); *see also Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009). "[E]vidence laying dormant in the record is not enough." *Potter*, 558 F.3d at 550. "[T]he district

court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make its own analysis . . . of what may, or may not, be a genuine issue of material disputed fact." *Id.*

### B.  Title VII

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and from retaliating against an employee for "oppos[ing] any practice" made unlawful by Title VII, *id.* § 2000e-3(a). Courts generally evaluate Title VII discrimination and retaliation claims using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To make out a prima facie discrimination claim, the plaintiff must show that "(1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class)." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). And to establish a Tile VII retaliation claim, a plaintiff must demonstrate that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). The burden then shifts to the employer to present a legitimate, nondiscriminatory (or nonretaliatory) justification for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802.

However, if the employer articulates a legitimate, nondiscriminatory reason for the challenged action, the *McDonnell Douglas* framework falls away. *Figueroa v. Pompeo*, 923 F.3d 1078, 1086–87 (D.C. Cir. 2019). Instead, the court simply asks: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory

reason was not the actual reason[,] and that the employer intentionally discriminated [or retaliated] against the employee?" *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying *Brady* to retaliation claims).

To show that the employer's stated reasons were pretextual, a plaintiff may cite "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or [its] pattern of poor treatment of other employees in the same protected group . . . or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). In the context of retaliation, "[t]he temporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation," *id.*, although temporal proximity without more is insufficient to survive summary judgment, *see Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015).

Title VII also prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prevail on a hostile work environment claim, a plaintiff must show that "she was subjected to discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014). That requirement includes both a subjective and objective element. *See Harris*, 510 U.S. at 21–22. In other words, even if an employee subjectively views her environment as abusive, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* at 21. Neither the

"ordinary tribulations of the workplace" nor "petty insults, vindictive behavior, and angry recriminations" are sufficient. *Brooks*, 748 F.3d at 1277–78 (first quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); then quoting *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 74 (1st Cir. 2011)). This analysis requires the Court to look "at all the circumstances, including the frequency of the [alleged] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007) (quoting *Faragher*, 524 U.S. at 787–88).

### C.  42 U.S.C. § 1981

Section 1981 protects the rights of all persons to "make and enforce contracts." 42 U.S.C. § 1981(a). The statute's "prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship, including discriminatory contract terminations." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 302 (1994). And as with Title VII, "Section 1981 can encompass employment discrimination and retaliation claims." *Olatunji v. District of Columbia*, 958 F. Supp. 2d 27, 31 (D.D.C. 2013); *see CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 450–52 (2008).

"Courts analyze Title VII and Section 1981 employment discrimination claims under similar legal standards," *Olatunji*, 958 F. Supp. 2d at 31, and the *McDonnell Douglas* framework also applies to Section 1981 race discrimination claims, *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). Like under Title VII, if the employer has presented evidence of a legitimate, nondiscriminatory reason for their action, the plaintiff bears the ultimate burden of showing that the defendant's proffered reasons were a pretext for unlawful discrimination. *Barbour v. Merrill*, 48 F.3d 1270, 1276 (D.C. Cir. 1995).

### III.    ANALYSIS

### A.  Disparate Treatment

Kalantaripour first alleges that MFA subjected her to disparate treatment based on her race, national origin, and sex. ECF 1-2 ¶ 37 (alleging race, national origin, and sex discrimination under Title VII); *id.* ¶ 51 (alleging race discrimination under Section 1981).[9]

A plaintiff alleging discrimination must offer sufficient evidence to "permit a reasonable jury to find that she suffered some adverse employment action," meaning that she was "denied 'the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship,' or was discriminated against in the 'compensation, terms, conditions, or privileges of employment.'" *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 76–77 (D.D.C. 2024) (first citing 42 U.S.C. § 1981(b); then citing 42 U.S.C. § 2000e-2(a)(1)); *see also Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024) ("To make out a Title VII discrimination claim, a [plaintiff] must show some harm respecting an identifiable term or condition of employment.").

Kalantaripour's termination, including the PIP that ultimately led to her firing,[10] is the

---

[9] While Kalantaripour raises all three protected categories in her complaint, and puts forward evidence and arguments regarding discrimination based on race and national origin, the Court finds the record to be devoid of evidence or arguments regarding the claim that her sex was specifically a motivating factor of her disparate treatment.

[10] In *Muldrow v. City of St. Louis*, the Supreme Court held that an adverse employment action for Title VII discrimination purposes need only represent "some harm respecting an identifiable term or condition of employment," 601 U.S. at 354–55, a ruling consistent with the D.C. Circuit's holding in *Chambers v. District of Columbia*, which held that the "terms, conditions, or privileges of employment," standard is "capacious, and evince[s] [Congress's] intent to strike at the entire spectrum of disparate treatment in employment," 35 F.4th 870, 874 (D.C. Cir. 2022) (en banc). Nevertheless, "not everything that happens at the workplace affects an employee's terms, conditions, or privileges of employment." *Id.* Courts after *Chambers* and *Muldrow* have come to different conclusions regarding whether placement on a PIP alone or similar negative feedback qualifies as an adverse action under this standard. *Compare CLASP v. Hassan*, No. 25-cv-1197, 2025 WL 3062911, at *12 (D.D.C. Nov. 3, 2025) (finding, post-*Muldrow*, that while being placed on a PIP may increase stress and pressure on an employee, "that is presumably true of every PIP and without more does not make the PIP an adverse employment action," although not addressing whether *Muldrow* or *Chambers* impacted the analysis), *with Abdelhamid v. Lane Constr. Corp.*, 744 F. Supp. 3d 10, 18 (D.D.C. 2024) (stating that "placement on a PIP is an adverse employment action under *Muldrow*"), *and Achoe v. Gensler*, No. 21- cv-1256, 2022 WL 16569241, at *4 (D.D.C. Sept. 29, 2022) (assuming, post-*Chambers*, that placement on a PIP qualified as an adverse employment action, without deciding the issue). Some Courts have found, post-*Chambers* and *Muldrow*, that while a formal reprimand alone is not necessarily actionable, "[a] formal reprimand can be an

relevant adverse action in this case.[11] The decision to place Kalantaripour on a PIP and to subsequently terminate her was made jointly by McClain and Saks. ECF 14-3 ¶¶ 9, 12. MFA argues that McClain and Saks had a "legitimate, non-discriminatory reason for" their decision: Kalantaripour's poor performance. *Brady*, 520 F.3d at 494; ECF 14-1 at 14; *see* ECF 14-3 ¶ 9 (stating that Kalantaripour was placed on a PIP "[b]ased on [her] poor performance"); ECF 14-4 at 99 (termination letter stating that Kalantaripour was terminated "due to a failure to satisfactorily demonstrate the ability to meet expectations as stipulated in [her PIP]"); ECF 14-3 at 3. In light of this asserted "non-discriminatory reason" for Kalantaripour's termination, the Court must determine whether Kalantaripour has "produced sufficient evidence for a reasonable jury to find that [MFA]'s" proffered reason "was not the actual reason and that [MFA] intentionally discriminated against [Kalantaripour] on the basis of" protected characteristics." *Brady*, 520 F.3d at 494.

"When determining whether summary judgment or judgment as a matter of law is warranted for the employer, the court considers all relevant evidence presented by the plaintiff and defendant." *Brady*, 520 F.3d at 495. As discussed above, there is substantial, uncontroverted

---

adverse action, however, if it serves as a 'building block' that justifies an adverse action down the road." *Holmes v. Wash. Metro. Area Transit Auth.*, 723 F. Supp. 3d 1, 17 (D.D.C. 2024). The Court need not resolve this question here. Defendant does not argue that Plaintiff's placement on a PIP, which undisputedly led to her termination, is not an adverse action giving rise to a disparate treatment claim. Further, it is not clear to the Court that Plaintiff is challenging the PIP as a discrete action separate and apart from the termination. Both Parties talk about the PIP and Plaintiff's firing collectively—the PIP is part of the process that resulted in Plaintiff's termination challenged in this lawsuit. Defendant's evidence regarding the reasons for its actions and Plaintiff's evidence of pretext are the same for both the PIP and termination, and the Court cannot reasonably analyze these actions separately. Accordingly, the Court's discussion of Plaintiff's termination also incorporates the fact that she was placed on a PIP for alleged performance issues before being fired.

[11] The relevant paragraphs of the complaint also refer to MFA's alleged "fail[ure] to take actions to investigate her claims of discrimination and protect her against Dr. Ehrlich and Dr. Patel," but the Court does not understand Kalantaripour's complaint to be challenging Defendant's alleged failure to investigate her claims as a discrete, adverse action. ECF 1-2 ¶¶ 37, 51. The Court understands Plaintiff's reference to Defendant's failures to investigate as evidence that MFA's stated reasons for firing Kalantaripour were pretextual. *See, e.g.*, ECF 15 at 30–35. Indeed, the Court notes that at least one court in this District has rejected the argument that such a failure to investigate would qualify as an adverse action following *Chambers* and *Muldrow*. *See Stewart v. U.S. Dep't of Agric.*, No. 23-cv-1194, 2024 WL 4332618, at *5 (D.D.C. Sept. 27, 2024) (citing *Holmes*, 723 F. Supp. 3d at 17).

evidence in the record demonstrating that Kalantaripour's coworkers raised concerns about her job performance after she began working with MFA's Dermatology department, many of those complaints which were specifically shared with Saks and McClain. *See supra* Section I.A. Saks and McClain also personally noted problems with Kalantaripour's performance, including her communications issues while handling Patel's surgical instrument order. ECF 14-4 at 95; ECF 14-5 at 26–27. McClain and Saks submitted declarations to this effect, and Saks testified in his deposition that their decision to terminate Kalantaripour was based on these performance issues, complaints from providers in the department, and her handling of the surgical instrument order. ECF 14-3 at 3; ECF 14-5 at 21; ECF 14-10 ¶ 4.

"Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). Kalantaripour fails to show that MFA terminated her for reasons other than its assessment of her performance—let alone for unlawful discrimination. First, the record contains no "direct evidence of discrimination" by Saks and McClain that would undermine their proffered reason for terminating Kalantaripour. *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). Kalantaripour's arguments regarding Saks also "face[] a significant initial hurdle in that [Saks] himself" had recruited Kalantaripour and been part of the team that hired her "less than a year before her dismissal." *Id.*; *see Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to that person an invidious motivation that would be inconsistent with the decision to hire, especially when the firing has occurred only a short time after the hiring."). Kalantaripour submits

deposition testimony of another former employee, an African-American woman, who states that "[Saks] is as nasty and mean as a racist." ECF 15-2 at 38; ECF 15 at 5. While evidence of Saks's poor treatment of other employees in the same protected class could in theory be indirect evidence of discrimination that might support a finding of pretext in Kalantaripour's case, *see Walker*, 798 F.3d at 1092, the deposition testimony cited falls far short of doing so. The deponent's general opinion that Saks was racist is not substantiated by any specific statements attributed to Saks and appears to be largely drawn from the opinions of unidentified third parties. ECF 15-2 at 39, 41. Moreover, the sole cited specific example of personal treatment of the deponent by Saks—a failure to meet one-on-one with her—is not evidence of discriminatory treatment against members of Plaintiff's protected class such that the testimony would be relevant at trial, let alone support a reasonable inference of Saks's discriminatory animus against Kalantaripour. *Id.* at 38. And to return to the direct evidence regarding Saks's treatment of Kalantaripour, it cuts the other way. When asked at her deposition whether "Adrien Saks discriminated against [her]," Kalantaripour answered: "[I] did not get the sense that he discriminated, based on my observation." ECF 14-4 at 68.

Kalantaripour also focuses on her treatment by Patel and Ehrlich. While Ehrlich and Patel did not make the decision to fire Kalantaripour, and "[o]rdinarily, a discrimination plaintiff must show that *the decisionmaker*" did the discriminating, *Onyebuchi v. Howard Univ. Hosp.*, 731 F. Supp. 3d 1, 8 (D.D.C. 2024), MFA may be liable if a "formal decision maker" is an "unwitting conduit of another actor's illicit motives," *Walker*, 798 F.3d at 1095, or that biased actor was an "integral part of the decision-making process that led to [the] discharge," *Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1311 (D.C. Cir. 1998). Patel in particular provided many of the critiques of Kalantaripour and was involved in the surgical implement incident. But Kalantaripour

stated that she could not recall any instance of Ehrlich and Patel expressly mentioning her national origin, race, or gender during their outbursts against her or at any other point. ECF 14-4 at 10–11, 50–51. Kalantaripour instead testified that Ehrlich and Patel repeatedly told her that she was not "understanding[] what [they] were saying," or that they were not "understand[ing] [her]," *id.* at 21, 50, which she construed as a veiled commentary on her accent or her national origin. In her summary judgment briefing she claims that "Dr. Patel, in particular, would mock [her] when she would speak and pretend that he did not understand her, using her accent as an excuse to discriminate against her." *See* ECF 15 at 6. But Kalantaripour never points to any evidence in the record—including her own deposition testimony—supporting her conclusory characterization of these conversations as Patel "mock[ing]" her accent.[12] *Id.*; *see Vatel v. All. of Auto. Mfrs.*, 679 F. Supp. 2d 15, 18 (D.D.C. 2010) ("[Plaintiff's] arguments are simply that; they are not evidence and do not help her carry her burden on summary judgment."), *aff'd*, 627 F.3d 1245 (D.C. Cir. 2011). When reviewing Kalantaripour's descriptions of her actual interactions with Patel and Ehrlich— and even accepting all her descriptions of the interactions as true—the Court cannot reasonably draw the inference that she desires. Absent some additional context regarding these conversations (which Kalantaripour has not provided), a reasonable jury could not find that Ehrlich and Patel's references to miscommunications and understanding, alone, qualified as them mocking her accent or blaming her national origin for the perceived communications failures.

.

---

[12] To support this claim, Kalantaripour cites to "Pl.'s' Ex. 1 ¶ 1," which appears to be answers to a set of interrogatories. In these interrogatories, she only mentions reference to her accent when stating that another employee at MFA, Nancy McCormack, told her that she believed that "if Plaintiff were American and did not have an accent she would have been treated differently." ECF 15-2 at 65–66. Plaintiff provides no record evidence to support this claim that could be put in admissible form, such as testimony of McCormick providing the basis for her belief.

Again, Kalantaripour need not show direct evidence of discrimination to show that MFA's reason for terminating her was pretextual. She could show that MFA "is making up or lying about the underlying facts that formed the predicate for the" decision to terminate her. *Brady*, 520 F.3d at 495. But she still must contend with the fact that an "employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George*, 407 F.3d at 415. Kalantaripour barely provides evidence to show that the many concerns raised by her coworkers were false, let alone that McClain and Saks did not believe these performance issues were true and merited her placement on the PIP and termination. *See Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts."). She argues that the many critiques of her performance were manufactured as part of "MFA's plot to make [her] work performance look poor," and claims that she was "unfairly held responsible for staffing issues that were out of her control and that negatively affected her own work as Practice Manager." ECF 15 at 22. But she fails to provide *any* evidence to contradict MFA's version of the facts underlying many of her performance critiques, such as Patel's concerns regarding Kalantaripour's handling of the onboarding process for new staff and her non-responsiveness to his questions, *compare* ECF 14-2 ¶ 16, *with* ECF 15-1 ¶ 16, and Elizabeth Hazuka's allegation that following Kalantaripour's placement on a PIP, she opened the "wrong resident's schedule for April," ECF 14-8 at 8–9.[13]

---

[13] Kalantaripour attempts to dispute the factual basis for Patel's mid-November complaints about her scheduling. *See, e.g.*, ECF 14-4 at 76 (November 7 email from Patel claiming that "[m]y schedule for Thursday has still not been corrected as we discussed last week"). Kalantaripour claims that in early November 2018, Patel wrote his preferred schedule out for her, and that she followed the schedule as Patel presented it, ECF 14-4 at 39, with the implication being that any issues with the schedule were either Patel's fault or manufactured by him as a pretext to criticize Kalantaripour, *see* ECF 15 at 7. As evidence, she cites to a document that she claims is the schedule as written by Patel, but does not explain how the schedule disproves Patel's claims about her scheduling decisions. *See* ECF 15-2 at 110. Nor is it clear from the face of the document as to why Patel's account of events is false. While the Court views

As to the incident regarding the ordering of surgical instruments, Kalantaripour denies that she misled Patel about the date that the order for surgical implements was placed. In her response to MFA's statement of facts, she states that she "called and spoke to the purchasing Department and later emailed a purchasing order" on "January 22" rather than on January 23 as McClain stated in her January 23 email. *See* ECF 15-1 ¶ 66. But the only evidence Kalantaripour cites is the same email chain between Patel, Kalantaripour, Saks, and McClain in which she states, on January 22, that "I have placed the order." ECF 15-2 at 158–59. And contemporaneous emails show that following McClain's January 23 email that the "order was just submitted on 1/23/19" and "was rejected for wrong cost center," Kalantaripour did not contest McClain's description of the events at the time, and simply responded, "[y]es, I rejected the order since the wrong cost center was used." ECF 14-3 at 8. The Court thus does not view the January 23 order submission date as being genuinely in dispute. And even if Kalantaripour had indeed placed the order on January 22, the record still demonstrates that Kalantaripour failed to respond to Patel's initial email regarding the status of the order for almost two weeks, and then seemingly avoided answering Patel's direct questions about when the order was placed, which is entirely consistent with McClain's subsequent assessment in her performance counseling letter that Kalantaripour exhibited a "lack of responsiveness, poor follow-up and communication." ECF 14-4 at 95. Again, the question is not "whether [Kalantaripour's performance] in fact" was poor, but whether MFA's "decision-makers

---

the evidence in the record in the light most favorable to Kalantaripour as the nonmoving party, see *Talavera*, 638 F.3d at 308, it must rely on her legal arguments to understand how her proffered evidence creates a genuine dispute. It would be improper for the Court to speculate about how and why this difficult-to-decipher document contradicts Patel's version of the scheduling disputes. *See Stephenson v. Cox*, 223 F. Supp. 2d 119, 122 (D.D.C. 2002) ("The court's role is not to act as an advocate for the plaintiff and construct legal arguments on h[er] behalf."); *Potter*, 558 F.3d at 553 (Williams, J., concurring) ("[J]udges 'are not like pigs, hunting for truffles buried in briefs' or the record." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

honestly and reasonably believed it was." *Evans v. District of Columbia*, 219 F. Supp. 3d 99, 107 (D.D.C. 2016).

Kalantaripour's other attempts at showing pretext are not availing. She attempts to rehabilitate her job performance by pointing to evidence that Saks told her in a text message on November 27 that she was "doing great." ECF 15-2 at 18. But the comment by Saks that she was "doing great," occurred before many of the purported incidents of her poor performance and cannot serve to dispute those events—including critiques by Saks himself in the PIP. Kalantaripour also points to a recording of a conversation she had with Dr. Friedman following her placement on the PIP, where Friedman told Kalantaripour that she was "thrown into a really untenable situation," and that she was "handed the reins to a sinking ship," and that this "wasn't the job that [she was] meant to do," and that she had "handled [herself] pretty well given the situation." Pl.'s Ex. 25 at 3:32–4:20. Friedman's comments, even if construed as a positive evaluation of Kalantaripour's post-PIP performance, are insufficient to demonstrate pretext on the part of Saks and McClain, "especially when the record contains numerous negative" statements about Kalantaripour's performance, including during the period of time that she was on the PIP. *Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 41 (D.D.C. 2014). Kalantaripour also points to patient survey results that she claims shows that MFA's Dermatology department improved on certain metrics during her tenure. ECF 15-2 at 104. These survey results, which rate the department's performance overall on broad categories, like "[e]ase of getting [the] clinic on [the] phone," *id.*, do not speak to Kalantaripour's personal performance, let alone address the concerns about communication and collaboration between MFA staff that provided the basis for Kalantaripour's PIP, ECF 14-4 at 96–97.

Kalantaripour also fails to show that Saks and McClain "treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual

circumstances." *Brady*, 520 F.3d at 495. For the comparison to be apt, the "plaintiff must demonstrate that all relevant aspects of [her] employment situation were 'nearly identical' to those of the other employees. *Clarke v. Wash. Metro. Area Transit Auth*., 904 F. Supp. 2d 11, 17 (D.D.C. 2012) (quoting *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008)), *aff'd*, 540 F. App'x 3 (D.C. Cir. 2013). Kalantaripour fails to identify similarly situated comparators. In her deposition, she admits that she was not aware of any MFA employees who had a similar number of complaints as her and were also not terminated. ECF 14-4 at 49–50. Kalantaripour argues that she was treated less favorably than Elizabeth Hazuka, an MFA employee outside her protected class, in that MFA more exhaustively investigated Hazuka's complaints against Dr. Ehrlich than it did Kalantaripour's complaints. ECF 15 at 33. But even if true, this evidence does not support an indirect finding of pretext regarding Kalantaripour's termination—the relevant employment decision—given that it speaks to an entirely different set of "factual circumstances." *Brady*, 520 F.3d at 495.

Relatedly, an employee may also show pretext by presenting evidence of "the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff." *Dodson v. U.S. Cap. Police*, 633 F. Supp. 3d 235, 253 (D.D.C. 2022). Kalantaripour points to the experience of two former MFA employees of purported "Middle Eastern Asian Descent," Azeddine Khechmoune and Shamsun Nahar, that she alleges were also mistreated by MFA. ECF 15 at 26. Of the two, Khechmoune was also subject to performance-related criticism by Patel and subsequently terminated. *Id.* But again, Patel was not the decisionmaker in Kalantaripour's case, and thus the termination of Khechmoune does not raise an inference of discrimination by McClain and Saks. As for Nahar, Kalantaripour does not present evidence that she was either terminated or placed on a PIP. *See* ECF 15-2 at 195; ECF 15 at 26 (stating that Nahar "submitted

her resignation letter to MFA"). A bigger hurdle is that given the scant details provided about these two employees, a "reasonable jury would be unable to assess whether [MFA] treated [these employees] differently than [Kalantaripour's] . . . counterparts, or even similarly to [Kalantaripour]," and thus this evidence does not weigh in favor of denying summary judgment. *Huckstep v. Wash. Metro. Area Transit Auth.*, 216 F. Supp. 3d 69, 83 (D.D.C. 2016); *see also Vatel*, 679 F. Supp. 2d at 18 (noting the "doubtful probative value to . . . a small sample size," and finding even that minimal probative value diminished when the sample size is "an incomplete snapshot") (citing *Mayor of Philadelphia v. Educ. Equal. League*, 415 U.S. 605, 620–21 (1974)).[14]

Finally, Kalantaripour argues that she has shown pretext because MFA failed to "follow established procedures" in its treatment of her. *Brady*, 520 F.3d at 495 n.3. She raises as evidence MFA's alleged failure to investigate her complaints against Ehrlich and Patel to the same degree that it did for the complaints by Hazuka against Ehrlich. ECF 15 at 34. But Kalantaripour does not demonstrate that there were "established procedures" that dictated the form and scope necessary for investigations of complaints such as the ones she made about Patel and Ehrlich. *Brady*, 520 F.3d at 495. MFA's "Harassment Prevention Policy" states that MFA provides a "work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive." ECF 14-4 at 71. However, as to investigations, it states merely that "possible sexual or other unlawful harassment" will be "investigated in a timely and confidential manner." *Id.*[15] Kalantaripour thus does not show that MFA failed to follow established procedures.

---

[14] An additional hurdle, at least with respect to the evidence regarding Nahar's treatment, is that Plaintiff relies entirely on statements that are inadmissible hearsay.

[15] Kalantaripour also claims that Patel deviated from "standard MFA procedures" in his treatment of her "in order to make [her] work performance look poor," by contradicting his own instructions to her about scheduling and later

When evaluating a discrimination claim at the summary judgment stage, a "court must 'consider all the evidence, taken together,' and assess whether it is sufficient to support a reasonable inference of discrimination." *Williams v. Verizon Washington, D.C. Inc.*, 304 F. Supp. 3d 183, 200 (D.D.C. 2018) (K.B. Jackson, J.) (quoting *Jones*, 557 F.3d at 678). "Thus, even for plaintiffs who create some genuine issue of material fact as to pretext, not every one 'will always be deemed to have presented enough evidence to survive summary judgment.'" *Id.* (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)). Even when the evidence is viewed in the light most favorable to Kalantaripour, the record "conclusively reveals some other, nondiscriminatory reason for the employer's decision"—MFA's genuine belief in her perceived performance issues. *Id.* (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)). Because Kalantaripour has not provided evidence that would be sufficient for a reasonable jury to conclude that MFA's purported reasons for her termination were mere pretext, her discrimination claim based on her termination fails as a matter of law. *See id.*

### B.  Hostile Work Environment

Kalantaripour also alleges that MFA subjected her to a hostile work environment. ECF 1-2 ¶¶ 37, 51. Kalantaripour's complaint and briefing are not entirely clear upon which specific treatment she premises her hostile work environment claim, but she frequently discusses Ehrlich and Patel's conduct—which, in her telling, involved repeatedly yelling at her, threatening her with discipline, and criticizing her job performance—as "discriminatory and hostile" behavior. ECF 15 at 39; *see also id.* at 7 (describing Ehrlich's treatment as "hostile and intimidating"); *id.* at 9 (describing a "hostile and abusive" interaction with Patel); *id.* at 12 (same).

---

blaming her for the errors. ECF 15 at 22. The Court does not find that Kalantaripour has presented evidence that MFA or Patel had "established procedures" regarding scheduling such that Patel's alleged deviation from the practices establishes pretext for discrimination. *Brady*, 520 F.3d at 495.

The Court does not find that this treatment amounted to "discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Brooks*, 748 F.3d at 1276. An employer may be held liable under Title VII and Section 1981 for harassment—but only harassment that would itself violate Title VII. *See Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013) ("[A]n employer is directly liable for an employee's *unlawful* harassment if the employer was negligent with respect to the offensive behavior." (emphasis added)). As the Court has discussed above, it has found no basis for a reasonable jury to find that Patel and Ehrlich's treatment of Kalantaripour was motivated by Kalantaripour's protected status, rather than their dissatisfaction with her perceived performance issues.

And even were Patel and Ehrich's treatment motivated by Kalantaripour's protected status, "[t]he bar for demonstrating a hostile work environment claim is a high one." *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016). Even construing the facts in the light most favorable to Kalantaripour, the Court cannot find that being yelled at about her job performance, both privately and in public, *see supra* Section I.A, meets the high standard required to show "intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of [Kalantaripour's] employment and create an abusive working environment." *Brooks*, 748 F.3d at 1276). MFA is entitled to summary judgment on the hostile working environment claims.[16]

---

[16] Kalantaripour's complaint also mentions the PIP, termination, and failure to investigate her complaints in the same paragraph as her allegation that MFA "subjected her to . . . a hostile work environment." ECF 1-2 ¶¶ 37, 51. The Court does not find that these actions can support her hostile work environment claim, either on their own or in conjunction with Ehrlich and Patel's conduct. This jurisdiction generally "frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of [discrimination] and retaliation into a broader hostile work environment claim," *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008), although a court may not "dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own," *Baird v. Gotbaum*, 662 F.3d 1246, 1252

### C. Retaliation

Kalantaripour also argues that MFA retaliated against her in violation of Title VII and Section 1981 by placing her on a PIP and terminating her employment in retaliation for her complaints about Patel and Ehrlich. ECF 1-2 ¶¶ 44, 58. To state a retaliation claim, she must allege that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) that a causal link connects the two. *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Libr. of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013).

The Court will grant summary judgment on these claims because Kalantaripour has not presented any evidence that she engaged in statutorily protected activity before her termination. "An activity is protected for the purposes of a retaliation claim if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006). "Not every complaint garners its author protection under Title VII." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination." *Id.*

Before she was placed on a PIP and terminated on March 22, 2019, Kalantaripour raised the issue of her treatment by Patel and Ehrlich with Human Resources on several occasions. *See, e.g.*, ECF 15-2 at 108, 114–15, 146, 147–48; ECF 14-2 ¶¶ 30, 33, 39, 41, 54. But of the complaints for which evidence exists in the record, Kalantaripour has failed to provide any basis to find that

---

(D.C. Cir. 2011). "Acts giving rise to a hostile work environment claim must collectively meet the independent requirements of that claim." *Id.* These remaining putative actions do not meet the standard in that plaintiff has not provided evidence that they were discriminatory, let alone that they were part of the sufficiently "severe or pervasive" discriminatory environment necessary to support a hostile work environment claim. *Id.* (citing *Harris*, 510 U.S. at 21); *see Holmes*, 723 F. Supp. 3d at 29 (finding that an employer's reprimands, reassignments, and failures to investigate complaints, were "work-related actions by supervisors that courts typically do not find to be sufficient for a hostile work environment claim"); *see also Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("The removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context.").

these complaints put MFA on notice that the conduct complained about involved discrimination on the basis of race, national origin, or sex.[17] *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 128 (D.D.C. 2015) ("[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.").

Take Kalantaripour's complaints about Ehrlich: In her November 28, 2018 email to Jennifer Hoffpauir in MFA's human resources department, Kalantaripour describes Ehrlich as acting "unprofessional toward me," speaking in a "very disrespectful tone," all of which had the result of making Kalantaripour "feel very insecure." ECF 14-3 at 22. Kalantaripour discussed the interaction with Hoffpauir the next day, but there is no evidence in the record demonstrating that Kalantaripour discussed unlawful discrimination as the basis for her complaint. Moreover, she sent a follow-up email to Hoffpauir where she merely described herself as being "wrongfully attacked and accused." ECF 14-4 at 82. In an email on December 2, 2018, Kalantaripour told Hoffpauir that she had an "unpleasant and unprofessional interaction," where Ehrlich slammed a catalog on a table in front of her and said, "[y]ou take care of this!" which left Kalantaripour "stunned." ECF 14-4 at 83. Kalantaripour stated that Ehrlich's actions were "not okay or acceptable" and that the Dermatology department was "not a healthy work environment." *Id.* None of these complaints or discussions raised Kalantaripour's protected characteristics as a basis for her treatment by Ehrlich, and they therefore amount to complaints about "unprofessional and abusive behavior,"

---

[17] Kalantaripour's complaint in this action mentions other times that she spoke with human resources staff regarding Patel that are not discussed previously in this opinion. *See* ECF 1-2 ¶¶ 14–15 (mentioning November 2 and November 5 emails to human resources staff about Patel, and stating that Kalantaripour had by that point "complained about his unacceptable behavior three previous times"). However, her materials in opposition to MFA's summary judgment motion provides no evidence as to the contents of those complaints and whether they raised unlawful discrimination as the basis for her treatment. *See* ECF 15-2 at 108 (November 5 email to HR referring to Kalantaripour's "interaction with Dr. Patel" and mentioning a discussion about the interaction, but providing no details about the contents of that discussion, including whether Kalantaripour raised the issue of unlawful discrimination). Similarly, Kalantaripour's opposition memorandum states that she met with Hoffpauir on March 4, 2019, to discuss her PIP and "raised concerns about discrimination," but in support merely cites to the memorandum assigning Kalantaripour the PIP. *See* ECF 15 at 14.

which are not themselves protected activity under Title VII and Section 1981. *See Welzel v. Bernstein*, 436 F. Supp. 2d 110, 122 (D.D.C. 2006).

The complaints about Patel suffer from the same defect. The record demonstrates that Kalantaripour informed Hoffpauir about Patel's December 4 outburst regarding her scheduling of Tony Garcia, the medical assistant. The record does not demonstrate exactly what Kalantaripour said to Hoffpauir, but Kalantaripour subsequently sent an email to Hoffpauir to "remind [her] of the incident t[hat] happened on Tuesday morning," in which she noted that Patel "got very upset," "raised his voice[,] and threat[ened]" that he would go to Kalantaripour's superiors. ECF 14-4 at 85. Kalantaripour noted that "this [was] not the first time" Patel raised his voice or threatened that "he would go to a higher authority if he d[idn't] get what he want[ed]." *Id.* Kalantaripour stated that she believed that his behavior "[wa]sn't acceptable," amounted to "humiliating and threat[en]ing staff," and was not "okay in any level and degree." *Id.* Like the complaints about Ehrlich, Kalantaripour's complaints do not qualify as protected activity because they do not indicate that her race, national origin, or sex was implicated in her treatment. *Broderick*, 437 F.3d at 1232 (noting that "complaining about being 'picked on,' without mentioning discrimination or otherwise indicating that gender was an issue, does not constitute protected activity, even if the employee honestly believes she is the subject of [unlawful] discrimination" (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727–28 (7th Cir. 2003)).

Kalantaripour presents evidence that she told at least one person, a fellow employee, that she believed that her treatment was due to her accent and national origin. ECF 15-2 at 35. But Kalantaripour presents no evidence that this employee ever spoke with anyone else on her behalf— let alone anyone involved in Kalantaripour's adverse employment actions—about the supposedly discriminatory nature of the treatment. Even if Kalantaripour genuinely believed that the treatment

by Patel and Ehrlich was based on her protected characteristics, "absent any indication that she communicated this belief to" individuals at MFA who later took adverse action, she has failed to show that her complaints constituted protected activity. *Clemmons*, 107 F. Supp. 3d at 130. Nor does the Court find that the details of the interactions with Patel and Ehrlich as relayed to the human resources staff would on their own infer or imply to Hoffpauir that Kalantaripour was really complaining about discrimination. *See Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 13 (D.D.C. 2006) ("The communication of a complaint of unlawful discrimination may be inferred or implied from the surrounding facts.").

Kalantaripour identifies a single instance where she complained about discrimination: a meeting on March 22, 2019 with Hoffpauir and Saks. The problem for Kalantaripour is that this meeting occurred *after* the decision had been made to terminate her and after she had indeed been told that she was terminated. A plaintiff "cannot make out a . . . case of retaliation [where] the only protected activity identified in the record . . . did not occur until after plaintiff had been terminated" because "there can be no inference of causality." *Marshall v. Potter*, 634 F. Supp. 2d 66, 73 (D.D.C. 2009). The decision to terminate Kalantaripour was made by McClain and Saks, ECF 14-3 at 3, and was formalized by the time Kalantaripour met with Saks and Hoffpauir on March 22. *See* ECF 14-4 at 99 (termination letter delivered to Kalantaripour on March 22, stating that "your employment relationship with [MFA] will end effective March 22, 2019"). At the March 22 meeting, Saks and Hoffpauir told Kalantaripour her employment was terminated. ECF 14-10 ¶ 7. It was only after the termination that Kalantaripour told Saks and Hoffpauir that she thought she had been discriminated against, by saying "I was discriminated against, and that's all I can say." Pl.'s Ex. 33 at 1:27–53. Kalantaripour followed up her statement by saying to Saks: "you know the conversation we had and everything so . . . nothing else to say." *Id.* at 1:54–2:05. Even

construed most favorably to Kalantaripour, her reference to a prior conversation does not make clear what the content of the prior conversation was and whether it even involved discrimination. And Kalantaripour does not affirmatively argue that this statement was referring to some prior complaint of discrimination she made to Saks. Kalantaripour thus does not genuinely dispute that her only discrimination complaint to her employer came after she was terminated.[18]

Because Kalantaripour cannot identify any protected complaints made while she was employed, and because the only arguable protected activity "followed all the alleged retaliatory acts," Kalantaripour cannot claim retaliation under Title VII and Section 1981. *Marshall*, 634 F. Supp. 2d at 73.

\*    \*    \*

For the foregoing reasons, Defendant's motion for summary judgment, ECF 14, is **GRANTED**, and the case is **DISMISSED**. A separate order accompanies this memorandum opinion.

   **SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: February 9, 2026

---

[18] In response to MFA's evidence regarding the timeline of her complaints, including the argument that she raised her concerns about discrimination only after she was terminated, Kalantaripour states that "Mr. Saks confirmed in his deposition that Plaintiff reported to him that she believed she was being discriminated against due to her race and national origin prior to her termination." ECF 15-1 ¶ 114. This misrepresents the record. The deposition testimony cited by Kalantaripour says nothing about any prior complaints of discrimination. Instead, it confirms that the only time Kalantaripour raised the issue of discrimination to Saks was in the termination meeting. *See* ECF 17-1 at 4–5.